# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| THE REINALT-THOMAS CORPORATION d/b/a DISCOUNT TIRE,<br><br>   Plaintiff,<br><br>v.<br><br>MAVIS TIRE SUPPLY LLC,<br><br>   Defendant. | Civil Action No. 1:18-cv-05877-TCB |

### DECLARATION OF MATTHEW G. EZELL.

1. I, Matthew G. Ezell, have been retained as an expert in this matter by counsel for Plaintiff The Reinalt-Thomas Corporation d/b/a Discount Tire.

2. Attached as Exhibit 1 to this declaration is a true and correct copy of my rebuttal expert report, which was served on counsel for Mavis Tire Supply LLC on April 1, 2019.

3. All statements made in the attached report are true and correct and are based on my personal knowledge.

I declare under the penalty of perjury under the law of the United States that the forgoing is true and correct.

Executed this 7th day of May, 2019.

_____
Matthew G. Ezell

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| THE REINALT-THOMAS CORPORATION d/b/a DISCOUNT TIRE, <br><br> Plaintiff, <br><br> v. <br><br> MAVIS TIRE SUPPLY LLC, <br><br> Defendant. | Civil Action No. 1:18-cv-05877-TCB <br><br> **REBUTTAL EXPERT REPORT OF MATTHEW G. EZELL** |

## INTRODUCTION

1. I am a partner in the marketing research and consulting firm of Ford Bubala & Associates, located in Huntington Beach, California, which has been engaged in commercial marketing research and consulting for the past forty-three years. My qualifications can be found in paragraphs 20 through 26 of my original expert report.

2. At the request of Kilpatrick Townsend & Stockton LLP, counsel for The Reinalt-Thomas Corporation ("Discount Tire" or "Plaintiff"), I am submitting this rebuttal expert report to address the "Rebuttal Study" described on pages 17-34 of the Declaration of Yoram (Jerry) Wind, PhD.

### THE FORD BUBALA & ASSOCIATES SURVEYS PROPERLY FOLLOW THE ESTABLISHED "TEFLON" FORMAT

3. As stated in my initial expert report in this matter, my late partner Dr. Gerald Ford designed and caused to be conducted a "Teflon" survey in 2013 (the "2013 Survey") to address the issue of the primary significance of DISCOUNT TIRE in thirty-seven markets across the United States. I subsequently designed and caused to be conducted a "Teflon" survey (the "2019 Survey") in connection with Plaintiff's Motion for Preliminary Injunction (the "PI

Motion") to address the issue of the primary significance of DISCOUNT TIRE to the relevant consuming public[1] in the markets that are the subject of the PI Motion, namely Atlanta, Jacksonville, and Orlando.

4. The 2013 Survey and 2019 Survey employed the well-established "Teflon" design because that design is generally accepted as a reliable methodology among trademark survey experts. The "Teflon" format has been widely used by experts for decades to test whether the primary significance of a term is as a brand (i.e., trademark) or common (i.e., generic) name.[2] Courts and the TTAB regularly accept and rely on "Teflon" surveys in genericness cases, including those involving non-coined terms.[3] Leading authors on trademark surveys have identified the "Teflon" design as one of the two most common survey methodologies used in trademark cases.[4]

---

[1] The universe for the Ford Bubala surveys is people who within the next two years are likely to purchase tires for a vehicle at a store that sells tires.

[2] See, e.g., *Rise-N-Shine, LLC v. Robin Duner-Fenter*, 2015 U.S. Dist. LEXIS 24601, (S.D.N.Y. 2015) (GO AWAY GRAY); *Pods Enterprises, Inc. v. U-Haul Int'l, Inc.*, No. 8:12-cv-01479-T-27, 2014 WL 2625297, at *1 (M.D. Fla. 2014) (PODS, noting the "general reliability of *Teflon* surveys cannot be questioned, given their wide acceptance"); *Amazon Technologies, Inc. v. Daigle*, 2013 TTAB LEXIS 298, (TTAB 2013) (WINDOW SHOPPING); *Invisible Fence, Inc. v. Fido's Fence, Inc.*, 2013 U.S. Dist. LEXIS 167642, (E.D. Tenn. 2013) (INVISIBLE FENCE); *The Great American Restaurant Co. v. Domino's Pizza LLC*, 2008 U.S. Dist. LEXIS 32495, (E.D. Tex. 2008) (BROOKLYN STYLE PIZZA); *SportsChannel Assocs. v. Comm'r of Patents & Trademarks*, 903 F. Supp. 418, 426 (E.D.N.Y. 1995) (SPORTS CHANNEL); *Windsurfing Int'l, Inc. v. Fred Ostermann GMBH*, 613 F. Supp. 933, 959 (S.D.N.Y. 1985) (WINDSURFER).

[3] See *E.I. du Pont de Nemours & Co. v. Yoshida International, Inc., et al.*, 393 F. Supp. 502 (E.D.N.Y. 1975); *Windsurfing International, Inc., et al. v. Fred Ostermann GmbH, et al.*, 613 F. Supp. 933 (S.D.N.Y. 1985); *In re Callaway Golf Company*, 2001 T.T.A.B. LEXIS 599 (T.T.A.B. 2001); *In re Country Music Association, Inc.*, 2011 T.T.A.B. LEXIS 343 (T.T.A.B. 2011); and *Elliot v. Google*, 45 F. Supp. 3d 1156 (D. Ariz. 2015), affirmed, United States Court of Appeals for the Ninth Circuit, May 16, 2017, 2017 U.S. App. LEXIS 8583. See *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 2008 U.S. Dist. LEXIS 78353 (C.D. Cal., 2008) ("Plaintiff has introduced evidence of a consumer survey…known as the 'Teflon Survey' design which has been accepted and given weight by the courts and is frequently cited…"), affirmed, 2009 U.S. App. LEXIS 10508; *Arrow Trading Co. v. Victorinox A.G.*, 2003 TTAB LEXIS 310 (T.T.A.B., 2003) ("[The] survey utilized the generally approved "Teflon Methodology"); and 15 U.S.C. § 1064(3) ("The primary significance of the registered mark to the relevant public...shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used.").

[4] *See, e.g.,* Jay, E Deborah. "Genericness Survey in Trademark Disputes: Under the Gavel." *Trademark and Deceptive Advertising Surveys Law, Science, and Design*, edited by Shari S. Diamond and Jerre B. Swann, ABA Publ., 2012, at 112-124 (hereinafter "E.D. Jay"); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §12:16, at 12-63 (5th Rel. 2018).

5. The results of the 2013 Survey support a finding that the primary significance of DISCOUNT TIRE in thirty-seven markets across the United States is that of a brand name or trademark and not of a generic term. Additionally, the magnitude of acquired distinctiveness or secondary meaning evidenced by the 2013 Survey results support a finding that DISCOUNT TIRE is a strong and famous mark among relevant consumers in those markets.

6. The results of the 2019 Survey support a finding that the primary significance of DISCOUNT TIRE in the metropolitan areas of Atlanta, Jacksonville, and Orlando is that of a brand name or trademark and not that of a generic term. Additionally, the magnitude of acquired distinctiveness or secondary meaning evidenced by the 2019 Survey results support a finding that DISCOUNT TIRE is a strong and famous mark in Atlanta, Jacksonville, and Orlando among the relevant consuming public.

### DR. WIND'S "REBUTTAL STUDY" DOES NOT RELIABLY MEASURE THE PRIMARY SIGNIFICANCE OF DISCOUNT TIRE

7. Dr. Wind's "Rebuttal Study" drastically departs from the well-established Teflon survey design and instead adopts a methodology that I do not believe has ever been described in the peer-reviewed literature or accepted by a court. Indeed, I am not aware of any expert who has even *utilized* Dr. Wind's novel methodology in a trademark case, regardless whether or not a court accepted it. It is my professional opinion, for the reasons described below, that the Teflon design used in the 2013 Survey and 2019 Survey is far more reliable than the heretofore unknown and untested design used by Dr. Wind in the Rebuttal Study.

8. At the outset, I disagree with Dr. Wind when he asserts that a "traditional Teflon survey" is inappropriate "to assess consumer perceptions of a non-coined term such as 'DISCOUNT TIRE.'" Courts have relied upon Ford Bubala surveys utilizing the Teflon format

in prior cases involving non-coined terms,[5] I am aware of numerous other trademark-survey experts that have opted for the Teflon format in cases involving non-coined terms.[6] Similarly, I am aware that the TTAB and numerous courts have cited and relied upon Teflon-format surveys in evaluating whether a non-coined term is generic.[7] Dr. Wind does not cite to peer-reviewed publications or any court opinions that posit a Teflon survey is an inappropriate design to evaluate the primary significance of a non-coined term.[8]

9. By abandoning the long-established Teflon design, Dr. Wind created a survey design that is confusing, biased, and fails to reliably measure the primary significance of the term DISCOUNT TIRE as a brand/trademark or a common/generic term. For each question he asked, his variation provided respondents with "three non-exclusive" response options in addition to "none of the above" and "don't know/not sure":

> 1) It is a word or phrase used by <u>only one company</u> as its <u>full</u> unique name or as the <u>full</u> unique name of its product – for example, AMERICAN AIRLINES is the unique name of a specific airline, and

---

[5] See, e.g., *In re Country Music Ass'n*, 2011 TTAB LEXIS 343, (TTAB 2011) (COUNTRY MUSIC ASSOCIATION).

[6] See *Supra* at n. 2.

[7] See, e.g., *Calista Enterprises Ltd. v. Tenza Trading Ltd.*, 2014 U.S. Dist. LEXIS 109509 (D. Colo. 2014) ("[Plaintiff's] argument that consumer surveys may only be considered where a court is analyzing a newly-coined or fanciful term, or in the context of a descriptiveness analysis, is unavailing…[S]urvey evidence is relevant in this case…"); *Primary Children's Med. Ctr. Found. v. Scentsy, Inc.*, 2012 U.S. Dist. LEXIS 86318, (D. Utah 2012) ("But the court agrees with authorities that challenge this position and finds that consumer surveys can play an important role in determining primary significance even if the term at issue was not first coined by the party seeking to protect its mark."); *Burger King Corp. v. Pilgrim's Pride Corp.*, 705 F. Supp. 1522, 1526 (S.D. Fla. 1988), *aff'd sub nom. Burger King v. Pilgrim's Pride*, 894 F.2d 412 (11th Cir. 1990) (relying on Teflon survey in assessing whether CHICKEN TENDERS was generic or a trademark).

[8] On page 8 of the Wind Report, Dr. Wind references (without citation) cases involving CRAB HOUSE, BRICK OVEN, LITE, PRETZEL CRISPS, OVERHEAD, and WOOL FELT. At my request, counsel at Kilpatrick Townsend located those cases and I reviewed them. None of the courts in those cases rejected the reliability of the Teflon format. Rather, the courts in those cases concluded that *any* survey evidence (regardless of format or design) would not be relevant, because, in those cases, the term was determined to be generic *ab initio*. These opinions have also been criticized by leading commentators. See McCarthy…§ 12:17:50 ("[t]o state that consumer perception is irrelevant for a non-coined "generic" word . . . is to assume the result before making an analysis of that which is to be decided…. No matter how a term received its genesis, the 'primary significance' test is still of paramount importance to determine if the term is generic, and a consumer survey is a useful indicator of what that significance is to the relevant public." See also E.D. Jay at 141 (noting the CRAB HOUSE opinion is an outlier and that "genericness surveys have been probative with regard to *descriptive, suggestive,* and *arbitrary* marks. . . .").

      DICK'S SPORTING GOODS is the unique name of a specific sporting goods store. [I refer to this as "Option 1" or "Category 1"]

2) It is a word or phrase used by <u>more than one company</u> as <u>part</u> of its name or as <u>part</u> of a product name to refer to its type of business or product -- for example, the word AIRLINES is used by both AMERICAN AIRLINES and UNITED AIRLINES, and the phrase SPORTING GOODS is used by both DICK'S SPORTING GOODS and MODELL'S SPORTING GOODS. [I refer to this as "Option 2" or "Category 2"]

3) It is a word or phrase that may be used by <u>more than one company generally</u> to refer to a type of business or product -- for example, "Our AIRLINES offer the most flights to Baltimore" or "We are the leading SPORTING GOODS company." [I refer to this as "Option 3" or "Category 3"]

10. First, the Wind format is confusing. The one option Dr. Wind provides for a brand or trademark response is one that requires respondents to assess whether a term is used as the "full unique name" of only one company. The term "unique" in this context, however, is confusing and potentially misleading because a brand or trademark need not be "unique" in the sense of fanciful or coined; rather, numerous brand names consist of or are comprised of non-unique terms.

11. Dr. Wind's second and third options are also confusing. Option 2 requires respondents to assess whether a word or phrase is used by more than one company *and* is used as a *part* of the companies' names, *or* as part of a product name, to refer to "its type" of business or product. Option 3 requires an assessment of whether a word or phrase is used by more than one company "generally" to refer to "a type" (presumably distinct from "its type" in Option 2) of business or product.

12. The inherently confusing phrasing of the three non-exclusive options available to respondents is then compounded by Dr. Wind offering respondents the option to "[p]lease check any or all that apply." This suggestion that respondents should select two or three of the options improperly suggests that a word or phrase could at once be used by only one

- 5 -

company *and* by more than one company, or that a word could be the "full unique name" of a company and yet also be "part of the name" of another company. For example, a respondent that knew of the plaintiff's DISCOUNT TIRE mark (the "full unique name" of one company) and also knew of defendant's MAVIS DISCOUNT TIRE mark (in which "Discount Tire" is part of the name) should, according to the Wind format, assign "Discount Tire" to Category 1 *and* 2. In this way, Dr. Wind's Rebuttal Study fails to assess the *primary* significance of the term.

13. Second, the Wind format is biased and leads respondents toward the "more than one company" options. He splits the traditional "common name" alternative into two choices ("more than one company as part of its name..." or "more than one company generally..."), allowing respondents to select from *two* "more than one company" alternatives.

14. The Rebuttal Study also biases the result by using a universe that – given the odd phrasing of Options 1-3 – is improperly overinclusive. Specifically, Dr. Wind included in the universe respondents from geographic areas in which DISCOUNT TIRE does not have stores. Because DISCOUNT TIRE is not a coined term, but rather is a descriptive mark that has achieved secondary meaning in its markets, respondents unfamiliar with Plaintiff's *company* would not have been able to identify it as the "full unique name" of "one company." As such, respondents in areas outside of Plaintiff's operating markets had no choice but to assign the term DISCOUNT TIRE to Option 2 or Option 3.

15. Third, the Wind format fails to reliably measure the primary significance of DISCOUNT TIRE as a trademark or a generic term, because he combines into a single question two separate analyses – whether a mark is used by one company or multiple companies *and* whether a mark is used "as a name of its product" or "to refer to . . . type of business or product."

16.   Dr. Wind also fails to reliably measure the primary significance of DISCOUNT TIRE as a trademark or a generic term because he does not create a dichotomous choice for respondents. In the Teflon design, respondents are asked to identify the primary significance of a term as either a brand name or common name[9] and are typically given a don't know alternative.[10] By providing *three* non-exclusive options, his response alternatives do not permit us to glean the primary significance of the term DISCOUNT TIRE from the survey results.

17.   Dr. Wind's survey also fails to reliably measure the primary significance of DISCOUNT TIRE as a trademark or a generic term because his Option 2 does not necessarily isolate *generic* terms and instead invites respondents to identify *descriptive* terms within a *protectable* trademark, and then he improperly codes all Option 2 responses as "generic."[11]

## CONCLUSION

18.   Dr. Wind deviates from the well-tested Teflon survey design and, in so doing, used confusing and biased questions that, particularly in the context of an overinclusive universe, failed to implement a survey design that would reliably measure the primary significance of the DISCOUNT TIRE mark among the relevant population.

Executed this 1st day of April, 2019, in Huntington Beach, California.

_____
Matthew G. Ezell

---

[9] *See* E.D. Jay at 114.

[10] *Id.* at 117-119.

[11] See *Perfect Memorials LLC v. United Priority Distributors*, 2016 TTAB LEXIS 95, (TTAB 2016) ("Where a mark consists of multiple words, the mere combination of descriptive words does not necessarily create a nondescriptive word or phrase. If each component retains its merely descriptive significance in relation to the goods or services, the combination results in a composite that is itself merely descriptive. However, a mark comprising a combination of merely descriptive components is registrable if the combination of terms creates a unitary mark with a nondescriptive meaning...").