# Exhibit 16

```
1                  IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF GEORGIA

3                         ATLANTA DIVISION

4       ----------------------------------x

5       THE REINALT-THOMAS CORPORATION

6       d/b/a DISCOUNT TIRE,                 No. 1:18-cv-05877-TCB

7              vs.      Plaintiff,

8       MAVIS TIRE SUPPLY LLC,

9                  Defendant.

10

11

12

13

14               VIDEOTAPED DEPOSITION OF MATTHEW G. EZELL

15                     Wednesday, April 17, 2019

16                     Beverly Hills, California

17

18      REPORTED BY:

19      GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR

20      FILE NO.: 84915

21

22

23

24

25
```

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

-----------------------------------x

THE REINALT-THOMAS CORPORATION

d/b/a DISCOUNT TIRE,          No. 1:18-cv-05877-TCB

    vs.    Plaintiff,

MAVIS TIRE SUPPLY LLC,

    Defendant.

VIDEOTAPED DEPOSITION OF MATTHEW G. EZELL

Wednesday, April 17, 2019

Beverly Hills, California

REPORTED BY:

GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR

FILE NO.: 84915

---

Page 2

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE NORTHERN DISTRICT OF GEORGIA

3  ATLANTA DIVISION

4  -----------------------------------x

5  THE REINALT-THOMAS CORPORATION

6  d/b/a DISCOUNT TIRE,          No. 1:18-cv-05877-TCB

7      vs.    Plaintiff,

8  MAVIS TIRE SUPPLY LLC,

9      Defendant.

10

11

12  Videotaped Deposition of MATTHEW G. EZELL

13  taken on behalf of Plaintiff, at 1999 Avenue of the stars,

14  Suite 1500, Beverly Hills, California, beginning at 7:53 a.m.

15  and ending at 12:45 p.m., on Wednesday, April 17, 2019,

16  before GRACE CHUNG, CSR No. 6246, RMR, CRR, CLR.

17

18

19

20

21

22

23

24

25

---

Page 3

1  A P P E A R A N C E S

2

3  KILPATRICK TOWNSEND LLP

4  Attorneys for Plaintiff

5  1100 Peachtree Street NE

6  Suite 2800

7  Atlanta, Georgia 30309

8  (404) 815-6672

9  BY: R. CHARELS HENN, JR.

10  chenn@kilpatricktownsend.com

11

12  COVINGTON & BURLING LLP

13  Attorneys for Defendant Mavis Tire Supply LLC

14  The New York Times Building

15  620 Eighth Avenue

16  New York, NY 10018

17  212.841.1221

18  BY: NEIL K. ROMAN, ESQ.

19  nroman@cov.com

20

21

22  ALSO PRESENT: DASH ARNOTT, Videographer

23

24

25

---

Page 4

1  INDEX

2  WITNESS  EXAMINATION                    PAGE

3  MATTHEW. G. EZELL

4  BY MR. ROMAN                6

5

6  EXHIBITS

7  NO.    DESCRIPTION                      PAGE

8  Exhibit 226  Trial and Deposition Testimony of    7
    Matthew G. Ezell Since 2015

9

    Exhibit 227  Declaration of Dr. Gerald L. Ford    17

10

    Exhibit 228  Declaration of Matthew G. Ezell    18

11

    Exhibit 229  Declaration of Yoram (Jerry) Wind,  19
    Ph.D.

12

13  Exhibit 230  Rebuttal Expert Report of Matthew   20
    G. Ezell

14

    Exhibit 231  Professional History          27

15

    Exhibit 232  Publications Since 2009 Authored   42

16      or Co-Authored by Matthew G. Ezell

17  Exhibit 233  List of Market Areas in      65
    Continental U.S. with Three or

18      More Discount Tire Stores within a
    10-Mile Radius

19

    Exhibit 234  Intellectual Property Surveys:  156

20      2017

21  Exhibit 235  Frito-Lay case before United    158
    States Patent and Trademark Office

22

23

24

25

Page 5

```
 1              Beverly Hills, California
 2           Wednesday, April 17, 2019
 3                  7:53 a.m.
 4
 5         THE VIDEOGRAPHER:  We are now on the
 6   record in the matter of the Reinalt-Thomas
 7   Corporation versus Mavis Tire Supply.  Today's date
 8   is April 17th, 2019.  The time is 7:53 a.m.  This
 9   is the video-recorded deposition of Matthew Ezell,
10   being taken at 1999 Avenue of the Stars in
11   Los Angeles, California.
12         I am the camera operator.  My name is Dash
13   Arnott in association with Alderson Court
14   Reporting, located at 1111 14th Street Northwest,
15   Washington, D.C.  The court reporter is Grace
16   Chung, also in association with Alderson Court
17   Reporting.
18         Will all attorneys please identify
19   themselves and the parties they represent, beginning
20   with the party noticing this proceeding.
21         MR. ROMAN:  Good morning.  Neil Roman,
22   Covington & Burling, attorney for the defendant.
23         MR. HENN:  My name is Charlie Henn with
24   Kilpatrick Townsend.  I'm here on behalf of the
25   plaintiff and the witness.
```

Page 6

```
 1         THE VIDEOGRAPHER:  Thank you.  Will the
 2   court reporter please administer the oath.
 3              MATTHEW. G. EZELL,
 4          having been first duly sworn, was examined
 5              and testified as follows:
 6
 7              EXAMINATION
 8   BY MR. ROMAN:
 9      Q.  Good morning, again, Mr. Ezell.  How are
10   you?
11      A.  Good.  Good morning.  How are you?
12      Q.  Good, thank you.  Your work address is
13   16400 Pacific Coast Highway in Huntington Beach,
14   California; correct?
15      A.  Correct.  There is a Suite 211 that should
16   be included there, but yes, you've got the right
17   address.
18      Q.  And that's the office of Ford Bubala &
19   Associates?
20      A.  That's correct.
21      Q.  And in what city do you live?
22      A.  I also reside in the same city of
23   Huntington Beach.
24      Q.  California?
25      A.  Yes.
```

Page 7

```
 1      Q.  Mr. Ezell, I have put before you what's
 2   been marked as Exhibit 226.  I believe it's Exhibit
 3   D to your opening report.  Have you seen this
 4   document before?
 5      A.  Yes, I have.
 6         (Deposition Exhibit 226 was marked for
 7          identification by the reporter and is
 8          attached hereto.)
 9   BY MR. ROMAN:
10      Q.  What is it?
11      A.  It is the trial and deposition testimony
12   of myself since 2015.
13      Q.  And this is a complete and accurate list?
14      A.  Yes, it is.
15      Q.  Did you have any trial or deposition
16   testimony before 2015?
17      A.  No, I did not.
18      Q.  And have you had any trial or deposition
19   testimony since you created this exhibit, 226?
20      A.  No, I have not.
21      Q.  So in your career, you have testified at
22   trial once and at deposition twice; correct?
23      A.  That is correct.
24      Q.  And all three of those matters were in
25   Southern California; correct?
```

Page 8

```
 1      A.  That is correct.
 2      Q.  The first case, the San Diego Comic
 3   Convention case, on whose behalf did you testify?
 4      A.  On behalf of San Diego Comic Convention.
 5      Q.  And what was the issue on -- or issues on
 6   which you testified?
 7      A.  The primary significance of the mark
 8   Comic-Con.
 9      Q.  So it was not a genericness?
10      A.  You may say it was a genericness matter,
11   but generally, I would say a primary significance.
12   I just like that term in terms of "generic" to me
13   sounds it's a little bit like we are already coming
14   to one conclusion or the other.
15      Q.  So that -- what was your opinion in that
16   case?
17      A.  The survey results supported a finding
18   that the mark Comic-Con was perceived as a brand
19   name.
20      Q.  So the court -- or the jury adopted your
21   position?
22      A.  Right.  It was a jury trial, and it was
23   admitted into evidence, and ultimately, our party
24   prevailed, so I assume that is a "yes" to your
25   question.
```

Page 9

1    Q.  Why were you not deposed in that case?
2    A.  I'm not sure what happened there.  For
3    whatever reason, both sides didn't take depositions
4    of either side's experts.  So it was a strange
5    case.
6    Q.  Okay.  How about the -- I know I'm going
7    to mispronounce this -- the Quidel Corporation
8    case?
9    A.  Quidel Corporation.
10   Q.  Thank you.  What was that about?
11   A.  That was a matter involving Quidel
12   Corporation and Siemens.  It had to do with immune
13   assays, which is used to diagnose and treat -- not
14   treat, diagnose thyroid-related diseases, including
15   Graves' disease.
16   Q.  What was the nature of your testimony in
17   that case?
18   A.  In that case, we provided a
19   false-advertising type of survey, what messages
20   were received by a certain website, messages that
21   appeared on a website that was owned by Siemens.
22   Q.  So no issues of genericness or primary
23   significance in that case?
24   A.  That's correct.
25   Q.  How about the LUXE Hospital case.  What

Page 10

1    was that about?
2    A.  That was a matter involving likelihood of
3    confusion.  So we proffered a survey that was --
4    that was designed to address the issue of
5    likelihood of confusion, and you can't tell by the
6    party names, but it was basically LUXE Hotel versus
7    Lux Hotel; one had an E at the end and one did not.
8    Q.  Then I belive I misstated the name of the
9    case.  It's LUXE Hospitality; correct?
10   A.  Yeah, that's correct.  It's LUXE
11   Hospitality versus SBE Entertainment Group.
12   Q.  So again, there were no issues on which
13   you are -- at least, on which you are opining,
14   involving genericness or primary significance in
15   that case; correct?
16   A.  That's correct.
17   Q.  So you've been deposed twice as an expert;
18   correct?
19   A.  Yes, that's correct.
20   Q.  Have you ever been deposed in any other
21   capacity?
22   A.  No, I have not.
23   Q.  Are you familiar with the process?
24   A.  Of being deposed?
25   Q.  Yes.

Page 11

1    A.  Yes.
2    Q.  Okay.  If you have any questions about my
3    questions, you don't hear me or you don't
4    understand me, please let me know.  I will be happy
5    to repeat or restate or do whatever is necessary so
6    that you and I are operating on the same
7    wavelength.  If you answer a question, I'm going to
8    assume you understood it.  Do you understand that?
9    A.  I do understand that.
10   Q.  If you need a break for whatever reason,
11   please let me know.  I will be happy to take one.
12   A.  Thank you.
13   Q.  What did you do to prepare for your --
14   well, strike that.
15       Is there any reason you can't give
16   complete and accurate testimony today?
17   A.  No.
18   Q.  You're not on any medications that affect
19   your mental abilities?
20   A.  No, I'm not.  Not yet.
21   Q.  So what did you do to prepare for your
22   deposition today?
23   A.  I suppose I reviewed my reports, my
24   rebuttal reports, the report of Dr. Wind, reviewed
25   -- you know, had conversations with counsel here,

Page 12

1    Mr. Henn.  I don't know if that's an exhaustive
2    list, but things of that nature, I suppose,
3    reviewed the documents.
4    Q.  Let's start with your meetings with
5    Mr. Henn.  How many times did you meet with
6    Mr. Henn in preparation for your testimony?
7    A.  Sure.  We met yesterday, and that was the
8    only time we met face to face for this case.
9    Q.  Was anyone else present?
10   A.  No.  It was -- it was staff members
11   outside the room, but it was just a meeting between
12   the two of us.
13   Q.  So it took place in your office?
14   A.  No, it was actually at the Kilpatrick
15   office.
16   Q.  Okay.  No one else was on the phone or
17   anything like that?
18   A.  Correct.
19   Q.  And for how long did you meet with
20   Mr. Henn?
21   A.  I would say we met for about one hour
22   yesterday, and I continued to read materials and
23   prepare by myself for maybe another hour or so
24   beyond that.
25   Q.  Had you ever before worked with any

Page 13

1    lawyers from the Kilpatrick firm before?
2        A.  Yes.
3        Q.  Which ones?
4        A.  We have worked with a variety of attorneys
5    from the Kilpatrick firm.  Larry McFarland,
6    certainly Mr. Henn here, Jerre Swan, Sr., David
7    Mayberry.
8        Q.  And when you say "we," are you talking
9    about the Ford Bubala firm?
10       A.  Right, my partner, Dr. AnnaBelle Sartore
11   and I.
12       Q.  How about you personally?  Have you ever
13   served as an expert before for any lawyers at the
14   Kilpatrick firm before?
15       A.  No.
16       Q.  How about the Ballard Spahr firm?
17       A.  I have not served as an expert, no, for
18   their firm.
19       Q.  And you also know, at least, Mr. Swan from
20   your work on the IP survey reviews that you do
21   every year; correct?
22       A.  That's correct.
23       Q.  Have you ever had any dealings with the
24   plaintiff in this case, the Reinalt-Thomas
25   Corporation before this case?

Page 14

1        A.  Well, prior to this instant matter, yes,
2    in terms of Ford Bubala & Associates did conduct a
3    survey that I'm sure you are aware of in 2013.
4        Q.  Thank you for the clarification.
5        A.  Sure.
6        Q.  Before that matter, had you ever had
7    any -- had you or anyone else from Ford Bubala ever
8    had any involvement with the Reinalt-Thomas
9    Corporation before?
10       A.  I can't say with certainty yes or no.  The
11   firm has been around for 43 years, and some of that
12   time certainly was before I joined the firm.  So I
13   just don't know the answer to that question.
14       Q.  Did you discuss or have you discussed the
15   substance of your expected testimony with anyone
16   other than counsel?
17       A.  No.
18       Q.  Have you reviewed any transcripts of any
19   depositions taken in this case?
20       A.  No, I have not.
21       Q.  Have you reviewed any of the pleadings,
22   including RTC's complaint, Mavis's answer to the
23   complaint, any interrogatory responses, or
24   responses to request for admission, anything like
25   that?

Page 15

1        A.  I reviewed the complaint, and I reviewed
2    the motion for preliminary injunction.
3        Q.  In paragraph 27 to your opening report,
4    you list the materials considered.  And you list
5    the Discount Tire website and the store location
6    maps on the website at discounttire.com, the 2013
7    declaration of Dr. Gerald Ford and its exhibits
8    relative to the Discount Tire matter, and the
9    results of an Opinion Research Corporation
10   telephone omnibus study conducted between May 2 and
11   May 5, 2013.  Do you see that?
12       A.  I do see that.
13       Q.  Okay.  So now you've mentioned the
14   complaint and the preliminary injunction motion?
15       A.  Yes.  And now that you bring this topic
16   up, those should be included under materials
17   considered.
18       Q.  In paragraph 27 of your opening report?
19       A.  Yes.
20       Q.  Is there anything else that should be
21   considered in that paragraph -- should be added to
22   that paragraph?
23       A.  I don't believe so, no.
24       Q.  Okay.  Have you reviewed any of the
25   documents produced in this case by any of the

Page 16

1    parties?
2        A.  I don't believe so, no.  If I did, I
3    didn't know it was a document produced.  I haven't
4    seen, really, any documents.
5        Q.  That was going to be my next question.
6    Have you reviewed any documents at all other than
7    the ones that you listed in the materials
8    considered and the complaint and the preliminary
9    injunction motion?
10       A.  I have seen a chart that shows sales data
11   for plaintiff over the last several years, but I
12   briefly reviewed that.
13       Q.  For what purpose did you review that?
14       A.  To get an understanding of what percentage
15   of plaintiff's sales were via its retail stores,
16   Discount Tire or America's Tire, and what
17   percentage were through its Discount Tire Direct.
18       Q.  And what did you learn?
19       A.  I learned that approximately 95 percent of
20   the sales of -- plaintiff's sales were via its
21   stores, and maybe 5 percent or less were through
22   Discount Tire Direct.
23       Q.  And with respect to that 5 percent, do you
24   know to what states those sales were made?
25       A.  No, I don't.  I believe that those were

Page 17

```
1    annual gross numbers.
2        Q.  And was this a document that had been
3    produced in the litigation?
4        A.  I'm not sure.
5        Q.  When did you review this document?
6        A.  Yesterday.
7        Q.  Have you reviewed any other documents in
8    this case?
9        A.  No.  I believe that was the only other
10   document that I've seen, other than exhibits that
11   you have here in front of me and others I
12   mentioned.
13       Q.  Let's talk about those exhibits that are
14   in front of you.  Let's go through and identify
15   them if we could.
16           So the first one is Exhibit 227.  You have
17   that in front of you?
18           (Deposition Exhibit 227 was marked for
19           identification by the reporter and is
20           attached hereto.)
21       A.  I do.
22   BY MR. ROMAN:
23       Q.  Do you recognize that?
24       A.  Yes, I do.
25       Q.  What is Exhibit 227?
```

Page 18

```
1        A.  It's the declaration of Dr. Gerald L. Ford
2    that was submitted in 2014.
3        Q.  Okay.  And for whatever reason -- we are
4    the ones who printed this out -- for whatever
5    reason, the signature is not showing up on this
6    exhibit.  I assure you that I printed it out from a
7    copy that did have a signature.  I don't know why
8    it didn't reproduce.
9            So this was on April 11th of 2014; correct?
10       A.  That is the date printed here.
11       Q.  Okay.  Let's go to Exhibit 228, please.
12       A.  Sure.
13       Q.  Have you seen that document before?
14           (Deposition Exhibit 228 was marked for
15           identification by the reporter and is
16           attached hereto.)
17       A.  Yes, I have.
18   BY MR. ROMAN:
19       Q.  What is Exhibit 228?
20       A.  This is my declaration, my opening
21   declaration in this matter.
22       Q.  And you submitted this one on March 1st of
23   2019; correct?
24       A.  Yes, I did.
25       Q.  That is your signature on the last page?
```

Page 19

```
1        A.  That is my signature, yes.
2        Q.  Okay.  Turning to Exhibit 229, have you
3    seen this document before?
4        A.  Yes, I have.
5            (Deposition Exhibit 229 was marked for
6            identification by the reporter and is
7            attached hereto.)
8    BY MR. ROMAN:
9        Q.  Exhibit 229 is the declaration submitted
10   by Gerald Ford on behalf of the defendant in this
11   case; correct?
12       A.  Did you say 229?
13       Q.  I hope I did.
14       A.  Oh.
15       Q.  I meant to.
16       A.  I have a document here that says
17   "Declaration of Yoram Wind, Ph.D."
18       Q.  Right.
19       A.  I thought you said Gerald Ford just now.
20       Q.  I misspoke.  I'm sorry; it's early.
21       A.  No problem.
22       Q.  Let me start again.
23       A.  Sure.
24       Q.  Do you have in front of you Exhibit 229?
25       A.  I do.
```

Page 20

```
1        Q.  Exhibit 229 is a declaration of Jerry Wind
2    in this case; correct?
3        A.  That is correct.
4        Q.  And the date on that is March 22nd, 2019?
5        A.  Yes, it is.
6        Q.  Okay.  And then direct your attention to
7    Exhibit 230.  Have you seen that document before?
8        A.  Yes, I have.
9            (Deposition Exhibit 230 was marked for
10           identification by the reporter and is
11           attached hereto.)
12   BY MR. ROMAN:
13       Q.  And what is Exhibit 230?
14       A.  This is my rebuttal expert report in this
15   matter.
16       Q.  And this is your rebuttal to the Wind
17   declaration that's Exhibit 229; correct?
18       A.  That is correct.
19       Q.  And that's your signature on the last
20   page?
21       A.  Yes, it is.
22       Q.  And you executed this rebuttal expert
23   report on April 1 of 2019; correct?
24       A.  That is correct.
25       Q.  Going back to Exhibit 227, the Ford
```

Page 21

1  survey -- do you understand if I refer to that as
2  the "Ford survey"?
3      A. I will understand what you mean by that,
4  yes.
5      Q. Okay. Did you have any involvement in the
6  design, implementation, or analysis of the Ford
7  survey?
8      A. Yes, I did.
9      Q. What was the nature of your involvement?
10     A. I was, at the time, a senior research
11 associate, and I was involved in any of the matters
12 that Ford Bubala & Associates was retained to
13 design and conduct surveys. So as you understand,
14 Dr. Ford's signature is on here, and he was
15 responsible for the content, but his partner, and
16 my partner now, Dr. AnnaBelle Sartore and myself
17 and Dr. Ford all had a hand -- you know,
18 participated in the design and execution of this
19 survey and its report.
20     Q. What exactly did you do?
21     A. It's been six years or so. I don't recall
22 the exact nature of my contributions or my role,
23 but as I say, I'm sure I was present for the design
24 of the questionnaire and analyzing the survey
25 results.

Page 22

1      Q. Would you have been involved in drafting
2  the report?
3      A. I think I would have been, yes.
4      Q. But everything you would have done would
5  have been at the direction of Dr. Ford; correct?
6      A. I wouldn't say it was at, necessarily, the
7  direction of just Dr. Ford. It's a team effort in
8  terms of all of the design of the questionnaire
9  and, ultimately, the creation of the report, that
10 the three of us would work on, Drs. Ford, Sartore,
11 and myself.
12     Q. But you were the junior member, and they
13 would have made the bigger decisions, and you would
14 have implemented them; correct?
15     A. Ultimately, the final decision came to
16 Dr. Ford.
17     Q. And you were the junior member of the
18 team?
19     A. I was, at the time, not a partner. I was
20 a senior research associate.
21     Q. So the answer is "yes"?
22     A. So the answer would be yes.
23     Q. Have you had any discussions with any of
24 the other experts retained in this case by RTC?
25     A. No, I have not.

Page 23

1      Q. Going to your report, Exhibit 230 -- or
2  your two reports, I'm sorry -- 228 and 230, did
3  anybody assist you with these?
4      A. I worked, again, with my partner
5  Dr. AnnaBelle Sartore, but ultimately, the -- I'm
6  responsible for the content of this, and it's my
7  signature on the last page of these respective
8  documents.
9      Q. What would you say were Dr. Sartore's
10 contributions?
11     A. It's hard to put that into words. We both
12 try to work on concepts -- we are both sitting in
13 the same office looking at the same computer screen
14 and having a conversation about how to craft, you
15 know, the sentences so that they express the
16 notions -- the ideas that we are looking for --
17 that I'm looking for.
18     Q. Let me ask you this: How many hours have
19 you spent on this matter?
20     A. I don't recall the exact number of hours.
21 I'm going to say between 10 and 20, something like
22 that.
23     Q. That's on both Exhibits 228 and 230,
24 combined?
25     A. Probably closer to the 20 hours, would be

Page 24

1  my guess in terms of the -- designing the survey,
2  getting up to this first declaration and, in
3  addition, creating this rebuttal report.
4      Q. And do you know about how many hours
5  Dr. Sartore has spent on this matter?
6      A. I don't -- we don't have a record in terms
7  of that. We create invoices in terms of our
8  partner time or principal time, so I don't know
9  what portion of the hours were hers or mine in
10 terms of time.
11     Q. Would it be less -- it would be less than
12 yours?
13     A. I would say it would be approximately
14 equal or less.
15     Q. The 20 hours doesn't seem like a lot, but
16 I guess that's because you essentially borrowed the
17 survey, the design of Dr. Ford's; correct?
18     MR. HENN: Object to the form.
19     A. We certainly had the structure of the
20 questionnaire, the questions in place in terms of
21 Dr. Ford's design. So this was probably a less
22 time-consuming questionnaire, but it was a
23 different methodology.
24 BY MR. ROMAN:
25     Q. Do you know when you were first retained

Page 25

1  in this matter? And I know that your opening
2  report was executed on March 1 of 2019, but do you
3  know when the lawyers for the plaintiff first
4  approached you?
5      A. You know, I don't recall that exact date.
6  I believe it was the end of 2018, maybe December --
7  or November 20- -- no, I think it was
8  December 2018, is my best recollection.
9      Q. Did you -- I will represent to you that
10 they -- that the plaintiff filed its complaint on
11 December 26, then on or about that date, filed its
12 motion for preliminary injunction. Was there --
13 were you involved in any discussions about whether
14 or not you were going to submit a new survey in
15 connection with that motion?
16     A. We had some -- I had some discussions with
17 counsel about the previous study and what it
18 showed, and we certainly had a discussion about
19 potentially conducting a survey to address the new
20 geographies that were at issue in terms of the
21 preliminary injunction.
22     Q. When were you given a direction to conduct
23 a new survey?
24     A. I believe it was February or March of this
25 year.

Page 26

1      Q. It couldn't have been March --
2      A. It couldn't have been March?
3      Q. Well, because March 1 is the day you
4  finished it. So that would have been really quick
5  work.
6      A. That's true. It was not March, then. Let
7  me see when we did this. I believe the information
8  that I'm looking for may be found in Exhibit A to
9  the declaration in terms of when the -- thank you,
10 sir.
11     Q. For the record, I've handed Mr. Ezell his
12 full report with the exhibits.
13     A. Now that I see Exhibit A -- normally it
14 would be Exhibit A. It would actually be Exhibit B
15 because this is Dr. Ford's report.
16     Q. Okay. Well, here is Exhibit B.
17     A. It's also in the same binder. I
18 apologize. I didn't realize that. So I'm going to
19 say, now that my recollection is refreshed, I see
20 that we conducted interviews from February 13 to
21 February 20. So certainly, early February, late
22 January is when we were first contacted about
23 approval to move forward with the survey.
24     Q. Thank you, sir. Any time you need to
25 refer to either your declaration or to Dr. Wind's,

Page 27

1  please let me know. I've got both here with the
2  full exhibits -- full declarations with the
3  exhibits. So --
4      A. Thank you.
5      Q. They are here for your convenience.
6          Let's go ahead and mark -- mark as
7  Exhibit 231 what appears to be your professional
8  history. Have you seen Exhibit 231 before?
9      A. Yes, I have.
10         (Deposition Exhibit 231 was marked for
11         identification by the reporter and is
12         attached hereto.)
13 BY MR. ROMAN:
14     Q. What is Exhibit 231?
15     A. As you say, this is my professional
16 history.
17     Q. And it sets forth your entire professional
18 history?
19     A. I would say the relevant professional
20 history. I had jobs when I was a very young man
21 that are not relevant to my current work.
22     Q. And Exhibit 231 accurately sets forth your
23 education and experience?
24     A. Yes, it does.
25     Q. Are there any additions or corrections you

Page 28

1  would like to make?
2      A. No.
3      Q. Okay. So looking down at your education,
4  you graduated with a BA from Cal State, Fullerton,
5  in 2002; correct?
6      A. That's correct.
7      Q. What was your major?
8      A. Japanese.
9      Q. Did you take any courses either -- I'm
10 sorry, relating in any way to consumer surveys?
11     A. No, I did not.
12     Q. Then you were at -- and you got, I'm
13 sorry, a master's in linguistics from Cal State,
14 Long Beach, in 2010; correct?
15     A. That is correct.
16     Q. And you attended Cal State, Long Beach,
17 from 2007 to 2010; correct?
18     A. That is my best recollection, yes.
19     Q. And why did you do a master's in
20 linguistics?
21     A. At the time, I was very interested in
22 teaching Japanese at the community college level,
23 and that was one possible way to fulfill the
24 requirement of being able to -- being eligible to
25 teach.

Page 29

1    Q.  Do you consider yourself to be an expert
2  in linguistics?
3    A.  I wouldn't say that I'm an expert in
4  linguistics.  I certainly have a broad
5  understanding of a variety of linguistic topics.
6  My focus was on teaching Japanese as a second
7  language.
8    Q.  And just to be clear, you're not
9  testifying as an expert in linguistics or on any
10  linguistics issues in this case, are you?
11    A.  No, I am not.
12    Q.  Did anything you studied in connection
13  with your master's have anything to do with
14  consumer surveys?
15    A.  Yes and no.  Mostly no in terms of the
16  type of surveys that we conduct today.  But as part
17  of the master's thesis, I conducted a small-scale
18  survey among students, you know, to collect data in
19  terms of language-acquisition-related questions.
20    Q.  That didn't require any special expertise,
21  though, did it?
22    A.  At the time, it was not something that I
23  had done a lot, and I certainly sought advice and
24  counsel from my advising teacher.  But I did have
25  the experience of working at Ford Bubala &

Page 30

1  Associates.  So in terms of the conclusions and the
2  data analysis, it was a very different type of
3  survey than I am used to conducting in my
4  experience at Ford Bubala.
5    Q.  And then your last schooling, at least the
6  last schooling that's listed on your professional
7  history, is that you received a graduate
8  certificate in survey research from the University
9  of Connecticut in 2016; correct?
10    A.  That's correct.
11    Q.  Was that a one-year course?
12    A.  That was, I believe, four different
13  courses over -- spanning from -- I believe it was
14  from 2015 to 2016, and I don't recall if it was
15  three semesters or if it was four semesters, but it
16  took approximately one year.
17    Q.  And was that your only thing that you did
18  that year, was go to school?
19    A.  No, I was also continuing to work at Ford
20  Bubala & Associates.
21    Q.  And what kind of certificate do you get?
22    A.  A graduate certificate in survey research.
23    Q.  It's not an advanced degree or anything
24  like that?
25    A.  It's not an advanced degree, but it is a

Page 31

1  graduate certificate in survey research.
2    Q.  Do you recall what the courses that you
3  took were?
4    A.  Generally, yes.  There was Advanced
5  Questionnaire Design.  There was Quantitative
6  Methods.  So basically, designing questionnaires
7  and interpreting the results was the gist of it.
8    Q.  Do you have any other -- strike that.
9      Have you had any other academic training
10  concerning consumer surveys?
11    A.  No formal academic training.  I believe
12  that I have received quite a bit of training in my
13  tenure at Ford Bubala & Associates.
14    Q.  But I'm just, right now, asking about
15  academic training.  And you've had no other
16  academic training other than your graduate
17  certificate from the University of Connecticut;
18  correct?
19    A.  That's correct.
20    Q.  You're not a lawyer?
21    A.  That is correct.
22    Q.  You're not a trademark expert?
23    A.  I would say I have some expertise in
24  trademark-related matters.
25    Q.  In what respects?

Page 32

1    A.  Well, we -- every year, as you may know,
2  we publish an article titled "Intellectual Property
3  Surveys," and we review the opinions of reported
4  cases in which a survey is mentioned.  And we
5  select certain portions of the reported cases that
6  may be instructive to litigators in
7  trademark-related matters.
8    Q.  You're not testifying as a trademark
9  expert in this case, are you?
10    A.  Again, I think the answer is no, but I do
11  want to say that I have some understanding of the
12  Lanham Act in trademark-related claims.
13    Q.  You're not a branding or marketing expert,
14  are you?
15    A.  No, I am not.
16    Q.  You're not an expert in the automotive or
17  tire industries, are you?
18    A.  No, I'm not.
19    Q.  Or any of the subindustries of those
20  industries; correct?
21    A.  That is correct.
22    Q.  So let's go to Ford Bubala.  You started
23  there as a research associate in 1997; correct?
24    A.  That is correct.
25    Q.  And you were a research associate from

Page 33

```
1    1997 to 2002; correct?
2        A.  That time period, as well as 2007 to 2010,
3    yes.
4        Q.  But right now, I'm just focusing on that
5    five- or six-year period from 1997 to 2002.  Do you
6    have that in mind?
7        A.  I do have that in mind.
8        Q.  Okay.  When did you graduate from high
9    school, what year?
10       A.  1987.
11       Q.  So you were working at Ford Bubala
12   part-time while still in college; is that right?
13       A.  Yes, I was.
14       Q.  How many hours a week?
15       A.  It's difficult to recall exactly, but
16   probably 20 to 30 hours per week.
17       Q.  How did you come to be employed by Ford
18   Bubala?
19       A.  I met Dr. Ford at a family get-together,
20   and he asked me what I was doing the following
21   summer.  And I said I was trying to earn some money
22   to travel to Japan, and he said, "You should come
23   work for me."  It was a pretty informal interview.
24       Q.  So Dr. Ford was a family friend of yours?
25       A.  Yeah, he and my father went to high school
```

Page 34

```
1    together.
2        Q.  When you were working as a research
3    associate with Ford Bubala from 1997 to 2002, what
4    were your responsibilities?
5        A.  At the time, things like managing storage
6    files and data entry, proofreading questionnaires
7    and survey-related materials, things of that
8    nature.
9        Q.  You weren't involved in the design or
10   implementation of the surveys, were you?
11       A.  Not at that time, no.
12       Q.  You mentioned that you were also a
13   research associate with Ford Bubala from 2007 to
14   2010.  Correct?
15       A.  That is correct.
16       Q.  And you were doing this work while getting
17   your master's; is that right?
18       A.  Yes.  There was some overlap of me
19   obtaining my master's degree during that time, yes.
20       Q.  So were you part-time during this whole
21   period or just some of the time during this period?
22       A.  I think that I was full-time until I
23   attended -- until I began attending Cal State
24   University, Long Beach.
25       Q.  And when was that?
```

Page 35

```
1        A.  I believe it was the fall of 2007, if I
2    recall.
3        Q.  So you were full-time the summer of 2007
4    and then part-time thereafter?
5        A.  I believe it was, maybe, spring or even
6    February 2007 that I began working there full-time,
7    and then I went -- down in hours to part-time
8    during the master's.
9        Q.  During the master's when you were working
10   part-time, how many hours a week were you working?
11       A.  Probably 20 to 30 hours per week.
12       Q.  And were your responsibilities as they
13   were before?
14       A.  Less the data entry or more menial tasks,
15   and I was becoming more involved in capturing
16   websites or capturing -- yeah, websites, let's say,
17   or helping to create survey stimuli, in addition to
18   helping Drs. Ford and Sartore craft questionnaire
19   questions.
20       Q.  I'm sorry.  I missed the last part of
21   that.  I will just ask a question, and you can tell
22   me whether I got it right or not.  Is it fair to
23   say that at this stage, 2007 to 2010, you were not
24   involved in the design or implementation of Ford
25   Bubala studies?
```

Page 36

```
1        A.  I think there was a limited involvement in
2    the design and implementation of surveys at that
3    point.  I think probably just towards the tail end,
4    closer to 2010.  And that -- I think my increased
5    involvement at that time led to me becoming a
6    senior research associate soon thereafter.
7        Q.  Okay.  So is it fair to say until sometime
8    in 2010, you had no involvement at all in designing
9    or implementing surveys; correct?
10           MR. HENN:  Object to the form.  Misstates.
11       A.  Again, I don't want to say no involvement,
12   but I had a more limited involvement than my later
13   years as a senior research associate.  But I did
14   have some limited involvement in the design and
15   data collection and reporting.
16   BY MR. ROMAN:
17       Q.  What was the nature of that limited
18   involvement?
19       A.  Being asked to participate in
20   questionnaire design, perhaps if there would be a
21   type of goods or services that I was more familiar
22   with.  Let's say it had to do with the nature of
23   the goods being -- like an Internet-based service,
24   maybe I was more familiar with those types of
25   services.  And that was the impetus or the
```

Page 37

1  beginning of my increased involvement in survey
2  design.
3       Q.  So you said you became a senior research
4  associate in 2010; correct?
5       A.  That's correct.
6       Q.  And was that upon your graduation from --
7  or your receiving your master's?
8       A.  You know, I don't recall if it was prior
9  to, right at the time, or after the master's.  I
10 don't recall the exact timing of when I became a
11 senior research associate, but certainly in the
12 same year as I did obtain the master's degree.
13      Q.  That was a promotion?
14      A.  Yes, it was a promotion from a research
15 associate.
16      Q.  And was this the first time you worked
17 full-time for Ford Bubala & Associates?
18      A.  No, I had worked full-time in --
19      Q.  That's right.  2007, I mean.
20      A.  Right, in the earlier period of 2007.  And
21 I suppose I had worked full-time during the summers
22 when school was not in session in the prior years
23 of 1997 to 2002.
24      Q.  Did your responsibilities change as --
25 when you became a senior research associate?

Page 38

1       A.  Yes.
2       Q.  How so?
3       A.  I was routinely involved.  Instead of
4  occasionally being asked to assist in survey
5  design, I was routinely involved in helping design
6  surveys and analyze those results and draft reports
7  based on those results.
8       Q.  But always in the back-office capacity;
9  right?  You were never the survey expert.  You were
10 always providing support to the survey expert;
11 correct?
12          MR. HENN:  Object to the form.
13      A.  I wouldn't say back-office capacity.  I
14 was in the same room as Drs. Ford and Sartore, and
15 we worked together as a team of three to design the
16 questionnaire and analyze the results.
17 BY MR. ROMAN:
18      Q.  But you did not serve as a survey expert
19 during this period; correct?
20      A.  That is correct.
21      Q.  It was not until after -- in or after 2015
22 that you first served as a survey expert; correct?
23      A.  That's correct.
24      Q.  Now, during this time, 2010 to 2015, you
25 were also lecturing on the Japanese language at

Page 39

1  Irvine Valley College and Fullerton College;
2  correct?
3       A.  That's correct.
4       Q.  And was that a part-time gig?
5       A.  That was a part-time teaching position.
6       Q.  And did that detract at all from your time
7  at Ford Bubala?
8       A.  In a limited fashion.  I was closer to,
9  probably, 35 hours per week during the times that
10 those courses were in session, but it was -- if my
11 recollection is correct, I believe they were both
12 once-per-week meetings in terms of the Japanese
13 classes.
14      Q.  And when you say 35 hours a week, that was
15 the time you spent at Ford Bubala?
16      A.  Correct.  Thank you for making the record
17 clear.
18      Q.  Now, you became a principal of Ford Bubala
19 in 2015; correct?
20      A.  That is correct.
21      Q.  Was that before or after Dr. Ford died?
22      A.  That was soon after Dr. Ford passed away.
23      Q.  And Dr. Ford was one of the founders of
24 Ford Bubala; correct?
25      A.  That is correct.

Page 40

1       Q.  And at the time of his death, he was the
2  lead principal of Ford Bubala; correct?
3       A.  He was the public face, so to speak.  He
4  was the designated expert.  His signature appeared
5  on all declarations, but as I have stated before,
6  it was a team effort in terms of questionnaire
7  design and report analysis.
8       Q.  Did Dr. Sartore ever provide reports and
9  testify?
10      A.  I understand that in her career, she has
11 done that a very small number of times, maybe three
12 or four times, something along that nature.  And I
13 understand that she did not enjoy testifying and
14 that Dr. Ford did.  And therefore, that
15 responsibility fell to him.
16      Q.  I gather it's your view that he was one of
17 the leaders in the world of professional surveys,
18 Dr. Ford?
19      A.  Yes.  I think he was very well respected
20 in the world of surveys, and, yes, I would agree
21 with that statement.
22      Q.  So did Dr. Sartore unilaterally decide to
23 make you a partner -- a principal?
24      A.  No.  The plan had been, prior to
25 Dr. Ford's untimely passing, the discussion had

Page 41

```
 1    been, with the three of us, that I would eventually
 2    become a partner, and they were -- that he would
 3    kind of mentor me into the position over some time,
 4    and I think his death may have expedited that
 5    somewhat, but it was always the plan.
 6         Q.   And so as Ford Bubala is set up today,
 7    there's two principals, you and Dr. Sartore;
 8    correct?
 9         A.   That's correct.
10         Q.   And then one associate, Theresa Bavaro?
11         A.   We actually have two associates.  One is
12    Theresa Bavaro, and we have an office manager,
13    Kathi Ferguson.
14         Q.   You talked about some experience that does
15    not bear on consumer surveys.  Let me just quickly
16    go through that, if I could, just to make sure I've
17    got a complete sense of your professional history.
18    After you graduated from college in 2002, from 2002
19    to 2005, you were a teacher in Japan; correct?
20         A.   That is correct.
21         Q.   And did you do any work for Ford Bubala or
22    on consumer surveys during this period?
23         A.   No, I did not.
24         Q.   What did you do between 2005 and 2007?
25         A.   I worked -- after I came back to the
```

Page 42

```
 1    United States, I believe I worked at a temp
 2    agency -- I know I did work for a temp agency, and
 3    I'm saying I believe, about the time period, it was
 4    about six months.  And then I was hired by a firm
 5    that was a land auction company.  I was working in
 6    a payroll administrative position.  And so I went
 7    from being a temp work placed at a land auction
 8    company to being hired directly by that land
 9    auction company.
10         Q.   So during this period, 2005 to 2007, you
11    did no work for Ford Bubala or on consumer surveys;
12    is that correct?
13         A.   Prior to 2007 and after 2005, that is
14    correct.  But as we stated, in 2007, I began
15    working for Ford Bubala & Associates again.
16         Q.   Thank you for that clarification.
17              Mr. Ezell, I'm handing you what's been
18    marked as Exhibit 232, which I believe is the list of
19    publications that were appended as Exhibit C to your
20    opening report.  Do you see that?
21         A.   I see Exhibit 232, and I can tell you
22    that, yes, it is a list of publications that I have
23    authored since 2009.
24              (Deposition Exhibit 232 was marked for
25              identification by the reporter and is
```

Page 43

```
 1              attached hereto.)
 2    BY MR. ROMAN:
 3         Q.   Are there any -- first of all, is this
 4    list accurate and complete?
 5         A.   Yes.
 6         Q.   Were there any publications before 2009
 7    that bear on consumer surveys in any respect?
 8         A.   No, there are not.
 9         Q.   And any, since you prepared Exhibit 232,
10    that should have been included in this report?
11         A.   No.  Nothing in addition to what's on the
12    list.
13         Q.   So your professional writing has been
14    limited to -- well, strike that.
15              There are, on here, seven articles that are
16    described as intellectual property surveys.  Do you
17    see that?
18         A.   I do.
19         Q.   Can you please describe those?
20         A.   Sure.  We briefly touched on this before.
21    But every year, Ford Bubala & Associates puts out
22    an article that is maybe a summary or -- maybe not
23    "summary" is the best term.  It is excerpts from
24    reported case opinions in which survey evidence
25    appears, and we don't write any words of our own,
```

Page 44

```
 1    but rather excerpt out portions of the reported
 2    opinion that we feel a trademark practitioner may
 3    find useful.
 4         Q.   Okay.  So your professional -- I'm sorry.
 5    Strike that.
 6              Then you have a chapter in a -- is this a
 7    book that's listed at the bottom of Exhibit 232?
 8         A.   Yes.
 9         Q.   Okay.  Your -- the chapter is entitled
10    "Survey Evidence in U.S. Dilution Cases"; is that
11    right?
12         A.   That's correct.
13         Q.   So -- and this the extent of your
14    professional writing, the annual excerpts of
15    cases -- I'm sorry -- annual -- strike that.
16              Is it fair to say that your professional
17    writing experience is limited to excerpting reported
18    decisions to include in a survey, annual survey, of
19    intellectual property cases and then that one chapter
20    in one book?
21         A.   I would say that the publications include,
22    as you say, the survey excerpt -- excuse me,
23    reported opinion excerpt papers, as well as one
24    chapter, yes.
25         Q.   In these -- can I call them "annual
```

Page 45

1 reviews"?

2 A. Sure.

3 Q. These annual reviews are published by Ford

4 Bubala; correct?

5 A. Well, we make them available on our

6 website, but they are also electronically published

7 by the INTA.

8 Q. And that's a trademark trade association?

9 A. International Trademark Association, yes.

10 Q. And the reason that you do these annual

11 reviews, is they serve a marketing function for

12 Ford Bubala; correct?

13 A. I would say they have a couple of

14 functions. One, as you say, could be a marketing

15 function. Another is so that we stay current on

16 the case law. That is certainly an important

17 aspect of our job.

18 Q. Do you get any compensation for these

19 annual reviews?

20 A. No, I do not.

21 Q. Does Ford Bubala get any compensation for

22 these annual reviews?

23 A. No, it does not.

24 Q. Who does the research for the reviews?

25 A. We have an associate pull cases -- I think

Page 46

1 we have a Lexis alert such that we get an alert for

2 any new cases that involves a number of keywords,

3 such as "survey" or "study," involving trademark

4 terms, so there is a list of cases that are printed

5 by an associate. But ultimately, my partner,

6 Dr. AnnaBelle Sartore and I both review each case

7 and collectively decide if there is something of

8 interest. And we then decide on the nature of the

9 excerpt and put it in the paper.

10 Q. But there is no writing; correct? No

11 writing of your own, no original writing?

12 A. There is no opinion of ours in these

13 annual reviews.

14 Q. No analysis?

15 A. No analysis; that is correct.

16 Q. It's just a compendium of excerpts from

17 case opinions covering surveys; correct?

18 A. That is correct.

19 Q. If you can please go to your report, the

20 opening report, which is Exhibit 228.

21 Paragraph 22, page 11, states, "I've been with Ford

22 Bubala & Associates for approximately 17 years.

23 During the past nine years, I participate in the

24 design and execution of a variety of surveys

25 relating to intellectual property matters,

Page 47

1 including trademark, false advertising, and other

2 related matters." Do you see that?

3 A. I do.

4 Q. That's an accurate statement?

5 A. Yes, it is.

6 Q. So is it fair to say that for the first

7 eight years at Ford Bubala, you were not involved

8 in the design or execution of surveys?

9 MR. HENN: Asked and answered.

10 A. I think that I had a limited role prior to

11 the most recent nine years at Ford Bubala &

12 Associates, in either stimulus creation or perhaps

13 crafting a question or two, but certainly in the

14 last nine years, that's when my responsibilities

15 became full-time, so to speak, in terms of the

16 involvement in the survey design.

17 Q. When you say "stimulus creation," what do

18 you mean by that?

19 A. Oh, an exhibit or a website or a

20 photograph being shown to a respondent in a

21 trademark-related survey.

22 Q. So you would find the photograph?

23 A. I might take the photograph. I might

24 capture the website. I might create the control

25 stimulus under, you know, collective conversation

Page 48

1 with the partners at Ford Bubala & Associates.

2 Q. How many surveys have you designed and

3 executed as the principal survey expert?

4 A. You are asking in terms of how many

5 surveys have I designed where my signature

6 appears --

7 Q. Yes.

8 A. -- on the declaration?

9 That number is probably not very large. My

10 involvement has been greater than the number of

11 declarations, but I want to say -- I guess it should

12 be here in terms of my -- that's not true. I sign

13 more declarations than I am deposed in. So I would

14 say, probably, 15 to 20 times or so, somewhere in

15 that range.

16 Q. But you have only testified three times;

17 correct?

18 A. That's correct.

19 Q. What happened in those other 12 to 17

20 times?

21 A. Many times, as you know, a matter will

22 settle before it comes to trial or a deposition.

23 Q. You are quite a cooler.

24 A. A cooler?

25 Q. Yes. Someone who -- someone who makes

Page 49

1  cases go away.
2      A.  Oh.  I wouldn't say that.  I would say
3  that sometimes a mutual agreement is come to by
4  both parties, and we are happy for our clients when
5  they can achieve a known outcome and not have to go
6  to the expensive trial.
7      Q.  Have all the surveys you have conducted
8  been in the context of litigation or potential
9  litigation?
10     A.  No.  There are times that Ford Bubala &
11  Associates is acting as a consulting -- excuse me,
12  consulting expert.
13     Q.  What do you mean by "consulting expert"?
14     A.  For nonlitigation matters, we may be asked
15  to advise about brand awareness or which of a
16  series of logos might be perceived in a most
17  favorable fashion by consumers of the goods, et
18  cetera.
19     Q.  And of the 15 or 20 surveys that you've
20  conducted as a principal survey expert, how many
21  have been in that capacity, as a business adviser
22  or consultant?
23     A.  Well, I think maybe I misunderstood the
24  question earlier.  In terms of litigation-related
25  matters, and I was thinking in terms of when my

Page 50

1  signature would appear on a declaration, those
2  would always be for litigation-related matters.
3      Q.  So the consultancy matters are on top of
4  the 15 or 20 as a litigation expert?
5      A.  Right.  That's correct.
6      Q.  Okay.  So how many consultancies have you
7  done -- do you think? -- where you've been the
8  principal survey expert?
9      A.  I suppose another 20 or 30 on top of that,
10  but, boy, I really don't have a great sense of
11  tracking that number.
12     Q.  How many genericness surveys have you
13  designed and conducted as the principal survey
14  expert?  You talked about the one.
15     A.  Yeah.  We definitely -- the Comic-Con
16  case.  I'm trying to think if there were any
17  others.  I can't recall if there were any others
18  where they were involved -- involved in litigation
19  and we were testifying experts.  There may have
20  been some where we were consulting experts.
21     Q.  Well, how many times, again, regardless of
22  whether or not you actually testified, but how many
23  genericness surveys have you conducted as the
24  principal survey expert, whether in the context of
25  testifying, litigation consulting, just when you've

Page 51

1  studied genericness, how many times have you done
2  that as the principal survey expert?
3      A.  I would say probably five times or so in
4  terms of -- it's hard to answer that question the
5  way you posed it because when you say when I am the
6  principal survey expert, to me, that connotes that
7  I have put my signature to a declaration, and if
8  it's a consultancy, I don't really fill that
9  primary role, necessarily.  If we are just advising
10  a client, then that would happen with my partner
11  AnnaBelle Sartore as well in approximately equal
12  capacity.
13     Q.  Okay.  Well, include those times, please.
14     A.  Sure.  Then I would say probably five
15  times or so, including those, maybe five to ten.
16  I'm not sure.
17     Q.  What words or terms have you found to be
18  common names?
19         MR. HENN:  I will just caution you with
20  regard to consulting relationships, if there are
21  confidentiality agreements that would preclude you
22  from testifying about them, I don't want you to get
23  crosswise as to those.
24     A.  Right.  I wouldn't be at liberty to
25  disclose the names of things for consultancies.

Page 52

1  Can you repeat your question again?  I think you
2  asked about a specific outcome?
3         MR. ROMAN:  Well, can we go off the record
4  for a second, please?
5         THE VIDEOGRAPHER:  The time is 8:51 a.m.,
6  and we are now off the record.
7         (Recess taken from 8:51 a.m. to 8:52 a.m.)
8         THE VIDEOGRAPHER:  The time is 8:52 a.m.,
9  and we are back on the record.
10  BY MR. ROMAN:
11     Q.  So subject to any confidentiality
12  agreements that you may have in these
13  consultancies, can you tell me what words or terms
14  you have found to be common names, and what words
15  or terms you have found to be brand names?
16     A.  As we discussed, the survey that we
17  conducted in the San Diego Comic Convention matter
18  supported a finding that Comic-Con was that of a
19  brand name.  And I can't recall -- I can't recall
20  any other matters that are definitely public
21  record, so I suppose I don't want to potentially
22  disclose a name that may have been involved in a
23  consultancy.
24     Q.  Have you ever been precluded by a court
25  from testifying for any reason?

Page 53

1  A. No, I have not.
2  Q. Has a judge ever criticized your analysis
3  or testimony for any reason?
4  A. No, they have not, to my knowledge.
5  Q. Are you familiar with Professor Wind and
6  his reputation?
7  A. I'm aware, generally, of Dr. Wind.
8  Q. Are you aware that Professor Ford had
9  great respect for Dr. Wind?
10  A. I don't think he had any disrespect for
11  him. I think he's another survey expert that we
12  see from time to time in terms of the reported
13  opinions that relate to surveys conducted.
14  Q. I think we discussed earlier. You agree
15  that Dr. Ford was one of the leaders in the field;
16  correct?
17  A. I agree with that, yes.
18  Q. And you agree that Dr. Wind is one of the
19  leaders in the field, would you not?
20  A. I don't know that he's a leader or not a
21  leader. I honestly don't know that much about his
22  reputation. I just know that I've seen his name
23  come up in reported opinions. I will leave it at
24  that.
25  Q. Would you agree that Dr. Wind is an expert

Page 54

1  in consumer surveys?
2  A. I would agree that he has been admitted as
3  an expert in consumer surveys in the past that I
4  have seen.
5  Q. Any reason to doubt that he's an expert in
6  consumer surveys?
7  A. Not that qualification. I think I am
8  generally aware of certain cases where maybe his
9  survey was not reviewed in the most favorable light
10  by a court. And I can't think of a specific
11  example. I'm just -- I have that feeling from
12  reviewing the cases over the years.
13  Q. Were there times when Dr. Ford's surveys
14  were not reviewed in the most favorable light?
15  A. A small handful of times, yes, that also
16  happened.
17  Q. Would you agree that as between you and
18  Dr. Wind, Dr. Wind is more expert in consumer
19  surveys?
20  MR. HENN: I would object to form.
21  A. I would say that he probably has a longer
22  duration of experience as a testifying expert.
23  BY MR. ROMAN:
24  Q. That's it? He's done hundreds more;
25  correct?

Page 55

1  A. I'm not aware of the number of surveys
2  he's conducted.
3  Q. So you would not concede that he's more
4  knowledgeable about consumer surveys than you are?
5  A. Not necessarily. I don't know that --
6  that I can make that statement.
7  Q. Let's go to Dr. Ford's survey, which is
8  Exhibit A to your opening report; correct?
9  A. Yes. Dr. Ford's survey was attached as
10  Exhibit A to my report.
11  Q. And are you aware that Dr. Ford designed
12  and conducted the survey in connection with RT --
13  strike that.
14  If I use the acronym "RTC," you will
15  understand that's the -- an acronym for the
16  plaintiff, Reinalt-Thomas Corporation?
17  A. Yes, I will understand that.
18  Q. You are aware that Dr. Ford designed and
19  conducted the survey in connection with RTC's
20  application to register Discount Tire as a
21  trademark with the U.S. Patent and Trademark
22  Office?
23  A. Can you repeat the question? I'm sorry.
24  Q. Are you aware that Dr. Ford designed and
25  conducted the survey that's been marked as

Page 56

1  Exhibit 227 in connection with RTC's application to
2  register Discount Tire as a trademark with the
3  United States Patent and Trademark Office?
4  A. That is my understanding, yes.
5  Q. Are you familiar with the concepts of
6  acquired distinctiveness and secondary meaning?
7  A. Yes, I am.
8  Q. What is your understanding of those terms?
9  A. That a term, through its use in marketing
10  and sales, et cetera, can be associated with a sole
11  source, whether that source is named or anonymous.
12  Q. Now, I believe you testified earlier that
13  you were involved in the survey; correct?
14  A. Yes, I was involved in the design and
15  execution and did analysis of that earlier survey,
16  Dr. Ford's assigned survey.
17  Q. And in doing so, you consulted regularly
18  with Dr. Ford; correct?
19  A. That's correct.
20  Q. And you understood that Dr. Ford knew that
21  the survey he conducted in 2013 -- and it was
22  ultimately reported in April 2014 -- was going to
23  be used as evidence that Discount Tire had acquired
24  distinctiveness, that it had achieved secondary
25  meaning?

Page 57

1      A.  That was my general understanding.  The
2   survey was designed to test the primary
3   significance of the mark in 37 markets.  And I
4   understand that the conclusions -- or the results
5   of the survey supported a finding that the mark had
6   acquired secondary meaning.
7      Q.  And you understand that Dr. Ford knew that
8   the registration would give -- the trademark
9   registration would give RTC nationwide rights on
10  the Discount Tire mark; correct?
11     A.  I have a general understanding that if
12  someone obtains a registration, that they have
13  rights, unless those rights are specifically
14  disclaimed in terms of geography.
15     Q.  Are you aware of any disclaimer in RTC's
16  application?
17     A.  I'm not.
18     Q.  Do you know if Dr. Ford or anyone else
19  conducted any pilot or other surveys before
20  conducting the survey reflected in Exhibit 227?
21     A.  I'm not aware of anything conducted prior
22  to the survey that's referenced in Exhibit 227.  It
23  may be -- it's very likely that in that same
24  matter, we would probably start with, as is typical
25  practice, start with a small number of, let's say,

Page 58

1   100 completes and see what the results look like
2   and if the client wishes to move forward.  So in
3   that sense, that initial run of 100 may be deemed
4   as a pilot, depending on your perspective.
5      Q.  Well, I guess I distinguish in my mind --
6   and I'm not a survey expert, so please correct me
7   if I'm wrong, but I understand that there is a
8   difference between a pilot survey and what
9   others -- some call a "soft launch."  Do you have
10  understandings of those terms?
11     A.  I suppose, in our firm, we would say
12  "pilot survey," but that might be what another
13  expert refers to as a "soft launch," where you
14  begin the full study with, as I say, a limited
15  number of completes and then proceed with the
16  remaining completes.  So I'm really talking about a
17  soft launch, I suppose, in that -- if you are going
18  to use that term.
19     Q.  And so I'm asking -- so those results from
20  the soft launch, adopting that terminology, were
21  ultimately incorporated into the final results that
22  are reflected in Exhibit 227?
23     A.  That's correct.
24     Q.  Do you know, for example, if Dr. Ford or
25  anyone else conducted a survey on a different

Page 59

1   survey universe?
2      A.  I'm not aware of any other survey
3   conducted in this matter.
4      Q.  Okay.  Now --
5      A.  Other than Dr. Wind's, I suppose, but we
6   are talking about Ford Bubala & Associates, I
7   think.
8      Q.  Right.
9      A.  Right.
10     Q.  You did one, too?
11     A.  Ford Bubala & Associates, to me, includes
12  Dr. Ford's and my own.
13     Q.  Okay.  So the survey was conducted --
14  Dr. Ford's survey was conducted in June of 2013;
15  correct?
16     A.  That sounds correct.  I think I would have
17  to look at the other binder that you have in front
18  of you to confirm those dates, but I take your
19  representation as being on or about the correct
20  dates.
21     Q.  And you would agree that those results are
22  now dated; correct?
23     A.  I wouldn't -- I would say that they are
24  not conducted this year, but I think that the
25  results of the survey conducted in 2013 still have

Page 60

1   relevance.
2      Q.  So you as -- you would rely on or
3   recommend one of your clients rely on the results
4   of a survey that's six years old?
5      A.  I think in this case, with this particular
6   fact pattern of a universe of respondents who are
7   likely to purchase tires at a store that sells
8   tires, I'm not aware of any drastic changes in
9   purchasing patterns or sales that would invalidate
10  the results of a survey that was conducted five or
11  six years ago.
12     Q.  Have you looked for any such patterns?
13     A.  I have not.  I suppose I have looked
14  generally to see if there is any change in sales
15  data in terms of the plaintiff, and I don't think
16  that there was a substantial change in sales from
17  2013 to today.
18     Q.  What do you mean by "change in sales
19  data"?
20     A.  I suppose, the dollar amount, the gross
21  sales of the plaintiff has certainly fluctuated a
22  little bit here and there, but it has generally
23  remained, you know, in the billions of dollars and
24  has stayed in the billions of dollars for that time
25  period.

Page 61

1    Q.  So you believe that because of that, that
2    therefore, consumer recognition of Discount Tire as
3    a brand name is essentially unchanged from 2013?
4    Is that your testimony?
5        A.  I think that might mischaracterize it a
6    little bit, but I'm talking about the general
7    reliability.  You were asking me if I would
8    recommend or rely on a survey that was conducted in
9    the past.  Was that the question, I believe?
10       Q.  That's six years old, yeah.
11       A.  In this case, yes, because the sales of
12   tires have continued.  Because I don't see any
13   drastic changes in sales patterns, I don't see any
14   reason why that earlier survey cannot be relied on
15   as well.
16       Q.  And to see whether there were any changes
17   in sales pattern, all you've done is looked to see
18   whether there were any changes in the gross sales;
19   correct?
20       A.  That was -- I looked for other documents,
21   but that was the one specific document that I've
22   looked at that certainly confirms that there was
23   not a twofold or tenfold increase, let's say, in
24   sales over the past five or six years.
25       Q.  So is that -- that was the document you

Page 62

1    looked at yesterday?
2        A.  That is correct.
3        Q.  Dr. Ford conducted what's known as a
4    "Teflon survey"; correct?
5        A.  It is often referred as a "Teflon survey,"
6    that methodology, yes.
7        Q.  Can you describe what's involved in a
8    Teflon survey?
9        A.  Sure.  In terms of jumping right into the
10   questionnaire, the main questionnaire, is that a
11   fair place to start?  Or do you want to talk about
12   the screener or --
13       Q.  Well, why don't you just kind of give me
14   an overview.  If somebody said -- if you were at a
15   cocktail party and somebody asked you, you know,
16   "What's a Teflon survey?  I was just reading in the
17   paper about Teflon surveys because they are such a
18   hot topic.  What is one?"
19           How would you answer that question?
20       A.  I would say, in a nutshell, that a Teflon
21   survey is a survey design in which you expose --
22   first, you teach respondents the difference between
23   a brand name and a common name, and not only do you
24   explain the difference, but you give them a
25   mini-test, and you test their understanding of a

Page 63

1    brand name and a common name.
2            So in our case, we might say -- or the
3    original Teflon case, we might say a brand name is
4    used by one company, for example, Chevrolet, and a
5    common name is used by more than one company, for
6    example, automobile, and then you would give them a
7    mini-test and test the respondent's understanding
8    of brand name versus common name.  And only those
9    respondents who passed that test would continue.
10           And then you would expose them to --
11   what's typical, is a list of names and ask the
12   respondent for each of those names, Do you
13   understand each name to be a brand name or common
14   name or don't you know?
15       Q.  Okay.  And it's called a "Teflon survey"
16   because the survey format was first used in a case
17   in and around 1975 involving Teflon; correct?
18       A.  I don't have an exact recollection of the
19   date but, yes, it was definitely in a matter
20   involving Teflon.
21       Q.  And Teflon was a coined term; correct?
22       A.  I believe that Teflon is a coined term.
23       Q.  And the question in that case was whether
24   Teflon had become generic for a protective cookware
25   coating; correct?

Page 64

1        A.  I don't recall the exact description of
2    the goods, but I do take your representation
3    that -- that's my general understanding of Teflon
4    now, that it's for a nonstick cookware coating.
5        Q.  At the time that the Teflon survey was
6    first used, there was no such thing as a Teflon
7    survey was there?
8        A.  I suppose that is true.  The people would
9    not have called it the "Teflon survey" the very
10   first time it was used.
11       Q.  Does that mean that that survey was
12   invalid?
13       A.  No, I would not say that it means that.
14       Q.  Do you know if it was criticized by those
15   on the other side of the case as novel and not
16   accepted by any court?
17       A.  I don't recall the exact criticisms.  I'm
18   sure that, as with any case, the other side did
19   their best to attack that survey.
20       Q.  Never been used before.  That's the basis
21   for attacking; right?
22       A.  That may be a basis for attacking the
23   survey.
24       Q.  Would you agree that if a new survey
25   format produces more meaningful or more reliable

Page 65

```
1   results, it would make sense to use it?
2       A.  That sounds logical.
3       Q.  Are you doing okay?
4       A.  I'm doing okay, thank you.
5       Q.  Good.  Okay.  So the Ford survey was
6   conducted by telephone; correct?
7       A.  That is correct.
8       Q.  And the survey universe was those who
9   lived in 37 markets in which there were three or
10  more Discount Tire stores within a 10-mile radius;
11  correct?
12      A.  That is correct.
13      Q.  Let's go ahead and mark that list.
14  Mr. Ezell, I'm handing you what's been marked as
15  Exhibit 233.  Have you seen this document before?
16      A.  Yes, I have.
17          (Deposition Exhibit 233 was marked for
18          identification by the reporter and is
19          attached hereto.)
20  BY MR. ROMAN:
21      Q.  What is Exhibit 233?
22      A.  This is Appendix E to Dr. Ford's report
23  that was submitted in 2014, and it lists the market
24  areas in the continental United States with three
25  or more Discount Tire stores within a 10-mile
```

Page 66

```
1   radius, and these were the 37 markets in which his
2   survey was conducted -- our survey was conducted in
3   which he signed.
4       Q.  Now, that survey universe, the respondents
5   to qualify had to say they were likely, within two
6   years, to buy tires for a motor vehicle at a store
7   that sells tires; correct?
8       A.  That is correct.
9       Q.  And the respondents were given
10  instructions about the difference between brand
11  names and common names?
12      A.  That's correct.
13      Q.  And you would agree that at least some
14  names can be definitively categorized as a brand
15  name or a common name; correct?
16      A.  Yes, I think that there are certain
17  names -- for example, margarine, that I don't think
18  is -- by itself, I don't think that is in danger of
19  being deemed by the responding -- by the
20  respondents as a whole as a brand name.
21      Q.  Well, what are the -- remind me what the
22  terms were for the screener in the Ford survey.
23  Was it Mercedes-Benz?
24      A.  I believe the term "Mercedes-Benz" was
25  used either as the test question to test a
```

Page 67

```
1   respondent's understanding of a brand name versus
2   common name, as opposed to being in the list of
3   primary survey questions.
4       Q.  But there is a right answer.
5   Mercedes-Benz is a brand name; correct?
6       A.  Yes, it's my understanding that that is a
7   brand name.
8       Q.  Okay.  And car -- I don't know if that was
9   used in the survey or not, but car, we can agree,
10  is a common name; correct?
11      A.  Yes.
12      Q.  So there are some names that you know for
13  sure are brand names, and some names that you know
14  for sure are common names; correct?
15      A.  Yeah.  I would say that there are some
16  names that behave in that way, such that they are
17  relatively unambiguous.  And I say relatively, it's
18  never quite 100 percent of all respondents
19  answering fully brand name or fully common name.
20      Q.  But for example, both you and Dr. Ford
21  disqualified those who got questions wrong; right?
22      A.  Sure.  As part of the Teflon test, once
23  you explain the difference between a brand name and
24  a common name, and you give them those -- that
25  mini-test, the two-question test, to those two
```

Page 68

```
1   questions, you have to get it 100 percent correct
2   to continue with the survey.
3       Q.  So there are right answers and wrong
4   answers; correct?
5       A.  I suppose in terms of that screening
6   question, yes, that's a right or wrong answer.  In
7   terms of the later names, we are asking for
8   respondents' opinions.  So every answer is equally
9   valid, I suppose.  And in the aggregate, we decide
10  what the primary significance is.
11      Q.  Well, if somebody said that Mercedes-Benz
12  was a common name, would you say that that person
13  was correct or incorrect?
14      A.  For Mercedes-Benz, I would say -- my own
15  personal understanding is that it's a brand.  So I
16  would say that they were incorrect if they said if
17  it was a common name.
18      Q.  And if they said -- if the respondent
19  answered "car" as a brand name, you would say that
20  that person was incorrect; right?
21      A.  For car by itself, I would say that that's
22  a brand name, and I would say that they were
23  incorrect.
24      Q.  So after you -- after Dr. Ford gave the
25  respondents or potential respondents instructions
```

Page 69

1    about the difference between brand names and common
2    names, he gave them two test questions, one of an
3    obvious brand name and one of an obvious common
4    name; correct?
5        A.  I don't know if it's obvious or not.  I'm
6    sure there are some number of respondents who
7    failed that mini-test.  I would hope that it's a
8    relatively easy task for most people.  It's not
9    designed to be a trick question.  We are trying to
10   narrow the respondent pool to just people who have
11   an understanding of brand names and common names.
12       Q.  But the reason you disqualified them is
13   because they got it wrong; correct?
14       A.  Correct.
15       Q.  Okay.  So -- and that is why you chose an
16   obvious brand name -- or Dr. Ford chose an obvious
17   brand name and an obvious common name; correct?
18       A.  We chose a name that is, I would say,
19   prototypically -- I just don't know about obvious
20   in terms of what some people see, certain names.
21   But we are trying to, again, not be tricky.  We are
22   trying to choose a name that is overtly seen as a
23   brand name and overtly seen as a common name, and
24   not try to have anything ambiguous.  Like steelhead
25   may not be a great example, because steelhead could

Page 70

1    be a brand for golf clubs and it could be a common
2    name for a fish.
3        Q.  So I'm a fisherman.  I appreciate that.
4    Never caught a steelhead, but.
5            And so maybe you are quibbling with my
6    word choice.  What you're -- what I'm suggesting is
7    that instead of using the word "obvious," it's fair
8    to say that a brand name or a name that's
9    recognized either as a brand name or a common name
10   by the overwhelming number of respondents; correct?
11       A.  That's certainly the idea.  You don't want
12   to have an ambiguous answer in terms of your
13   training and testing of a respondent's
14   understanding of brand names and common names.
15       Q.  Okay.  So instead of "obvious," I will
16   substitute the word "unambiguous."  Is that better?
17       A.  Yeah, I think that's what we are striving
18   to do.
19       Q.  Okay.  So you gave them a choice of an
20   unambiguous common name and an unambiguous brand
21   name, and if they got it wrong, they were
22   disqualified; correct?
23       A.  That is correct.
24       Q.  Those who qualified, were then given a
25   list of ten names and asked each time whether or

Page 71

1    not the name was a brand name or a common name;
2    correct?
3        A.  That is correct.
4        Q.  And they were not told that they could
5    choose both, that a word could be both a brand name
6    and a common name; correct?
7        A.  That is correct.
8        Q.  And they were not given the choice of
9    saying both can be a brand name and a common name;
10   correct?
11       A.  The questionnaire had the answer choices
12   in terms of -- ultimately, it was a programmed
13   questionnaire, but the paper we would send to the
14   professional interviewing service that conducted
15   the telephone interviews had a brand name choice, a
16   common name choice, a both, and a don't know, but
17   as you stated, the both choice was not vocalized
18   over the telephone.
19       Q.  Okay.  So if they -- they could say
20   "both," but they would have to come up with that on
21   their own?
22       A.  That's correct.
23       Q.  Then respondents were asked about five
24   names in the automotive space; correct?
25       A.  Generally, in the automotive space, yes.

Page 72

1        Q.  And, again, they were not told that they
2    could choose both or given the choice of both;
3    correct?
4        A.  Right.  Same as before, there was a choice
5    that could be recorded, but it was not vocalized in
6    terms of the "both" alternative.
7        Q.  And the principal result of the Ford
8    survey was that Discount Tire had about an 80
9    percent recognition as a brand; correct?
10       A.  Right.  Approximately 80 1/2 percent is my
11   recollection.
12       Q.  So it was closer to brand -- to
13   unambiguous brand names, such as Coke, than
14   unambiguous common names, such as refrigerator;
15   correct?
16       A.  That is correct.
17       Q.  And on the basis of these survey results,
18   Dr. Ford concluded that the principal significance
19   of "discount tire" is that of a brand name;
20   correct?
21       A.  That is correct.
22       Q.  Okay.  Can you go to page 9 -- I'm sorry,
23   paragraph 9 of his survey.
24       A.  Okay.
25       Q.  In there, Dr. Ford says that the survey

Page 73

1  conducted in this matter was administered under a
2  double-blind protocol. Specifically, not only were
3  the respondents not informed as to the purpose or
4  sponsor of the survey, but similarly, both the
5  survey's supervisors and interviewers were not
6  informed as to the purpose or sponsor of the
7  survey. Do you see that?
8      A. I do.
9      Q. Now, the purpose of a double-blind survey
10  is to make sure that no one knows what you are
11  testing so that you don't bias the results;
12  correct?
13      A. I don't know if I --
14      MR. HENN: Object to the form.
15      A. I don't know if I can say no one knows
16  what you are testing, but we don't want, as it
17  states here, we don't want respondents to know the
18  purpose or sponsor of the survey.
19  BY MR. ROMAN:
20      Q. Because otherwise, it would bias the
21  results?
22      A. It may. It may not.
23      Q. But that's a standard protocol -- is it
24  not? -- to do a double-blind survey?
25      A. Yes, it is.

Page 74

1      Q. And it's to avoid any possibility of bias;
2  correct?
3      A. Right. We are trying to reduce the
4  possibility of bias in terms of -- we don't want to
5  have any expectation of the, quote/unquote, right
6  or wrong answer. We are asking for people's
7  opinions only.
8      Q. So you would agree that if respondents
9  know what you are testing, the results could be
10  invalid?
11      MR. HENN: Object to the form. Misstates.
12      A. If they know of -- I guess I would have to
13  have you expound on "know what we are testing." If
14  they knew, for example, that we were conducting the
15  survey for Discount Tire, I think that could
16  definitely influence the results.
17  BY MR. ROMAN:
18      Q. Are you familiar with the concept of
19  distractor questions?
20      A. Generally, I am familiar with what you are
21  talking about. Can you provide a more specific
22  example or --
23      Q. I was hoping you, as the expert, would
24  know what a distractor question is.
25      A. Well, I think it could -- my understanding

Page 75

1  of using that term, it could be used in a variety
2  of contexts in the -- are we talking about in a
3  primary significance survey or genericness survey?
4      Q. Well, when you are doing a screener at the
5  start of the survey, you don't want people to know
6  what you are trying to test; correct? You are
7  trying to avoid letting people know the subject
8  matter is tires or something like that; correct?
9      A. Generally, we include distractor questions
10  in the screener, and that may not always happen,
11  and I believe it did not happen in terms of
12  Dr. Ford's survey over the telephone. I think
13  we -- the intention there was to get directly to a
14  qualified respondent and not spend additional time
15  asking a respondent about other non sequitur
16  potential purchases.
17      Q. So -- what is your understanding of what a
18  distractor question is?
19      A. In terms of the screener, if we are
20  talking about a qualifying question --
21      Q. Right.
22      A. -- for a survey, I would say a distractor
23  question is another item in the list that might
24  distract or disguise the question that allows a
25  respondent to qualify for the survey.

Page 76

1      Q. And the purpose is to disguise what you
2  are trying to test so as to avoid any potential
3  bias of the results; correct?
4      A. I'm sorry. Can you repeat that please?
5      Q. The purpose of distractor questions is to
6  disguise what you are trying to test so as not to
7  bias the results of the survey; correct?
8      A. I generally agree with that statement,
9  that you want -- if you are going to use a
10  distractor question, it's purpose is to disguise or
11  distract from the true listing of goods and
12  services that would -- a yes answer would get a
13  respondent qualified to take the survey.
14      Q. So as -- I think you suggested in one of
15  your responses that Dr. Ford did not use a
16  distractor question here; correct?
17      A. I don't believe that he did for the
18  telephone survey.
19      Q. So what he did was: He qualified
20  respondents for the survey -- strike that.
21      What he did was: In qualifying respondents
22  for the survey, right after determining that the
23  person was 18 years old and lived in a market where
24  there were at least three Discount Tire stores, he
25  asked them if they planned to buy tires in the next

Page 77

1  two years; correct?
2      A.  That is -- I take your general
3  representation of the screening process in his
4  survey.
5      Q.  He didn't ask about the intent to buy any
6  other products; correct?
7      A.  That's correct.  My recollection is that
8  that is correct.
9      Q.  So everyone, both the respondents and
10  those administering the tests, knew that the survey
11  was about tires; correct?
12      A.  I would say once they got past that
13  question, they probably would suspect -- they could
14  suspect, I suppose, that the survey was on the
15  topic of tires, generally.
16      Q.  And would you agree that that introduced
17  potential bias into the survey?
18      A.  It may or may not have.  If we had, for
19  example, asked the respondent if they were likely
20  to purchase Big O tires, I think that would
21  certainly introduce some bias towards later
22  recognizing the name Big O tires.
23      Q.  Well, I mean, you asked about intent to
24  purchase a cell phone or dishwasher; correct?
25      A.  In my survey, yes.

Page 78

1      Q.  And the reason you did that was to avoid
2  potential bias; right?
3      A.  I think things have changed a little bit
4  in terms of telephone surveys and
5  Internet-conducted surveys.  The world that we are
6  in now, with the predominance of Internet-conducted
7  surveys, there are often panels, and respondents
8  agree to take surveys on a variety of topics from
9  time to time, and I feel the need more with
10  Internet surveys to have distractor items, and I
11  don't feel that need as much with a telephone
12  survey.  I think people are more candid on the
13  telephone with a live respondent and not feeling
14  obligated to say "yes" to a particular question.
15      Q.  What about an Internet survey leads you to
16  believe that people are more candid in a telephone
17  survey?
18      A.  I don't mean generally; I mean with
19  respect to a purchase question.  I think if you
20  agree to take surveys from time to time as part of
21  an Internet panel, I think that there may be a
22  greater risk of a respondent saying "yes" to a type
23  of product that they are not necessarily going to
24  purchase just to get rewards in terms of, you know,
25  a small compensation for taking the survey.

Page 79

1      Q.  Well, tell me what the purpose of your
2  including screener questions about intent to
3  purchase a cell phone and a dishwasher.  Why did
4  you ask those two questions?
5      A.  The purpose of those is, as we've
6  discussed, I think, as distractor items.  So we are
7  disguising from a respondent the topic of
8  likelihood to purchase tires.  In this particular
9  survey, if a respondent sees a variety of goods or
10  services, they may be less cued to think that a
11  "yes" answer here gets them in a survey -- a single
12  question, where if there's three or four items,
13  then I feel they may feel at liberty to -- to just
14  indicate the products that they are actually likely
15  to purchase.  I think there may be some bias
16  towards saying "yes" in terms of an Internet survey
17  when you, again, pre -- when you have agreed to
18  take surveys from time to time.
19      Q.  Well, why wouldn't you -- if your goal is
20  you want to qualify for the survey to get your
21  reward, why wouldn't you say "yes" to all of them?
22      A.  A respondent may or may not do that.  They
23  are often -- I've seen in other survey designs
24  where if you say "yes" to every item, you are
25  disqualified or things of that nature.

Page 80

1      Q.  Would you agree that it was common
2  practice in 2013, in telephone surveys, to include
3  distractor questions?
4      A.  I don't have an understanding if it was
5  common practice or not at the time.
6      Q.  You don't know one way or the other?
7      A.  I don't know one way or the other.
8      Q.  Okay.  Going to Exhibit 233 -- that's the
9  list of market areas.
10      A.  Yes.
11      Q.  And these are the 37 market areas tested
12  by Dr. Ford; correct?
13      A.  Yeah, these are the 37 market areas that
14  were part of our target market, I suppose, for
15  Dr. Ford's survey.
16      Q.  Okay.  I will represent to you that this
17  covers market areas in 19 states.  Okay?
18      A.  Okay.
19      Q.  Would you agree that the results of the
20  survey are not representative of the country as a
21  whole?
22      A.  I think that's a question for a fact
23  finder, whether or not the 37 markets may be
24  relevant to the nation as a whole.  This is
25  certainly a wide geographic spread of states and

Page 81

1  markets. So I think that's an empirical question.
2  It would be most helpful to compare a national
3  study to the study to see if there was any
4  difference. I don't know one way or the other.
5      Q.  Let me ask this question: Why did
6  Dr. Ford choose market areas with three or more
7  Discount Tire stores within a 10-mile radius?
8      A.  I would -- I believe the thinking was, at
9  the time, that we want to -- because "discount
10  tire" may be seen as a descriptive term, we want to
11  target markets in which a respondent may have been
12  exposed -- may or may not have been exposed to the
13  Discount Tire mark.
14      Q.  And would you agree that in those markets
15  where respondents were less likely to have been
16  exposed to Discount Tire -- to a Discount Tire
17  store, that they would be less likely to say that
18  Discount Tire is a brand name?
19      A.  Logically that sounds reasonable. I don't
20  know one way or the other whether or not
21  advertising is conducted nationally on the radio or
22  television. I just don't know the answer to that.
23      Q.  Are you aware of any evidence at all that
24  Discount Tire advertises on a national basis?
25      A.  I don't have an understanding one way or

Page 82

1  the other.
2      Q.  Sitting here today, you're not aware of
3  any national advertising campaigns by Discount
4  Tire, are you?
5      A.  Again, I don't know the scope, if they are
6  national or not. I'm aware of the long-running
7  Discount Tire commercial that has aired on
8  television.
9      Q.  Yeah. But, you don't know where it's
10  aired?
11      A.  I don't have an understanding if it's on a
12  national scope or on a more localized scope.
13      Q.  Would you agree that even within the 19
14  states covered by the market areas in Exhibit 233,
15  that you cannot extrapolate the results of the
16  survey to the entirety of those states?
17      A.  You may or may not be able to. To the
18  extent that one of these markets is a majority or a
19  significant portion of the population of that
20  state, perhaps you could make that extrapolation.
21  But ultimately, it's an empirical question. You
22  would have to look and see if the data were any
23  different on a statewide scope versus those
24  metropolitan areas.
25      Q.  And Dr. Ford didn't test that?

Page 83

1      A.  That is correct.
2      Q.  And so he cannot and you cannot
3  extrapolate those results to the states as a whole,
4  can you?
5      A.  Again, I think that to the extent that the
6  markets represent a good portion of the population
7  of the state, I think there can be some general
8  extrapolation. I'm not providing opinions about
9  the statewide -- let's say New Mexico. I'm not
10  providing opinions about New Mexico or about
11  Colorado, nor was Dr. Ford, I believe, in his
12  survey or in his declaration.
13      Q.  It was limited to those 37 market areas;
14  correct?
15      A.  I believe that is correct.
16      Q.  Let's direct your attention to
17  paragraph -- paragraphs 4 and 5 of Dr. Ford's
18  survey or the report of a survey, I should say.
19  Dr. Ford says -- writes, "The results of the survey
20  conducted in this matter evidence that for
21  approximately 81 percent," and then parens, "80.5
22  percent of adults 18 years of age or older who,
23  within the next two years, are likely to purchase
24  tires for a vehicle at a store that sells tires and
25  who were able to evidence their ability to

Page 84

1  distinguish between a brand name and a common name
2  the principal significance of Discount Tire is that
3  of a brand name or trademark."
4      And he continues in paragraph 5, "It is my
5  opinion that the results of the survey support a
6  finding that the principal significance of Discount
7  Tire is that of a brand name or trademark and not
8  that of a generic term or designation.
9  Additionally, the magnitude of acquired
10  distinctiveness or secondary meaning evidenced by
11  the survey results support a finding that Discount
12  Tire is a strong and famous mark among the relevant
13  universe of people who, within the next two years,
14  are likely to purchase tires for a vehicle at a
15  store that sells tires."  Do you see that?
16      A.  I do.
17      Q.  Where in these paragraphs does Dr. Ford
18  limit his findings to the 37 markets included in
19  Appendix E?
20      A.  In the prior paragraph, in paragraph 3, he
21  talks about the scope of the survey being conducted
22  in 37 markets.
23      Q.  But his conclusions are broader than that,
24  are they not?
25      A.  His conclusions talk about the relevant

Page 85

1  universe of people, and I think that relevant
2  universe is a little more specific to the 37
3  markets.
4      Q.  Where does he talk about the relevant
5  universe of people?
6      A.  In paragraph 5, the third from the last
7  line says that -- I guess starting from the fourth
8  to the last line, it says, "support a finding that
9  Discount Tire is a strong and famous mark among the
10 relevant universe of people who," and continues on.
11     Q.  And so you think that makes it clear that
12 it's the 37 market areas?
13     A.  I think so.
14     Q.  Okay.  Now, your report was more specific
15 than that, wasn't it?
16     A.  Specific in terms of geography?
17     Q.  Yeah, in terms of the conclusions that you
18 drew.
19     A.  I suppose it may or may not have been.
20 Let's see.  In terms of --
21     Q.  Direct your attention to page 10 of your
22 report, paragraph 19.  Your conclusion is that the
23 results of the survey support a finding that the
24 primary significance of Discount Tire is that of a
25 brand name or trademark and not that of a generic

Page 86

1  term or designation in the metropolitan areas of
2  Atlanta, Jacksonville, and Orlando."  Do you see
3  that?
4      A.  I do see that.
5      Q.  So you specifically limited your findings
6  to those three market areas; correct?
7      A.  That is correct.
8      Q.  And Dr. Ford possibly should have used the
9  same type of limiting language in his conclusion,
10 shouldn't he?
11     MR. HENN:  Object to the form.
12     A.  I'm not so sure about that.  As we've
13 discussed, the survey conducted by Dr. Ford, by
14 Ford Bubala & Associates, was in a wide geographic
15 area covering, as you say, 19 states across the
16 United States, and you may or may not be able to
17 extrapolate to a national survey.  That's really an
18 empirical question.
19 BY MR. ROMAN:
20     Q.  And the way you would find the answer to
21 that empirical test -- question is by testing those
22 other areas; correct?
23     A.  One could do that.
24     Q.  But you didn't?
25     A.  We did not conduct a national survey in

Page 87

1  this matter, a nationwide scope.
2      Q.  Or even a statewide survey; correct?
3      A.  We -- our survey was focussed in Atlanta,
4  Jacksonville, and Orlando regions, as we have
5  discussed.
6      Q.  Right.  So you have not conducted --
7  neither you nor Dr. Ford conducted a national
8  survey or a statewide survey; correct?
9      MR. HENN:  Objection to the form.
10 Misstates.
11     A.  I would say that my survey was not a
12 nationwide survey, certainly, and it's somewhat
13 debatable.  I agree it doesn't cover all states,
14 nationwide, for the Dr. Ford survey.  But the 37
15 markets is a pretty wide spread of the United
16 States.
17 BY MR. ROMAN:
18     Q.  What state of the 50 United States did
19 either you or Dr. Ford study on a statewide basis?
20     A.  On a -- in terms of geography for the
21 entire state, the survey questions weren't focused
22 on the entire state.  They were focused on markets
23 in 19 states.
24     Q.  So the answer is none; correct?
25     MR. HENN:  Object to the form.

Page 88

1      A.  I wouldn't say none.  Again, I would say
2  that the survey scope was limited to particular
3  markets in 19 states.
4  BY MR. ROMAN:
5      Q.  Please answer my question.
6      MR. HENN:  Asked and answered.
7      MR. ROMAN:  I haven't even asked it yet.
8      MR. HENN:  I thought "Please answer my
9  question" was your question.  Go ahead.
10     MR. ROMAN:  No.
11     Q.  Please name any state that either you or
12 Dr. Ford studied on a statewide basis.
13     MR. HENN:  Same objection.
14     A.  Again, on a -- on a 100 percent, covering
15 all of the states, none of the states were studied
16 on a hundred percent across-the-state basis.
17 However, as I stated, there are certain markets
18 that are analyzed within those states.
19     MR. ROMAN:  Move to strike everything
20 after "basis."  Why don't we take a break?
21     MR. HENN:  Okay.
22     THE VIDEOGRAPHER:  This marks the end of
23 DVD Number 1 in the deposition of Matthew Ezell.
24 The time is 9:38 a.m.  We are now off the record.
25     (Recess taken from 9:38 a.m. to 9:51 a.m.)

Page 89

1    THE VIDEOGRAPHER: This begins DVD
2  Number 2 in the deposition of Matthew Ezell. The
3  time is 9:51 a.m. We are back on the record.
4  BY MR. ROMAN:
5    Q. Dr. Ezell -- Mr. Ezell, I'm sorry, in your
6  report, you ask about, as part of the screening
7  process, potential respondents' intent within the
8  next two years to purchase tires for a vehicle at a
9  store that sells tires; correct?
10    A. That is correct in terms of our screening
11  question.
12    Q. And that's the same formulation that was
13  used by Dr. Ford; correct?
14    A. It was; correct.
15    Q. And so both you and Dr. Ford exclude
16  consumers who purchase tires online; correct?
17    A. To the extent a potential respondent only
18  purchases online, I suppose they would not be
19  allowed to participate in our survey.
20    Q. What was the basis for excluding those
21  consumers?
22    A. We understood that the majority of tire
23  purchases -- understood and understand that the
24  majority of tire purchases happen in-store.
25    Q. But why would you exclude those who buy

Page 90

1  via the Internet?
2    A. I don't know that it's material one way or
3  the other in terms of the overwhelming majority who
4  purchase in-store. I wouldn't say that we
5  excluded, but rather we crafted a question that
6  talked about stores because that is certainly the
7  most obvious way in which a respondent would
8  purchase tires, is at a store.
9    Q. And is that why you looked at that
10  document yesterday, was to see what percentage of
11  people buy tires in in-store versus outside the
12  store?
13    A. I don't know if that's the answer to why I
14  looked at it, but in terms of looking at that
15  document, I did understand that, by looking at that
16  document, that the great majority of purchases were
17  made in-store.
18    Q. At the time you conducted the survey, did
19  you know that the great majority of tire purchasers
20  bought their tires at brick and mortar stores as
21  opposed to online?
22    A. I don't believe we reviewed any documents
23  at that time that stood for that notion, but I
24  believe the general idea from counsel at the time
25  was that a great portion of the tires purchased

Page 91

1  were purchased in-store.
2    Q. At what percent would you be concerned
3  whether you had gotten a representative sample?
4  For example, if it was 50/50, half the people buy
5  their tires at a store and half buy it on the
6  Internet, would that cause concern about the
7  validity of your results?
8    A. It --
9    MR. HENN: Objection to form.
10    A. I'm sorry.
11    It may or may not cause concern.
12  Ultimately, you would have to do a survey that was
13  just among, let's say, Internet purchasers and just
14  among in-store purchasers and compare them to see
15  if it was a cause for concern.
16  BY MR. ROMAN:
17    Q. But you didn't do that?
18    A. We did not conduct two separate surveys
19  and compare them with respect to the survey
20  universe.
21    Q. And you don't know what the exact
22  percentage is, do you?
23    A. Not exact, but I do, again -- I think, my
24  testimony earlier this morning was that I
25  understand that approximately 95 percent of

Page 92

1  plaintiff's sales are in-store.
2    Q. But you don't know about people -- you
3  don't know about tire purchases in general. You
4  don't know, for example, whether, you know, 60
5  percent of Mavis customers buy tires online;
6  correct?
7    A. I don't have an understanding with respect
8  to Mavis or another tire manufacturer explicitly or
9  specifically. I did some other research online and
10  found general numbers that were consistent with
11  what I found out yesterday, in that the majority of
12  purchasers -- purchases, excuse me, for tires were
13  in-store. And even that -- if a purchase had been
14  online, many times there would be a follow-up with
15  installing those tires in a store.
16    Q. You haven't told me about this. What
17  online research did you do?
18    A. I did a general Internet search and -- for
19  tire-purchasing demographics, and I don't recall
20  the source. I just do recall seeing some
21  general -- you know, third-party data that was not
22  in relation to any document, let's say, turned over
23  in this matter, but, rather, some general
24  documentation that showed that there were more tire
25  purchases that happened in-store as opposed to

Page 93

```
 1   online.
 2        Q.  And you don't know anything about the
 3   reliability of the sources that you reviewed, do
 4   you?
 5             (Reporter clarification.)
 6        A.  I don't recall.  If I don't recall the
 7   source, then I suppose I can't comment on the
 8   reliability of that source.  But it did not -- it
 9   was not, for example, Wikipedia.  It was a source
10   that did talk about its methodology generally, that
11   it was among tire purchasers across the United
12   States.
13   BY MR. ROMAN:
14        Q.  Have you done any other Internet research
15   in connection with this case?
16        A.  I'm sure that -- I don't know if you call
17   it "Internet research," but I'm sure that I visited
18   the Discount Tire home page and generally, you
19   know, exposed to the pages of that nature, but in
20   terms of research, I don't know that it's,
21   quote/unquote, research.
22        Q.  In your report, I wonder whether this is a
23   typo or not.  I'm struggling to find it, but in
24   your report, you say that -- oh, yeah, here it is.
25   Exhibit B, page 1, under the -- under the heading
```

Page 94

```
 1   "Sampling Frame and Sample," the second paragraph
 2   says that "The age and gender distribution response
 3   was based upon an Opinion Research Corporation
 4   telephone survey conducted between May 2 and May 5,
 5   2013, among a nationally represented sample of
 6   approximately 1010 individuals across the United
 7   States."
 8             Is that right, that -- that you used the
 9   sampling data from 2013?
10        A.  That is correct.  There was an Opinion
11   Research Corporation, I believe telephone survey,
12   that was conducted, as you say, among approximately
13   1,000 individuals across the United States, and in
14   that survey we had asked if respondents had
15   purchased tires for an automobile at a store that
16   sells tires, and based upon the "yes" responses, we
17   derived our quotas for age/gender for our surveys.
18        Q.  That was the same distribution used by
19   Dr. Ford; correct?
20        A.  That is correct.
21        Q.  Okay.  And do you have any basis for
22   believing that the age and gender distribution of
23   potential -- of the potential tire-purchasing
24   public has remained the same throughout those five,
25   six years?
```

Page 95

```
 1        A.  I'm not aware of any changes that would
 2   invalidate that data.  I generally understand that
 3   we still drive a lot of automobiles in the United
 4   States, and there are still tires purchased, and I
 5   don't know of any major changes in trends that
 6   would cause me to call into question the results of
 7   that 2013 omnibus survey.
 8        Q.  Did you look for any changes?
 9        A.  I'm not sure if we looked for changes.
10   That's -- I generally understand that, as I stated,
11   the sales figures have been pretty consistent year
12   after year, in the several billions of dollars for
13   plaintiff.
14        Q.  Yeah, but you don't know if those are
15   going to more men now, more women now, younger
16   people, older people, do you?
17        A.  I don't know the specific demographics of
18   purchasers based on the sales data.  We do know the
19   specific demographics based upon that Opinion
20   Research Corporation omnibus that was conducted.
21        Q.  In 2013?
22        A.  That's correct.
23        Q.  But you made no effort to determine
24   whether it's still valid, did you?
25        A.  Again, I don't have any reason to suspect
```

Page 96

```
 1   that it is not valid.
 2        Q.  Did you make any efforts to determine the
 3   validity of the age and gender distribution?
 4        A.  I'm not sure how to answer that, in
 5   that -- again, there is no reason to suspect that
 6   it was invalid, so I didn't conduct a formal search
 7   into why we couldn't use these other than just
 8   looking at the general trends in tire sales, and
 9   they have been -- you know, tires are still widely
10   sold across the United States, so I don't have any
11   reason to believe that the demographics have
12   changed drastically in the last five or six years.
13        Q.  Okay.  But you made no efforts to
14   determine whether, in fact, it hasn't changed;
15   correct?
16        A.  Again, I don't know if I can say no
17   effort, but --
18        Q.  Well, describe all your efforts.
19        A.  Through conversation with counsel -- if my
20   recollection is correct, from five or six years
21   ago, I think that we had general discussions with
22   counsel about the nature of how many tires were --
23   or the portion of tires that were sold in-store
24   versus through Discount Tire Direct.  And
25   continuing to 2019, I'm sure that I had a
```

Page 97

1    conversation with Mr. Henn, and we decided that
2    there was no reason to conduct another survey
3    because, again, I don't imagine that the tire
4    purchase behavior has changed over the last five to
5    six years much.
6        Q.   This shouldn't be that difficult.  The
7    answer is:  You didn't do anything, did you?
8        A.   I didn't conduct a specific survey on
9    the -- on whether or not demographics have changed,
10   but I, again, I assume that they are relatively
11   constant.
12       Q.   So you made an assumption, but you didn't
13   do anything; correct?
14       A.   Again, we had no reason to believe that
15   there would be any change in the demographics over
16   the last five to six years.
17       Q.   I'm asking for a straight answer, please.
18   Just answer the question.
19           MR. HENN:  Object to form.  Argumentative.
20           MR. ROMAN:  Well, yes, it is argumentative
21   because the witness won't answer the question.
22       Q.   Did you do anything, other than make an
23   assumption, to confirm that the demographics --
24   that the tire-buying public had not changed?
25       A.   Other than reviewing general information

Page 98

1    available on the Internet about tire purchasers and
2    purchasing, I don't think that we did any specific
3    research that would call into question the results
4    of the 2013 survey.
5        Q.   Well, you didn't look at anything on the
6    Internet about tire purchasers.  You looked about
7    tire purchasing; correct?
8        A.   But also with respect to age and gender.
9    I believe there was some data available as well,
10   that it was generally, approximately 50 percent
11   male and 50 percent female.
12       Q.   Where did this come from?  Where -- you
13   haven't told me about that yet.
14       A.   I'm talking about the same general
15   information that -- I conducted an Internet search
16   about tire purchasers and where those purchasers --
17   purchases occur.
18       Q.   Right.
19       A.   And I think it's part of the same
20   document.  They talked generally about the overall
21   demographics of tire purchasers.
22       Q.   What's the name of this document?
23       A.   Again, I don't recall the name or the
24   source of this, but it confirmed what we had
25   already had in hand from the 2013 survey.

Page 99

1        Q.   Again, you don't know about the
2    reliability of this information?
3        A.   When you say "this information," you mean?
4        Q.   The information about the types of
5    purchasers of the tires.
6        A.   Oh, well, we do know about the reliability
7    of the 2013 survey.
8        Q.   No, I was asking about the recent stuff
9    that you were just talking about, the 2019
10   materials that you found on the Internet.
11       A.   Because I don't recall the source, I can't
12   comment one way or the other about the veracity of
13   its methodology.  But I generally take that that
14   was a reliable document.
15       Q.   In your report in the screener, you ask --
16   this is 4.0, on page 7, you say, "Now, with respect
17   to automobiles, if I were to ask you:  Do you
18   understand the name Mercedes-Benz to be a brand
19   name or a common name, what would you say?"  I want
20   to ask you about that -- that phrase with respect
21   to automobiles.  That's an important context;
22   right?
23       A.   In my earlier example, for example,
24   steelhead, I think, in that case, it would be very
25   much an important context because steelhead could

Page 100

1    be ambiguous; it could be a brand name for a golf
2    club, and it could be a common name for a fish.
3        Q.   Right.  And going -- your example even
4    with margarine, you know, if you said -- if
5    margarine were the name of a clothing store, it
6    could a brand name?
7        A.   I suppose, and without giving that
8    context, people would probably only go to the one
9    context that they knew, which would be a food
10   substance.
11       Q.   Right --
12       A.   For that example.
13       Q.   So context is important; correct?
14       A.   Sure, it can be important.
15       Q.   Now, when you got -- neither you nor
16   Dr. Ford, when you got to the part of the survey
17   that generates results, you didn't provide context,
18   did you?
19       A.   I don't think I can agree with that
20   statement.
21       Q.   Okay.  So we go to the survey results on
22   page 10.  This is of your report.
23       A.   Right.
24       Q.   And the question for Q4.2 is:  Now, for
25   each of the following ten names, would you please

Page 101

```
1    --
2           MR. HENN:  Time out.  You are reading from
3    a different document than we are looking at.
4           MR. ROMAN:  I'm sorry.
5      A.  That's okay.  I think you have -- page 9
6    of my report talks about the overall results.
7    BY MR. ROMAN:
8      Q.  Thank you.  Okay.  And on page 10, where
9    you have Table 1A for the Atlanta response, you
10   have that in front of you?
11     A.  No, I don't -- I mean, I have a copy of
12   those numbers in terms of the expert report, but
13   you are holding the exhibit.
14     Q.  Okay.
15     A.  And exhibit to this expert report.
16     Q.  I'm looking at Exhibit B to your report,
17   page 10, Table 1A, Atlanta respondents' numbers.
18   Do you see that?
19     A.  I do.
20     Q.  And you ask about the ten products on the
21   left-hand side?
22     A.  I see that.
23     Q.  And do you provide context for any of
24   those names?
25     A.  Not for these names.
```

Page 102

```
1      Q.  Okay.  And do you know if -- but you did
2    provide it for the five questions about the
3    automotive industry; correct?
4      A.  Right.  That's why I said I couldn't agree
5    with the statement -- or the question the way you
6    had phrased it prior.
7      Q.  Okay.  Now, Dr. Ford didn't do it for
8    either -- did he? -- for either the ten less -- no,
9    he did.  Okay, he did exactly what you did, or you
10   did exactly what he did.  He didn't provide context
11   for the ten names at the beginning, but he did
12   provide context for the five automotive names;
13   correct?
14     A.  That's correct.
15     Q.  Okay.  Your study follows the same basic
16   structure as Dr. Ford's; correct?
17     A.  It does.
18     Q.  It's a Teflon survey; correct?
19     A.  It is.
20     Q.  You test the same 15 names; correct?
21     A.  We did.
22     Q.  The list of ten --
23     A.  Initial names.
24     Q.  -- initial names and the five from the
25   automotive industry?
```

Page 103

```
1      A.  That is correct.
2      Q.  Okay.  And you ask the same questions?
3      A.  We did ask the same questions, and I only
4    paused because I was thinking about the "both" that
5    we talked about.  Again, I think the questions were
6    identical.  We asked brand name or common name.
7    There was a "both" alternative for the telephone
8    survey.  We didn't provide a "both" alternative.
9    So to the extent that is responsive to your
10   question, there is a slight difference.
11     Q.  Okay.  Well, there are three other
12   differences that are at least, you know, arguey
13   [sic] material.  One is that you conducted your
14   survey in February 2019 and not in June of 2013.
15   Right?
16     A.  I agree.  I thought we were talking about
17   the context.
18     Q.  No, we are.  Right.  No, I know.  But now
19   I am going to differences between your survey and
20   his.  So you have a different time period --
21     A.  Okay.
22     Q.  -- correct?
23     A.  I agree.
24     Q.  Second, yours is online and his was done
25   by telephone; correct?
```

Page 104

```
1      A.  I agree.
2      Q.  And his was 37 market areas.  Yours was
3    just three of those 37 -- 37, Atlanta,
4    Jacksonville, and Orlando; correct?
5      A.  I agree my survey was on those three
6    markets.
7      Q.  Are there any other material differences
8    between your survey and Dr. Ford's, in your view?
9      A.  I think there is some very slight
10   wording -- I think the answer is no in terms of
11   material.  I think there was very slight wording
12   changes in terms of making this an interview
13   methodology.  We may have said, "Now, we will ask
14   you" instead of "I will ask you," things of that
15   nature, but nothing terribly substantive.  It was
16   pretty -- it was our intention to certainly have it
17   be as comparable to his questions as possible.
18     Q.  And did you or anyone else conduct any
19   pilot or other surveys before conducting the survey
20   that's reflected in Exhibit 228?
21     A.  No.  Again, we did a soft launch, if we
22   are going to use that terminology.  We did an
23   initial run of approximately 100 completes in this
24   matter, and we reviewed those results and had a
25   discussion with counsel and decided to proceed.
```

1    Q.  And so those 100 results from the soft
2  launch were included with the full survey universe?
3    A.  Right.  And now that I say 100, that is
4  very typical for us, but I believe it was probably
5  50, 50, and 50 of the three markets.  So I may have
6  misspoken there in terms of the number.
7    Q.  But all were included with the final
8  results?
9    A.  Yes, they were.
10    Q.  You didn't throw any results out?
11    A.  That's correct.
12    Q.  Okay.  And you didn't try a survey on a
13  different survey universe or different market areas
14  or anything like that?  It was always just Atlanta,
15  Jacksonville, and Orlando?
16    A.  That's correct.  There was no other
17  surveys conducted in -- in this matter on any other
18  markets in 2019, you know, setting aside Dr. Ford's
19  2013 survey.
20    Q.  Right.  And your conclusions were pretty
21  similar, too, to Dr. Ford's; correct?
22    A.  There were some similarities in the
23  conclusions, yes.
24    Q.  Yours was, I think, a little under 80
25  percent, and his was a little over 80 percent,

1  certainly within the margin for error; correct?
2    A.  I take your representation there, yes,
3  that it was very similar in terms of the results of
4  respondents who indicated that the mark was a brand
5  name.
6    Q.  And within the three markets, the ranges
7  for recognition of brand name for Discount Tire
8  range from, I think, 76 to 84 percent.  Does that
9  sound about right?
10    A.  That's correct.
11    Q.  Do you have any explanation for why there
12  were differences among the markets?
13    A.  I don't have any explanation.  I think
14  those are pretty comparable, and, as you say, on
15  average, it was -- Dr. Ford's survey in the 37
16  markets was approximately 80, 81 percent.  And the
17  average of these three markets that we tested was a
18  little bit under 80 percent, 78, 79, something like
19  that.  So I would say they were very comparable.
20    Q.  And then your conclusions are on
21  paragraphs 5 and 19 of your report; correct?
22    A.  Yes.
23    Q.  As we discussed earlier, you limited your
24  conclusions to those three markets, Atlanta,
25  Jacksonville, and Orlando; correct?

1    A.  Well, the conclusion talks about those
2  three markets.  That was the focus in terms of
3  geography.  And I think that the results could
4  certainly be interpreted in terms of the states of
5  Georgia and Florida generally.
6    Q.  So you think that these results are
7  representative of the entire states of Florida and
8  Georgia?
9    A.  I think that they are representative of
10  the states of Georgia and Florida because they are
11  in some major markets in those states.
12    Q.  Do you know anything about -- okay.  Now,
13  your conclusions don't say that.  It doesn't say
14  that, does it?
15    A.  It doesn't say that, but I think,
16  generally, one can extrapolate from -- for example,
17  back in the day of doing mall intercept surveys, we
18  would often only interview in eight locations
19  across the United States, but we were talking about
20  our conclusions in terms of, you know, a national
21  scope.
22    Q.  Okay.  Now, mall intercept surveys
23  provided -- there were logistical issues; correct?
24  You can't set up a tent in a hundred locations
25  across the country; correct?  It's really expensive

1  and difficult; correct?
2    A.  Our interviewing was always limited to
3  professional interviewing services that were
4  located in malls.
5    Q.  But there was nothing that prevented you
6  from doing an Internet survey of everybody in
7  Florida and Georgia, was there?
8    A.  I think not everybody in Florida and
9  Georgia necessarily has Internet access, but I take
10  the spirit of your question to mean that we -- one
11  can conduct a study among the entire population of
12  Georgia and Florida.  Is that the nature of your
13  question?
14    Q.  Right.  So if you want to get a result
15  that was good for all of Florida and all of
16  Georgia, you should have done the survey that
17  covered all of Florida and all of Georgia; correct?
18    A.  One could do such a survey.  I don't -- I
19  think that what we did in this matter was
20  appropriate because of the reasons that we
21  discussed before, that if this is a mark that may
22  be seen as descriptive and that has acquired
23  secondary meaning, specifically the Discount Tire
24  mark, then I think its especially relevant to have
25  respondents who may or may not have been exposed --

Page 109

1  had an opportunity to be exposed to the Discount
2  Tire mark in those markets.
3      Q.  Right.  Because you will get higher
4  numbers if they have been exposed to the Discount
5  Tire mark; right?
6      A.  That's not the intention.  What --
7      Q.  I'm not asking you whether it's the
8  intention or not, but it's the consequence, isn't
9  it?
10      A.  Not necessarily.  You may or may not get
11  different results if you test it across the entire
12  state.  I think if -- you know, Atlanta is a large
13  region, for example, of Georgia.  I think that
14  represents a good portion of the population.  So,
15  again, I think the results are generally
16  projectable to the state of Georgia.
17      Q.  Right.  So if you did -- let's just focus
18  on Georgia for right now, and you did a random
19  survey of all of Georgia.  Atlanta would be a
20  disproportionate percentage among Atlanta cities;
21  correct?  If you did just on population, Atlanta is
22  the biggest city in Georgia; right?
23      A.  So far I'm following you that, yes, I
24  think Atlanta, as far as I know, is the biggest
25  city --

Page 110

1      Q.  So if you want to get the relative
2  proportion of Atlanta to the rest of the state,
3  what you do is you test the whole state, pull out
4  the numbers randomly, and you should get a
5  disproportionate number of residents of Atlanta;
6  correct?
7      A.  If you are trying to compare a survey
8  between just the market of Atlanta, the greater
9  metropolitan area of Atlanta, versus the entire
10  state, there may or may not be differences, and you
11  would have to test that and see if it made a
12  difference.
13      Q.  But you made no effort to test anyone in
14  Georgia outside of the Atlanta metropolitan area;
15  correct?
16      A.  Our survey was targeted at the Atlanta
17  metropolitan area.
18      Q.  So the answer is yes.  I'm correct.  Ou
19  made no effort -- this will go a lot faster if you
20  just answer the questions.
21      MR. HENN:  Neil, just ask the questions.
22      MR. ROMAN:  I'm asking the questions.  I
23  get evasive answers.
24      Q.  You made no effort to test anyone in
25  Georgia outside the Atlanta metropolitan area;

Page 111

1  correct?
2      A.  I suppose "no" is the answer you are
3  looking for.  We targeted the Atlanta, Georgia
4  region, and if a respondent self-selected that they
5  were part of that Atlanta region, then they were
6  included in the survey.
7      Q.  If they didn't select it?
8      A.  They were not included in the survey.
9      Q.  Okay.  And the same with Florida.  You
10  tested your Orlando market and the Jacksonville
11  market and no other market in Florida; correct?
12      A.  That's correct.
13      Q.  And you don't know what people in other
14  markets where there is a lesser concentration of
15  Discount Tire stores would say, do you?
16      A.  That's an empirical question, and I don't
17  know that answer.
18      Q.  Who chose the three cities, Atlanta,
19  Jacksonville, and Orlando?
20      A.  Can you rephrase that question?  What do
21  you mean by "who" --
22      Q.  Whose decision was it to test just
23  Atlanta, Jacksonville, and Orlando?
24      A.  Because of the language in the motion for
25  preliminary injunction, they talked about the

Page 112

1  states of Georgia and Florida, and consistent with
2  the methodology of Dr. Ford and -- in this 2019
3  survey, we also wanted to test the markets in which
4  respondents had the opportunity to be exposed to a
5  Discount Tire store, potentially.
6      Q.  And are you aware that -- are you aware of
7  the number of Discount Tire stores in those three
8  cities or three market areas?
9      A.  Not precisely.  I know that there are a
10  number of stores -- that Discount Tire has a number
11  of stores in those regions, and I understand that
12  defendant is rebranding some stores in those
13  regions as well.
14      Q.  But one of the reasons that those three
15  market areas was chosen was the concentration of
16  Discount Tire stores in those three market areas;
17  correct?
18      A.  Yes and no.  In terms of the -- if there
19  were three stores within a 10-mile radius, yes, it
20  has to do with the concentration of stores, as you
21  say.  But it also has to do with the allegations in
22  the preliminary injunction where -- motion for
23  preliminary injunction where defendant's stores are
24  alleged to cause deception, I suppose, or
25  confusion.

Page 113

1    Q.  Well, the reason you chose -- let's say
2  Florida.  The reason you chose Orlando and
3  Jacksonville as opposed to, say, Miami and
4  Tallahassee is that there are more Discount Tire
5  stores in Orlando and Jacksonville than there are
6  in Miami and Tallahassee; correct?
7    A.  That -- I wouldn't say that we chose it
8  because of that reason, but, rather, looking at the
9  data -- of number of stores in those regions, you
10  are correct.  Based on the criteria of three or
11  more stores in a 10-mile radius, by definition,
12  yes, there are more stores in Jacksonville, more
13  Discount Tire stores in Jacksonville and in Orlando
14  than there are in Miami.
15    Q.  And Tallahassee?
16    A.  And Tallahassee.
17    Q.  So you chose the two cities in Florida
18  that have the greatest concentration of Discount
19  Tire stores; correct?
20    A.  I don't know if you did that analysis
21  based on population or on dispersion across an
22  area.  The answer may be yes or no.  But I think we
23  are talking about the same thing, that there were
24  three or more Discount Tire stores within a 10-mile
25  radius, and that was a factor in -- which we

Page 114

1  included in our screening process, in terms of
2  defining those three markets.
3    Q.  Are there any other Florida market areas
4  of which you are aware that have three or more
5  Discount Tire stores within a 10-mile radius?
6    A.  I'm not aware of any.
7    Q.  And in Georgia, are you aware of any
8  market area other than Atlanta where there are
9  three or more Discount Tire stores within a 10-mile
10  radius?
11    A.  I'm not aware of any.
12    Q.  Now, are you aware that there are Mavis
13  stores in those three market areas -- well, strike
14  that.
15        Do you project your results to anything
16  beyond Florida and Georgia?
17    A.  I think looking at the 2013 data and the
18  2019 data, those survey results are very
19  comparable.  So a fact finder may or may not want
20  to project the results of our study in 2019 to a
21  greater area.  They may not.  I don't know.
22    Q.  Do you believe, for example, that Discount
23  Tire has an 80 percent brand recognition in
24  Nebraska?
25    A.  I don't have an understanding about that

Page 115

1  one way or the other.
2    Q.  Do you believe that your survey bears on
3  that issue at all?
4    A.  I don't have an understanding about that.
5  We didn't test a, as far as I recall, Nebraska
6  metropolitan area.
7    Q.  Okay.  How about Wyoming?  Same answer?
8    A.  I will have to double-check the list, but
9  I don't believe that Wyoming was part of the 37
10  markets tested in the 2013 study.
11    Q.  So is it your testimony that if the state
12  is included within one of the 37 market areas
13  tested by Professor Ford -- or Dr. Ford in 2013,
14  that you can draw conclusions based on your survey
15  conducted in Atlanta, Jacksonville, and Orlando in
16  2019?
17    A.  I don't know if you can make conclusions
18  or not, but as I say, the results were quite
19  consistent between the two surveys.  So a fact
20  finder may or may not want to look at the results
21  of the 2013 survey in conjunction with our instant
22  survey.
23    Q.  Now, how about for the 31 states that are
24  not represented in Dr. Ford's survey?  Let's take
25  Maine, my favorite state.  Do you believe that the

Page 116

1  results from Dr. Ford's survey can be extrapolated
2  to Maine?
3    A.  I don't have an opinion about
4  extrapolating or not to the state of Maine in
5  particular.  But, again, the scope of Dr. Ford's
6  survey was across 19 states, and that's a pretty
7  far-reaching spread in terms of the -- the variety
8  of areas that interviews were conducted in.  It's
9  certainly more widespread than eight locations back
10  in the days of doing mall surveys.  So I think that
11  there very well could be some conclusions that one
12  could draw based on his study to a more nationwide
13  scope.
14    Q.  Now, I will -- let's assume, and I believe
15  this is correct -- that there are no Discount Tire
16  stores in Maine.  Let's work on that assumption.
17  Do you believe that still, notwithstanding the
18  absence of a store in Maine, that the results of
19  Dr. Ford's survey of 37 market areas in which there
20  are three or more Discount Tire stores within a
21  10-mile radius can be extrapolated to Maine where
22  there are no Discount Tire stores?
23    A.  If I take your representation that there
24  are none -- again, I don't know one way or the
25  other whether those results would be applicable to

1    the state of Maine. I think that's an empirical
2    question, and it would be more helpful to look at
3    data and look and see if it varied.
4        Q. Do you have any sense whether you'd get an
5    80 percent brand recognition there?
6        A. It's an empirical question. If we knew
7    the results of the survey prior to conducting it,
8    then we wouldn't have to conduct the survey.
9        Q. How about New Zealand?
10       A. Again, I wouldn't have an opinion one way
11   or the other about New Zealand.
12       Q. No opinion?
13       A. I wouldn't know whether or not the
14   recognition of the mark Discount Tire is widespread
15   or if people assume that's --
16       Q. Do you think you might be able to get an
17   80 percent number in New Zealand?
18       A. I guess if there's zero stores over
19   there -- I don't know about the New Zealand market.
20   I assume there are no stores over there. I don't
21   know what -- what respondents might say, but it's
22   an -- excuse me -- empirical question.
23       Q. With respect to all of these -- Maine, New
24   Zealand, Wyoming, Nebraska -- you didn't test any
25   of those; correct?

1        A. That's correct; we did not.
2        Q. We don't know the answer to any of those
3    empirical questions, do we?
4        A. We don't have the data to make a direct
5    comparison.
6        Q. Did you use a CAPTCHA question? That's
7    C-A-P-T-C-H-A.
8        A. We didn't use a CAPTCHA question, but we
9    used a similar type of question in terms of
10   attempting to ensure that a -- a respondent is a
11   human being and not a robot or something programmed
12   to take a survey.
13       Q. Why didn't you use a CAPTCHA question?
14       A. I personally find them a little bit
15   frustrating. I've seen them a lot, and I think a
16   respondent might go, "Oh, I need to pay attention
17   here and fill out the CAPTCHA." And the question
18   we used had the answer choices 1, 2, 3, 4, and I
19   suppose someone could be hurrying through and not
20   reading the question and not pass our test.
21   Perhaps more in a greater number than against the
22   CAPTCHA.
23       Q. You did not instruct respondents not to
24   guess, did you?
25       A. I don't know that I can take that

1    representation. We always tell respondents that if
2    they don't know the answer to a question, that's an
3    acceptable answer.
4        Q. Where in your survey format -- I will hand
5    it back to you -- can you tell me where you
6    instruct them not to guess?
7        A. Sure. So on Screen Number 16, this is
8    page 7 of Exhibit B, it says, "Now, for each of the
9    following" -- well, it does a preamble about the
10   ten names and the important part is, "For any of
11   the names, if you don't know, that is an acceptable
12   answer."
13       Q. Now -- which leads to the next question.
14   You never said "not sure." Do you view that as the
15   same or different than "don't know"?
16       A. I'm not sure in this case that it would be
17   materially different to say "not sure" or "don't
18   know."
19       Q. Okay. So let's go to Dr. Wind's report,
20   Exhibit 229. And his report is in two sections;
21   correct? Two main sections?
22       A. 229. Where did I put it? Here it is.
23       Q. There is one section where he critiques
24   your study and Dr. Ford's study, and then there is
25   the other section where he does his own study. Do

1    you understand that?
2        A. Yes, I understand that he has two parts.
3        Q. Now, his most fundamental criticism of
4    your survey and Dr. Ford's is on page 15. It's
5    the -- where it says "Summary of Criticisms." Do
6    you see that?
7        A. I do see that.
8        Q. And then the bullet reads, "First and most
9    fundamentally, the studies improperly used the
10   Teflon research design without modification to
11   assess consumer understanding of a noncoined term.
12   Because such terms may be used by more than one
13   company in their business names or to refer to the
14   type of business it is or the type of product it
15   offers, respondents must be given a range of
16   options that reflect the full range of possible
17   viewpoints, which the original Teflon research
18   design did not do because it involved a coined
19   term."
20          Do you see that?
21       A. I see those words.
22       Q. Do you agree or disagree with that
23   statement?
24       A. I disagree with that statement.
25       Q. On what basis do you disagree with that

1    statement?
2        A.  Well, I think Dr. Wind posits that the
3    Teflon survey design is inappropriate for a
4    noncoined term, and I disagree with that notion.
5        Q.  And why is that?
6        A.  There have been cases involving noncoined
7    terms that have had the Teflon survey design used
8    and relied on by courts.
9        Q.  Well, I understand that, but why do you
10   think it makes sense?
11       A.  Oh, I think just from a fundamental view,
12   I think the primary significance, however a term
13   began its origin, whether it was coined or whether
14   it was a descriptive term that acquired secondary
15   meaning over time, I think any term, you can
16   certainly conduct the Teflon survey design and get
17   an understanding as to the primary significance of
18   a mark with respect to the survey universe.
19       Q.  Are you aware that RTC is taking the
20   position that Mavis Discount Tire is likely to
21   cause confusion among consumers with Discount Tire?
22       A.  I'm generally aware of those allegations.
23       Q.  Okay.  And are you aware that RTC, in
24   fact, has submitted dozens of declarations
25   attesting to consumer confusion between Mavis

1    Discount Tire and Discount Tire?
2        A.  I have a general understanding.  I don't
3    have an understanding as to the number of
4    declarations.
5        Q.  You are aware that there are some
6    declarations saying that consumers were confused
7    between Mavis Discount Tire and Discount Tire;
8    correct?
9        A.  Yes, I have a general understanding about
10   that.
11       Q.  Do you agree that consumers could confuse
12   Discount Tire and Mavis Discount Tire?
13       A.  I certainly agree that it is possible, and
14   it seems that they have some evidence of actual
15   confusion in terms of some confusion out there.
16       Q.  Are you aware that hundreds of other tire
17   dealers across the nation, including in Atlanta,
18   Jacksonville, and Orlando use "discount tire" in
19   their business names?
20           MR. HENN:  Object to the form and
21   foundation.
22       A.  I'm not aware one way or the other about
23   the content of -- whether or not the two-word
24   phrase "discount tire" appears in other companies'
25   names one way or the other.

1    BY MR. ROMAN:
2        Q.  Let me show you what's been marked as
3    Exhibit 214.  It's Appendix 19 to a report of
4    Edward Finegan.  It's a listing of third-party auto
5    dealerships that have the words "discount" and
6    "tire" in them.  Do you see that?
7        A.  I haven't looked at the whole document,
8    but I see that this generally contains what you
9    describe.
10       Q.  Okay.  Do you agree that consumers could
11   confuse plaintiff's business, Discount Tire, with
12   other companies that use the phrase "discount tire"
13   in their business names?
14           MR. HENN:  Object to the form.
15       A.  I suppose it's theoretically possible.  I
16   don't have an opinion on that.
17   BY MR. ROMAN:
18       Q.  Are you aware that -- well, given the
19   possibility of confusion between Discount Tire and
20   Mavis Discount Tire, and between Discount Tire and
21   other companies that use "discount tire" in their
22   business names, would you -- wouldn't you agree
23   that some respondents in your survey, and in
24   Dr. Ford's survey, may have been thinking about
25   Mavis Discount Tire or one of the other companies

1    using "discount tire" in their business names when
2    they said that Discount Tire is a brand name?
3            MR. HENN:  Object to the form.
4        A.  I find that a little bit hard to agree
5    with or a lot hard to agree with.  If the name we
6    were testing was Mavis Discount Tire, we may get
7    totally different results.  But one of the names we
8    tested was Discount Tire, and we got the results
9    that we did.  I suppose -- I don't know why someone
10   would think we were talking about another mark that
11   included other words.
12   BY MR. ROMAN:
13       Q.  Well, you said that you thought that folks
14   could -- consumers could confuse Mavis Discount
15   Tire and Discount Tire, and Discount Tire and other
16   companies that use "discount tire" in their
17   business names.  And if they could confuse them,
18   why wouldn't they be confused when they were
19   answering your survey when you asked about Discount
20   Tire?
21       A.  Well, confusion -- surveys, for example,
22   ask very different questions.  This is a primary
23   significance survey.  And I think it's pretty
24   clear; it's this binary choice between brand name
25   and common name, and it's not asking about source

Page 125

```
 1   or sponsorship or affiliation, things of that
 2   nature.
 3        Q.  Well, let me ask you this:  Let's say
 4   those who say -- who responded that Discount Tire,
 5   in your survey or Dr. Ford's survey, either one,
 6   said Discount Tire is a brand name when they were
 7   thinking about Mavis Discount Tire or another
 8   company's use of the phrase "discount tire" in
 9   their business names.  Would you agree that those
10   persons should not count as having recognized that
11   plaintiff's Discount Tire is a brand name?
12        MR. HENN:  Object to the form.
13        A.  You are asking me a very hypothetical of
14   perhaps this may have happened; if this happened,
15   what would the conclusion be?  I don't have any
16   evidence or reason to believe that somebody looking
17   at the mark Discount Tire would confuse that mark
18   or to think that that was another mark.
19   BY MR. ROMAN:
20        Q.  Well, I mean we have instances, you know,
21   according to the plaintiff, that that's happening a
22   lot; there is a lot of confusion between Mavis
23   Discount Tire and Discount Tire.  And assuming that
24   that's the case and assuming that when they are
25   taking your survey, that they are thinking Mavis
```

Page 126

```
 1   Discount Tire when they say Discount Tire, you
 2   would agree -- would you not? -- that those persons
 3   should not count as having recognized Discount Tire
 4   as a brand name owned by RTC?
 5        MR. HENN:  Same objection.
 6        A.  Again, it's a very specific hypothetical
 7   that I just don't know happened in reality.  So I
 8   can't comment on that one way or the other.
 9   BY MR. ROMAN:
10        Q.  No, this is -- this is part of our -- this
11   is part of why Dr. Wind did what he did, and I want
12   to get an answer from you.  Assuming -- and I'm
13   asking you to assume, so yes, it is a hypothetical,
14   but I'm allowed to ask hypotheticals.
15        A.  Sure.
16        Q.  Assuming that some who responded, yes,
17   Discount Tire is a brand name in response to your
18   survey or Dr. Ford's survey were thinking of Mavis
19   Discount Tire or another discount tire company,
20   than a company named Discount Tire or having
21   discount tire in their name, those folks should not
22   count as having recognized RTC's Discount Tire as a
23   brand name owned by Discount Tire; correct?
24        MR. HENN:  Same objection.
25        A.  I don't know how else to answer in terms
```

Page 127

```
 1   of -- the survey data that we have asked about
 2   discount tire, and I think the question -- the
 3   questions that we asked and the results speak for
 4   themselves in terms of, they were asked about the
 5   mark Discount Tire, and I don't -- I can't agree
 6   with the assumption that you are positing that
 7   people make a confusion between this mark Discount
 8   Tire in plain text and Mavis Discount Tire.
 9   BY MR. ROMAN:
10        Q.  Well, would you agree that such responses
11   saying that Discount Tire is a brand name while
12   thinking of a business not owned by RTC does not
13   indicate recognition of Discount Tire as a brand
14   name owned by RTC?
15        A.  Well, in the Teflon survey design, we are
16   asking people if they understand it to be a brand
17   name or a common name, and it doesn't ask about
18   source questions, about who owns a brand.  This is
19   just simply, do they have an understanding as to a
20   mark being a brand name or a common name.
21        Q.  So what you are saying is your results
22   don't indicate that it's a brand name owned by RTC.
23   It's just that people recognize "Discount Tire" as
24   owned by RTC?
25        A.  The responses support the finding that
```

Page 128

```
 1   respondents associate the term "discount tire"
 2   with -- as a brand name, and based on our
 3   definition of "brand name," companies use -- a name
 4   used by one company, I think you can make an
 5   assumption that there is a secondary meaning in
 6   that mark.
 7        Q.  Okay.  But there is no part of this test
 8   that -- that associates "Discount Tire" with RTC,
 9   is there?
10        A.  We don't ask about whether -- well, we
11   don't ask them association, period, but we ask
12   about -- understand a term to be a brand name --
13   excuse me, a brand name or a common name.  And with
14   respect to the term "discount tire," we don't ask
15   about source.  We ask about the association --
16   excuse me, the understanding of whether that term
17   is a brand name or a common name.
18        Q.  So --
19        A.  Also given the markets that we tested, I
20   think there is the presumption that plaintiff who
21   has a trademark nationally and who has stores in
22   these areas, I would imagine that there is an
23   association with that name -- excuse me, I keep
24   saying association, an understanding of that name
25   being a brand name.  I would assume that there is
```

1    -- the results support an association with the
2    presumed trademark holder.
3        Q.   But you don't know that?
4        A.   We don't know based on this survey design.
5        Q.   I want to do a definition for you here.
6    I'm not saying you have to buy into it; I just want
7    to see if you understand it.  The word -- the
8    phrase I want to define is called a "false
9    positive," okay?  And that is where if somebody is
10   saying Discount Tire is a brand name when thinking
11   of a business not owned by RTC.  Okay?  So they are
12   thinking Mavis Discount Tire, and they say yes,
13   Discount Tire is a brand.  Or they are thinking
14   Calera Discount Tire, the first name in
15   Exhibit 214.  And they say okay, that's Discount
16   Tire.  I want to call those false positives.  Do
17   you understand that?
18       A.   I guess I don't understand what the --
19   what the question wording is about in terms of this
20   is a question about brand name or common name, and
21   we are not asking about the source.
22       Q.   I'm just asking -- I'm not asking you to
23   buy into anything other than the fact that I'm
24   going to call false positives, those who say
25   Discount Tire is a brand name when thinking about

1    another company.  That's all I'm asking you to do.
2    I'm not asking you to buy into the assumption.  I'm
3    just saying, do you understand that when I use the
4    word "false positives," that's what I'm referring
5    to?
6        A.   I guess I can't agree with that
7    representation.  I don't know what a false positive
8    is if somebody says brand name or common name
9    that's an answer that's a response to the question.
10   I don't know -- I don't know that it's relevant
11   whether or not they are thinking of this term or
12   that term.
13       Q.   I'm not asking you to buy into any of
14   that.  I'm just saying when I -- as a shorthand --
15   as a shorthand, I want to use the phrase "false
16   positives."  When I use that phrase, it means those
17   who say Discount Tire is a brand name were thinking
18   about a company other than RTC's Discount Tire.  Do
19   you understand that?
20       A.   I understand the concept.  I have no data
21   or any reason to believe that that may have
22   happened.
23       Q.   I'm not asking you for anything other than
24   your understanding.  Do you have that
25   understanding?

1        A.   I have the understanding based upon what
2    you have just said.
3        Q.   Terrific.
4            Do you agree that what Dr. Wind is trying
5    to do with his survey is to screen out false
6    positives?
7            MR. HENN:  I will object to the form.  I
8    assume you are going to use "false positive" a lot
9    going forward, so rather than object every time,
10   let me just put on the record that we object to the
11   characterization of these as, quote, "false
12   positives," which is a term of art in surveys, and
13   so I don't want there to be any assumption that we
14   are agreeing with that characterization.  So I
15   object to that term.
16           MR. ROMAN:  I will stop using that term.
17   I will not use it.  It took me too far to get
18   there, and now that I'm there, I'm going to get
19   objected to, so I'll start again.
20       Q.   Would you agree that what Dr. Wind is
21   trying to do is to screen out those who say that
22   Discount Tire is a brand name, but are thinking
23   about a company not owned by RTC?  Do you
24   understand that was his goal?
25       A.   I honestly don't know what the goal or

1    what Dr. Wind was attempting to do.  This is a
2    pretty out-there methodology.  It departs from the
3    Teflon -- the tested and accepted Teflon
4    methodology.  I'm not sure where he got his three
5    answer choices, his first, primary three category
6    responses in addition to "other" and "don't know."
7        Q.   Okay.  So let's actually -- let's go to
8    the structure of Professor Wind's survey.
9        A.   Okay.
10       Q.   So he asked -- he provided three options.
11   Those are set forth on page 18 of his report, as
12   well as "none of the above" and "don't know/not
13   sure."  Do you see that?
14       A.   I see on page 18, there is a restatement
15   of his survey answer choices, 1 through 5.  1, 2,
16   and 3 being not abbreviated.  They are very
17   long-winded, I suppose.
18       Q.   I didn't ask you to characterize.  I just
19   asked you if you saw it.
20       A.   I see these five choices.
21       Q.   Okay.  And he tested these -- he conducted
22   his test over two survey universes.  One was
23   nationwide, and one was covering the full states of
24   Georgia and Florida.  Do you understand that?
25       A.   I understand that he did different surveys

1   to address the different regions of the country.
2        Q.  One nationwide and one Georgia and
3   Florida; correct?
4        A.  Correct, I understand that.
5        Q.  And he included within his survey
6   universes those who had, within the past two years,
7   bought tires or were, in the next two years, going
8   to buy tires.  Do you understand that?
9        A.  I generally understand that.
10       Q.  And you would agree -- would you not? --
11  that standard practice is to include past
12  purchasers, as well as future purchasers?
13       A.  In the context of what?
14       Q.  Surveys.  When you ask about consumer
15  behavior, you typically ask people who have bought
16  or will buy -- or intend to buy the product?
17       A.  It's case-dependent or issue-dependent.
18       Q.  Why did you exclude -- why did you exclude
19  past purchasers?
20       A.  I'm not sure that we excluded past
21  purchasers.
22       Q.  Why did you not include past purchasers?
23       A.  We didn't ask a question about past
24  purchasers.  My best understanding of the case law
25  and what courts like to see is prospective

1   purchasers of a particular class of goods or
2   services.
3        Q.  So you think it was improper for Dr. Wind
4   to have included past purchasers?
5        A.  I suspect that there is a great overlap
6   between past purchasers and potential purchasers.
7   Maybe not so much in the case -- generally
8   speaking, maybe not so much in the case of tires
9   because you probably don't purchase tires every two
10  years, let's say.  But I suspect that the --
11  generally, the respondents who indicate they are
12  going to purchase a type of product, like jeans, in
13  the past are very much overlapping with the
14  prospective customers who are likely to purchase
15  jeans in the future.
16       Q.  You don't quibble with his use of past
17  purchasers, do you, his including past purchasers,
18  do you?
19       A.  I haven't made any comments one way or the
20  other about his survey.
21       Q.  Right.  But I guess the question is:  Do
22  you have -- do you disagree with his having used --
23  included past purchasers in the survey universe?
24       A.  I think as long as he has the potential
25  purchasers in there, then I think that is a

1   reasonable survey universe.  It's not something
2   that gives me great pause.
3        Q.  Okay.  And he also includes Internet
4   purchasers, or, at least, doesn't exclude them;
5   correct?
6        A.  I'm aware that he asks a question about
7   Internet -- or including those respondents who may
8   purchase via the Internet.
9        Q.  And you have no issue with his having
10  included such purchasers; correct?
11       A.  Again, given the facts of this case, given
12  that the majority of tire purchases happen
13  in-store, I'm not sure that including online
14  purchasers affects the survey sample greatly.  I
15  think there's probably not a huge shift, just in
16  terms of the survey universe there.
17       Q.  So that's not one of your criticisms of
18  his survey -- correct? -- that he included Internet
19  purchasers?
20       A.  We really responded to Dr. Wind's
21  criticisms of our survey, so we haven't made any --
22  I have not been asked to make any criticisms of his
23  survey.
24       Q.  I'm asking you:  Do you have any
25  criticisms of his survey based on his inclusion of

1   Internet purchasers?
2        A.  I haven't been asked to do that, so I
3   don't -- I suppose, sitting here in just a couple
4   of minutes, I don't want to give an answer as to
5   that question right now.  I would like to think
6   about it further.
7        Q.  Is it really your testimony that you
8   don't -- you weren't asked to criticize Dr. Wind's
9   survey?
10       A.  No.  I'm saying the focus of our rebuttal
11  expert report was focused on his criticisms of our
12  survey, and we have not been -- I have not been
13  asked, at this point, to address some of the issues
14  that he talks about in his report.
15       Q.  Because you have a section here where --
16  entitled "Dr. Wind's rebuttal survey does not
17  reliably measure the primary significance of
18  'discount tire.'"
19       A.  Right.  We talk about his survey.  We
20  don't talk about all aspects of his report.
21       Q.  And you keep on saying "we."  Who is the
22  "we" here?
23       A.  Ford Bubala & Associates and myself.
24       Q.  So the other -- who else was involved?
25  Ms. Sartore was involved?

Page 137

1      A.  Dr. Sartore was involved in the production
2  of the expert reports in this case, and ultimately,
3  I'm responsible for the content of those.
4      Q.  And how about the associate whose name I
5  forget?
6      A.  She may have -- I don't think, in terms of
7  these two documents, that she played any role.
8  She's more of -- administrative in terms of data
9  collection and data analysis.
10     Q.  That's Ms. Bavaro?
11     A.  Yes.
12     Q.  Okay.  So --
13         MR. HENN:  He's trying to get your
14  attention.
15         (Miscellaneous comments.)
16         THE VIDEOGRAPHER:  This marks the end of
17  DVD Number 2 in the deposition of Matthew Ezell.
18  The time is 10:53 a.m., and we are now off the
19  record.
20         (Recess taken from 10:53 a.m. to
21         11:02 a.m.)
22         THE VIDEOGRAPHER:  This begins DVD
23  Number 3 in the deposition of Matthew Ezell.  The
24  time is 11:03 a.m.  We are back on the record.
25  BY MR. ROMAN:

Page 138

1      Q.  Okay.  Do you understand that Dr. Wind
2  tested two well-known exclusive brand names in the
3  automotive industry, Pep Boys and Jiffy Lube, and
4  two well-known exclusive brand names related to the
5  breakfast food industry, Cap'n Crunch, and Lucky
6  Charms?  Do you understand that?
7      A.  I know that he uses a term -- well, I
8  guess, what do you mean by "exclusive"?
9      Q.  Well, take that out.  How about two
10  unambiguous brand names, using your phraseology.
11  Would you agree -- let me ask this:  Would you
12  agree that Pep Boys and Jiffy Lube are unambiguous
13  brand names?
14     A.  As far as I understand, yes, they are
15  unambiguous brand names.
16     Q.  And would you also agree that Cap'n Crunch
17  and Lucky Charms are unambiguous brand names?
18     A.  Cap'n with a C-A-P, apostrophe, N?
19     Q.  Yes.
20     A.  And what was the other name?  I'm sorry.
21     Q.  Lucky Charms.
22     A.  Lucky Charms.  In the context of cereal, I
23  think that those are unambiguously brand names.
24     Q.  And he also tested two unambiguous common
25  names in the automotive industry, auto parts and

Page 139

1  automotive center and two unambiguous common names
2  in the breakfast food industry, granola and
3  oatmeal.  Do you understand that?
4      A.  I understand that he tested the terms you
5  talked about.
6      Q.  Right.  And would you agree that all four
7  of those are unambiguous common names?
8      A.  Repeat the four names for me again.
9      Q.  Auto parts, automotive center, granola,
10  oatmeal.
11     A.  I think as they are, in that context to
12  me, at least, they are unambiguously common names.
13     Q.  And so with respect to the four brand
14  names that we mentioned before, Pep Boys, Jiffy
15  Lube, Cap'n Crunch and Lucky Charms, you would
16  agree -- would you not? -- that anyone saying that
17  any one of them is a common name would be wrong?
18     A.  Well, they are certainly entitled to their
19  opinion, and if it was our survey, we would allow
20  them into the survey, barring it wasn't that
21  initial test of their understanding.  I suppose
22  that they would be -- they would not have the same
23  understanding that I do.  In that sense, they would
24  be, quote/unquote, wrong.
25     Q.  Well, if you used any of these as a

Page 140

1  screener, and they guessed -- and they guessed --
2  or they said it was a common name, you would throw
3  them out of your survey, would you not?
4      A.  If it was the portion where we were
5  testing them and they said "brand name" -- excuse
6  me, "common name" for Cap'n Crunch, then they would
7  be disqualified from the survey.
8      Q.  Right.  And conversely, if anybody -- if
9  you had used any of the four common names that I
10  mentioned before, auto parts, automotive center,
11  granola, and oatmeal, if any of them had said that
12  was a brand name in response to a screening
13  question at the beginning, you would have tossed
14  them out, too -- correct? -- disqualified them?
15     A.  Had those hypothetically been the
16  mini-test, to test understanding, then, yes, I
17  would say if somebody said, for example, "brand
18  name" for granola, they would not pass the test,
19  and they would not be able to continue with the
20  rest of the survey.
21     Q.  Okay.  Do you understand that Dr. Wind
22  also tested raisin bran?
23     A.  Was the question:  Am I aware?
24     Q.  Yes.
25     A.  Yes, I'm generally aware that he tested

1  the name "raisin bran."
2      Q.  And would you agree that raisin bran is a
3  common name that some may mistakenly view as a
4  brand name?
5      A.  To me, by itself, it's a common name.  I
6  don't know that I accept his methodology and,
7  therefore, his results.  I understand that some
8  respondents answered "common name" and some --
9  well, he doesn't ask common name and brand name.
10  That's the thing.  That's my whole hang-up with his
11  survey.  So maybe you need to ask the question
12  again.  I'm sorry.
13      Q.  I'm just saying -- well, first of all, you
14  understand that raisin bran is a common name?
15      A.  By itself, I understand that raisin bran
16  is a common name.  If it had Kellogg's Raisin Bran,
17  maybe that can be seen as a brand name.
18      Q.  Right.  I'm not asking about Kellogg's
19  Raisin Bran.  I'm asking about raisin bran?
20      A.  Right.
21      Q.  Okay.  So you understand that raisin bran
22  is a common name?
23      A.  By itself, I understand that to be a
24  common name.
25      Q.  And you also understand that it is one --

1  it is a common name that some may mistakenly view
2  as a brand name?
3          MR. HENN:  Object to the form.
4  BY MR. ROMAN:
5      Q.  You would agree -- would you not? -- that
6  it's not as unambiguous as the other common names
7  that I listed before, such as auto parts,
8  automotive center, granola, and oatmeal?
9      A.  I think, by itself, raisin bran, to me, is
10  a common name, and I don't know what their response
11  would have been if we had asked about raisin bran
12  in the standard Teflon methodology.
13      Q.  You also understand that Dr. Wind also
14  used an external control, "discount windshield."
15  Do you understand that?
16      A.  I do understand that.
17      Q.  And you are familiar with controls and
18  their purpose?
19      A.  Yes.  I'm familiar with controls.  I'm not
20  sure why he varied from the Teflon survey design
21  here.
22      Q.  I'm sorry.  That wasn't the question I
23  asked.
24      A.  I'm sorry.
25      Q.  The question I asked is:  Are you familiar

1  with controls and their purpose?  I know you have
2  your talking points, but I'm just asking questions.
3  I would like answers to those questions.
4      A.  Okay.
5      Q.  Are you familiar with controls and their
6  purpose?
7      A.  I am familiar with controls and their
8  purpose, generally.
9      Q.  Okay.  What's the purpose of a control?
10  Or what is a control and what is its purpose?
11      A.  I would say in the context of trademark
12  surveys, a control is a, let's say, an exhibit or a
13  name, depending on the facts of the case, that is
14  designed to measure -- in the case of, let's say, a
15  confusion survey.  I will take that for a moment.
16  In a confusion survey, a control would be a name
17  that has as many similarities as possible as the
18  test cell exhibit, whatever that was, except for
19  the features that are claimed to cause confusion.
20          So I would say the purpose is to measure
21  the percentage of respondents who give a,
22  quote/unquote, confused response for reasons other
23  than the features that are alleged to infringe or to
24  cause confusion.
25      Q.  Okay.  Now, I understand that you don't

1  think that Dr. Wind should have used a control
2  here.  I understand that.
3          But please -- well, let's just go back.
4  Why do you think a control here doesn't -- why do you
5  think that Dr. Wind should not have used a control
6  here?
7      A.  Maybe that misstates my testimony, but --
8      Q.  Okay.  Let me ask the question then.  Do
9  you think that Dr. Wind was correct to have used a
10  control here?
11      A.  Well, again, the control -- the term
12  "control" could be referring to -- in our case,
13  other names like margarine and Jell-O and American
14  Airlines, those could serve as internal controls.
15  You are talking about an external control --
16      Q.  Exactly.
17      A.  -- that he had.
18      Q.  Yes.  So -- and I take it you disagree
19  with the use of an external control here, given
20  that there were internal controls.  Is that right?
21      A.  Well, it departs from the Teflon survey
22  methodology of having one group of respondents and
23  a name in question, and other names that are
24  internal controls for which to compare.
25      Q.  I understand that you -- it's a novel

Page 145

1  approach. I'm asking you if you think it's an
2  incorrect one, because just because something is
3  new doesn't mean it's wrong; correct?
4      A. In -- well, it's hard to separate the
5  overall methodology. So I guess it's not
6  inappropriate to have an external control
7  generally, I think, you know, in terms of other
8  survey designs. Those have been used. I don't
9  really have a comment on that particular facet of
10 his survey.
11     Q. Okay. Let's -- I know you have issues
12 with his use of a control -- well, you would not
13 have used a control; right? You did not use one,
14 and you don't think one is needed; right?
15     MR. HENN: Objection. Misstates.
16     A. Again, we used internal controls in our
17 survey.
18 BY MR. ROMAN:
19     Q. I meant external controls. I'm sorry.
20     A. Yeah, we conducted -- we did not conduct a
21 survey that had an external control.
22     Q. Okay. And you don't think one is
23 necessary?
24     A. I don't think one is necessary in the
25 Teflon design.

Page 146

1      Q. And why is that?
2      A. Because it's been widely tested. It's
3  been accepted by the courts. And you can -- by
4  looking at the other internal controls, you can get
5  an understanding that respondents do or don't, in
6  our case, that respondents do generally understand
7  the distinction between brand names and common
8  names. And then for the name in question, it
9  provides a greater validity to the name in
10 question, in this case, Discount Tire, if they
11 generally understand and demonstrate their
12 understanding with other names.
13     Q. Okay. Now I understand that you think
14 that internal controls are sufficient. Do you
15 think there is anything wrong with using an
16 external control?
17     A. Again, generally, I think external
18 controls are used, and there is nothing wrong with
19 them generally. It was not sufficiently
20 problematic for us to comment on it -- on that in
21 this particular case.
22     Q. Okay. Now, if you were going to choose an
23 external control here, what do you think about the
24 choice of "discount windshield"?
25     A. It's hard to answer that question because

Page 147

1  I just don't see why you would vary from the tested
2  and accepted format, which doesn't include a
3  novel -- well, I don't know that it's novel -- an
4  external control. That's just really new, and I
5  don't see the purpose in doing that.
6      Q. That's why I asked: If you were to use an
7  external control, what do you think about "discount
8  windshield"? Do you think it's a good one, a bad
9  one? Do you think there are any better ones?
10     A. In terms of conducting external controls
11 generally, I don't have a problem with that. In
12 terms of specifically using "discount windshield,"
13 I don't know what value that has in terms of
14 comparing -- if it had been the Teflon design,
15 what's the value of adding an external control when
16 you have the tried-and-true Teflon format?
17     Q. I understand that. Let me ask: Do you
18 have a better -- again, assuming you are going to
19 use external control, do you have a better one than
20 "discount windshield"?
21     A. I just don't know if I can accept the
22 assumption that I would use an external control.
23 We didn't use an external control. We used the
24 Teflon survey methodology, and it uses internal
25 controls.

Page 148

1      Q. So sitting here today, you don't have a
2  better control than "discount windshield"; correct?
3      MR. HENN: Object to the form.
4      A. Well, I don't have any external control at
5  all, and I don't see the need for an external
6  control if one were to do the Teflon survey design.
7  BY MR. ROMAN:
8      Q. Now, the results of Dr. Wind's survey
9  showed that Discount Tire had a brand recognition
10 of approximately 23 percent in both the national
11 sample and the Florida/Georgia sample and that the
12 results were closer to those of the unambiguous
13 common names than they were to the unambiguous
14 brand names. Do you understand that?
15     A. I understand that he uses those numbers.
16 I don't agree with his methodology, and I don't
17 agree with the conclusions based on that
18 methodology.
19     Q. That wasn't my question. Please listen to
20 my question.
21     A. Okay.
22     Q. Do you understand those to be the results?
23     A. I understand those numbers, generally, to
24 be the results that he talks about.
25     Q. Okay. What was your reaction to those

Page 149

1  results?
2      A.  As I stated just a moment ago, I don't
3  agree with his methodology, so I don't agree with
4  the results based on that methodology.
5      Q.  Okay.  What did you think about the
6  comparison of the results between discount tire and
7  raisin bran in which discount tire was recognized
8  as a brand less than half as often as raisin bran?
9      A.  Given the -- his survey methodology
10  varying drastically from the Teflon survey
11  methodology, I can't comment on those results in
12  terms of I don't agree with the methodology and,
13  therefore, I can't agree with the conclusions that
14  he draws based on his methodology.
15      Q.  And what about the methodology -- well, we
16  will go through that.  Never mind.
17          Let's go to your rebuttal report.
18      A.  Okay.
19      Q.  And that is Exhibit 230; correct?
20      A.  That is correct.
21      Q.  Let's go to -- let's start with
22  paragraph 14, please.
23      A.  Okay.
24      Q.  Actually, before that, we have talked
25  about coined terms, earlier.  What's your

Page 150

1  understanding of the difference between a coined
2  term and a noncoined term?
3      A.  My understanding of a coined term would be
4  something like Xerox or Kodak, a newly -- it's hard
5  to define "coined" without saying "coined" -- a
6  newly derived term that previously did not exist.
7      Q.  And you agree -- would you not? -- that
8  "discount tire" is not a coined term?
9      A.  The word "discount" and the word "tire"
10  are not coined terms.
11      Q.  And when you put it together, that's not a
12  coined term, either?  You even say in the middle of
13  paragraph 14, "Discount Tire is not a coined term."
14  Do you see that?
15      A.  I do see that.
16      Q.  Okay.  And that is your opinion; correct?
17      A.  That is correct.
18      Q.  Okay.  Now what you do state, that that's
19  a descriptive mark that has achieved secondary
20  meaning in its markets.  Do you see that?
21      A.  I see that.
22      Q.  Okay.  What does "discount tire" describe?
23      A.  I think it describes services related to
24  tires.
25      Q.  Any particular types of services?

Page 151

1      A.  Repeat the question.
2      Q.  Any particular types of services?
3      A.  No, I think tire services.
4      Q.  All tire services?
5      A.  To me, it sounds like tire services.
6      Q.  What does the word "discount" tell you?
7      A.  Those tire services may be offered at a
8  sale price, at a lower price.
9      Q.  So when you see discount tire together,
10  that doesn't tell you that you are going to get
11  services related to tires at a discount or lower
12  price?
13      A.  It may tell you that.  Certainly, the
14  primary service that I think of here is tires.
15      Q.  Do you have any understanding as to how
16  well-known Discount Tire is outside of the areas
17  where it has stores?
18      A.  Repeat the first part of your question.
19      Q.  Do you have any understanding as to how
20  well-known Discount Tire is outside of areas where
21  it has stores?
22      A.  To the extent that you can draw
23  conclusions from the markets that we tested, I
24  think there may be recognition outside of the
25  Atlanta region, across other areas of Georgia,

Page 152

1  perhaps.  It's really an empirical question, and I
2  don't know for certain.  I do know that across 37
3  markets in the United States, that the
4  understanding of Discount Tire was that of a brand
5  name.
6      Q.  37 markets where there are lots of
7  Discount Tire stores?
8      A.  Where there are three or more Discount
9  Tire stores within a 10-mile radius.
10      Q.  Okay.  So let's go to your rebuttal at
11  paragraphs 4 and 8.  And there you cite cases in
12  footnotes for the proposition that courts and the
13  TTAB regularly accept and rely on Teflon surveys in
14  genericness cases involving -- including those
15  involving noncoined terms.  Are you aware of that?
16  Or is that a fair statement of paragraphs 4 and 8?
17      A.  One moment please.  Let me see here.  Yes,
18  I agree that we talked about the surveys being
19  relied upon in paragraphs 4 and 8.
20      Q.  Okay.  And you -- the cases on which you
21  rely are found in Footnotes 2, 3, and 5 through 8;
22  correct?
23      A.  Footnotes 2 and 3 in paragraph 4, and then
24  what was the other?  5 and 8?
25      Q.  5 through 8.

Page 153

1    A.  5 through 8.
2    A.  5, 6, 7, and 8.
3    A.  Let me just check.  So I guess I need to
4  go back to your -- the original -- I see the
5  footnotes now.  Can you repeat your question?
6    Q.  So these cases that you cite in Footnotes
7  2, 3, and 5 through 8 are all in support of the
8  propositions that you set forth in paragraphs 4
9  through 8 as to judicial and administrative
10  acceptance and reliance on Teflon surveys in
11  genericness cases?
12    A.  Generally, yes, these footnotes talk about
13  how Teflon surveys are generally relied upon as a
14  methodology.
15    Q.  And my question is:  Did you do the
16  research to find these cases?
17    A.  In some cases, yes.  In terms of
18  Dr. Wind's -- I think it was Footnote 8, as it
19  states, "At my request, counsel at Kilpatrick
20  Townsend located some of the cases that Dr. Wind
21  identified" -- they weren't -- they had no
22  citations, so crab house, brick oven, light, some
23  of those were harder to find because he didn't cite
24  to the specific cases.  But others, I was able to
25  find on my own.

Page 154

1    Q.  You did that on your own?
2    A.  And -- yeah.  I suppose -- I found them in
3  that -- you know, there are resources out there,
4  for example, Dr. Jay's chapter, she talks about a
5  fair number of surveys.  So it wasn't brand-new
6  research on my own, necessarily, but I did find a
7  lot of these cases myself.
8    Q.  Okay.  But these weren't cases that were
9  just given to you by Mr. Henn or by somebody else
10  from Kilpatrick or Ballard Spahr?
11    A.  You mean the cases in Footnotes 2 --
12    Q.  2, 3, 5, 6, 7, and 8.
13    A.  No.  I think Footnote 8, it speaks for
14  itself.  It talks about how I received some
15  assistance from Kilpatrick Townsend.
16    Q.  Okay.  Do you know if in any of the cases
17  you cite, there was a discussion by the court or
18  the TTAB of use of Teflon surveys in cases
19  involving coined versus noncoined terms or
20  genericness generally?
21    A.  Let me take the first part.  Was there any
22  discussion in any of these cases cited about the
23  use of Teflon surveys in non -- I'm sorry,
24  involving noncoined marks?
25    Q.  Right.  Coined versus noncoined terms,

Page 155

1  whether there was a discussion, you know, it's --
2  you know, equally appropriate to use them in both
3  cases or more appropriate in one than the other?
4  Do you know if there was any discussions in any of
5  these cases?
6    A.  Yes.  I'm generally aware that there was
7  discussions in some of these cases.
8    Q.  Which ones?
9    A.  Lets see here.  Let me go back to --
10  footnote 3 talks about courts and the TTAB
11  regularly accepting and relying on Teflon surveys
12  in genericness cases, including those involving
13  noncoined terms.
14    Q.  I'm just asking:  Which case specifically
15  addresses that issue?
16    A.  For example, Country Music Association.
17  And -- let's see here.  I believe the Premier
18  Nutrition versus Organic Food Bar is another term
19  that struck me as a noncoined term.
20    Q.  I'm asking where there was specifically a
21  discussion about the appropriateness of a Teflon
22  survey in cases involving coined versus noncoined
23  terms.
24    A.  I wouldn't remember the exact -- you know,
25  I couldn't say, See paragraph X of this case and

Page 156

1  see paragraph Y of that case.  How can I answer
2  your question?
3    Q.  I'm handing you what's been marked as
4  Exhibit 234 and ask if you've seen this before?
5    A.  Yes, I have.
6      (Deposition Exhibit 234 was marked for
7      identification by the reporter and is
8      attached hereto.)
9  BY MR. ROMAN:
10    Q.  This is your 2017 Intellectual Property
11  Survey, what we were talking about earlier as one
12  of your annual reviews?
13    A.  Yes.
14    Q.  Okay.  You've basically done these annual
15  reviews every year since about 2013; correct?
16    A.  They have -- in terms of Ford Bubala &
17  Associates, it's been longer than that, but in
18  terms of my --
19    Q.  You personally?
20    A.  Yeah.  In terms of my personal
21  involvement, it's been -- I think that's about
22  right, since 2013.  Let me double-check, yes.
23    Q.  If you look on the first page, you thank
24  Mr. Swan and Kilpatrick Townsend.  Do you see that?
25    A.  Yes, I do.

Page 157

1    Q.  He's also acknowledged in all the other
2  reports that you do; correct?
3    A.  In terms of the ones that have my name on
4  it, I believe that is correct.  I can't recall one
5  way or the other in terms of the earlier documents
6  that Dr. Ford worked on.
7    Q.  How do you know Mr. Swan?
8    A.  We've had a personal and professional
9  relationship with him over the years, in terms of
10 Ford Bubala & Associates.  He was a friend of the
11 late Gerry Ford's and still is a friend of
12 Dr. AnnaBelle Sartore.
13   Q.  Was he the one who retained you in this
14 case?
15   A.  No.  That was -- originally, it was
16 Ballard Spahr, and after that, it was Mr. Henn,
17 here, to my right.
18   Q.  Okay.  On page 4 of Exhibit 234, you
19 include a summary of the Frito-Lay case.  Do you
20 see that?
21   A.  I see that we have an excerpt from the
22 Frito-Lay case.
23   Q.  And the last sentence -- they talk about
24 competing surveys here, and then the last sentence
25 reads, "Thus having considered the surveys to be

Page 158

1  relevant and probative, our conclusion would not
2  have changed because we find that, to the extent
3  they can be understood to measure something, the
4  survey results, overall, would support a finding of
5  genericness."  Do you see that?
6    A.  I see those words written.
7    Q.  Do you know why the court in that case did
8  not consider the surveys to be relevant or
9  probative?
10   A.  I don't recall exactly.  I know that
11 there -- this may be an example of -- and there are
12 cases in which the courts have found that no survey
13 was appropriate because it didn't go back in time,
14 so to speak.  It didn't measure the level of brand
15 name or common name, kind of, association or
16 understanding at a time that was relevant in a
17 case.  That can happen.
18   Q.  I'm going to hand you what's marked as
19 Exhibit 235.
20   A.  Okay.
21       (Deposition Exhibit 235 was marked for
22       identification by the reporter and is
23       attached hereto.)
24 BY MR. ROMAN:
25   Q.  My question is:  Is this the case that's

Page 159

1  referred to in Exhibit 234 that we just read the
2  excerpt from?
3    A.  It appears to be.
4    Q.  Okay.  I would like to direct your
5  attention to pages 25 and 26.  The last sentence on
6  page 25, the second-to-the-last line of text, where
7  it says "preliminary to our discussion."  Do you
8  see that?
9    A.  I see that sentence that begins with those
10 words.
11   Q.  Okay.  So I'll read that.  "Preliminary to
12 our discussion of the survey experts' evidence, we
13 note that various courts have found that Teflon
14 surveys are only appropriate to consider in a case
15 where the question is whether a coined or arbitrary
16 mark has become generic and is not appropriate to
17 prove recognition of an otherwise not inherently
18 distinctive mark."
19       Then there is a footnote, and the footnote
20 notes that cases include decisions from the 4th,
21 7th, and 8th circuits, as well as one from the
22 District of Massachusetts."  Do you see that?
23   A.  I see that discussion.
24   Q.  Okay.  And then let's go to pages 41 and
25 42, the second full paragraph that begins, "in its

Page 160

1  decision."  Do you see that?
2    A.  Yes, at -- yeah, the first -- sorry, the
3  bottom paragraph on page 41?
4    Q.  Yes.
5    A.  Okay.
6    Q.  And the second sentence reads, "We note in
7  this regard that several such sister circuits have
8  found Teflon surveys to be unpersuasive when used
9  outside the specific context of generici, i.e.,
10 testing to see whether a term that may once have
11 been a mark has become generic."
12       And then there are a series of -- then
13 there is another sentence describing that, and then
14 there are a whole bunch of cases that are cited,
15 including cases from the 4th, 7th, and 8th
16 circuits, as well as the District of Massachusetts.
17 So basically the cases that were cited earlier.  Do
18 you see that?
19   A.  I see that those same -- I assume it's the
20 same cases cited earlier because I do see what
21 appears to be the same names from that earlier
22 section.
23   Q.  Right.  Now, you were aware of this
24 decision, the Frito-Lay decision and the cases
25 cited in this when you did your report in this

1    case, were you not?
2        A.  Yes, I was generally aware of this.
3        Q.  And why did you not include the discussion
4    of this case and the cases cited therein in your
5    report?
6        A.  There is also a discussion in other cases
7    that talk about the appropriateness of the Teflon
8    design, regardless of the type of market it's
9    testing, whether it's descriptive or coined or
10   anything.
11       Q.  But you just chose the ones going that
12   way, as opposed to the more balanced approach of
13   saying everything; correct?
14       A.  We did not cite to this case.  I think the
15   record is clear on that.  But we did cite to a
16   variety of other cases that, as I say --
17       Q.  Go the other way?
18       A.  -- with respect to the coined or
19   noncoined --
20       Q.  Right?
21       A.  -- concept, there are cases that support
22   either side, it seems.
23       Q.  But you just cited the cases that went on
24   one side; correct?
25       A.  I suppose that's true.  We cite to the

1    cases that support the notion that a Teflon survey
2    is appropriate regardless of the type of term that
3    it is.
4        Q.  So in paragraph 8, when you say, "Dr. Wind
5    does not cite to a peer-reviewed -- to
6    peer-reviewed publications or any court opinions
7    that posit a Teflon survey as an inappropriate
8    design to evaluate the primary significance of a
9    noncoined term," yes, it's true that Dr. Wind did
10   not cite it, but neither did you, did you?
11       A.  I guess, repeat your question again.  It's
12   true that we -- go ahead.  I'm sorry.
13       Q.  I'm just -- you are aware of this decision
14   that comes out the other way.  You ignore it.  You
15   cite cases that go the other way, and you, you know,
16   are you an advocate, or are you a neutral expert?
17           MR. HENN:  Object to the form.
18       A.  I would say that there are often cases
19   that support and refute a certain notion, and to
20   the extent that we believed that the methodology is
21   appropriate, we would conduct methodology that --
22   we conduct a survey based on the methodology that
23   we feel is appropriate.  And I think this is a
24   question for the fact finder to weigh different
25   cases.

1    BY MR. ROMAN:
2        Q.  One last thing about the Frito-Lay
3    decision.  Let's go to page 30, please.
4        A.  Okay.
5        Q.  Do you see where it has the results of the
6    Teflon survey there?
7        A.  This has the results of one of the Teflon
8    surveys conducted in the case.
9        Q.  Yes.  So it's the results of a Teflon
10   survey?
11       A.  Of -- that's my understanding, that it was
12   a survey based on the Teflon design.  I see that
13   they have the terms "brand" and "category," which
14   are not the same as "brand name" and "common name"
15   to me.  So there's some variation, but I take your
16   representation that this was a survey submitted in
17   this case.
18       Q.  Okay.  And you see the results for Lucky
19   Charms?
20       A.  Yes, I see that.
21       Q.  And the results are 87 percent brand, 10
22   percent category, 3 percent don't know/not sure.
23   Do you see that?
24       A.  I see that.
25       Q.  Please go to the Wind report on pages --

1    on page 26.  That's the summary of his results.  Do
2    you have that, Figure 1?
3        A.  I see his Figure 1.
4        Q.  Okay.  And that's the results for the
5    national sample?
6        A.  I see that.
7        Q.  You see results for Lucky Charms?
8        A.  I see the results that he reports.
9        Q.  And that's 87.5 percent; right?
10       A.  I agree.
11       Q.  The Teflon survey showed results of 87
12   percent?
13       A.  You are going back to the other case?
14       Q.  Yes.
15       A.  I see that, yes, in this other case in
16   which that survey was offered for that specific
17   name, Lucky Charms, I see that it was 87 percent
18   said brand name.
19       Q.  And its generic result was 11.3 percent.
20   Do you see that?
21       A.  Say that again.  His --
22       Q.  The Lucky Charms results -- or generic or
23   brand -- or common name or category is 11.3
24   percent.  Do you see that?
25           MR. HENN:  Object to the form.

Page 165

1      A.  Yeah, I don't know that I can agree with
2  his characterization of this being the common name
3  answers because he combines two options, two or
4  three.
5  BY MR. ROMAN:
6      Q.  Well, let me ask you this:  His combined
7  options 2 and 3 were how much?
8      A.  I see that the number he reports here is
9  11.3 percent.
10      Q.  And that compares to what on the Teflon
11  survey that's in the Frito-Lay decision?
12      A.  In the Frito-Lay decision, you are asking
13  about Lucky Charms for category?
14      Q.  Yes.
15      A.  That response level was 10 percent.
16      Q.  Okay.  So wouldn't you agree that that's a
17  pretty good confirmation that the Wind survey
18  replicates, in many respects, the results of a
19  Teflon survey?
20      A.  No, I wouldn't.
21      Q.  Why is that?
22      A.  His -- sorry.  Dr. Wind's survey
23  methodology was very different from the -- from the
24  Teflon survey methodology.  So I'm not sure --
25  although these numbers, I agree, are pretty

Page 166

1  comparable, I don't see that the survey methodology
2  was -- was terribly comparable.
3      Q.  Well, it certainly suggests that there
4  weren't issues of bias and confusion, doesn't it?
5      A.  I don't know that you can say that, based
6  on this one comparison of one name.
7      Q.  Let's go back to your rebuttal report.
8      A.  Okay.
9      Q.  On page -- I'm sorry.  Paragraph 5,
10  page 3.
11      A.  Okay.
12      Q.  You say that the results of the -- I guess
13  you are talking about the 2013 Ford survey.  It
14  says they support a finding that Discount Tire is a
15  strong and famous mark among relevant consumers in
16  those markets?  Do you see that?
17      A.  In those markets, I see that.
18      Q.  And --
19      A.  Among relevant consumers in those markets.
20      Q.  Right.  When you talk about "relevant
21  consumers in those markets," who are you talking
22  about?
23      A.  People who indicated that they were likely
24  to purchase tires from a store that sells tires.
25  I'm paraphrasing, but that general notion.

Page 167

1      Q.  Now, you're not suggesting, are you, that
2  Discount Tire is a strong and famous mark in the
3  sense that Exxon and McDonald's are strong and
4  famous marks, are you?
5      A.  No.
6      Q.  So how do we assess how strong and famous
7  it is?  When you say it's strong and famous, what's
8  the measure by which you are making that statement?
9      A.  Well, I think after the TDRA, the
10  Trademark Dilution and Revision -- excuse me, after
11  the TDRA, Trademark Dilution Revision Act, we no
12  longer have this idea of a particular class of
13  purchasers.  The new accepted universe is the
14  general consuming public, quote/unquote.
15          So this is targeted at potential consumers
16  of a particular class of goods, namely, tires, to
17  abbreviate.
18      Q.  Is it your position that Discount Tire is
19  a strong and famous among tire buyers as Exxon and
20  McDonald's are among the general public?
21      A.  That's a hard comparison to make.  I would
22  imagine that a name like McDonald's is very well
23  known across the United States.  I don't know.  I
24  would have to measure that level of recognition.
25  But, certainly, in these markets, the Discount Tire

Page 168

1  mark, I believe, is well recognized and is a strong
2  and famous mark among tire purchasers.
3      Q.  At several points in your rebuttal,
4  including in paragraphs 9 and 10, you call
5  Professor Wind's survey confusing; correct?
6      A.  I generally recall that.  Sorry, which
7  paragraph are we on now.
8      Q.  I pointed out paragraphs 9 and 10, but I
9  think you make the point, basically, throughout.
10      A.  Yeah.  I generally understand that we made
11  that claim because I really don't understand some
12  of his category options in terms of his primary
13  survey questions.
14      Q.  Okay.  So let me ask you this:  Do you
15  believe that respondents to the survey were
16  confused?
17      A.  In what respect?  What are we talking
18  about?
19      Q.  Well, you say the survey is confusing;
20  right?  Is it your view that the survey was
21  confusing?
22      A.  It's my view that the wording that he uses
23  is confusing.
24      Q.  And you believed that because the wording
25  is confusing, that respondents responding to the

1  survey were confused?
2      A.  Well, I think we need to pin that down a
3  little more specifically.
4      Q.  Do you think they were able to answer the
5  questions?
6      A.  Well, I certainly think that their
7  respondents did answer the questions.  I don't know
8  that Dr. Wind's methodology is sufficient in
9  drawing the conclusions that he draws.
10      Q.  Well, why do you think the survey is
11  confusing?
12      A.  The options that he gave, he asked very
13  long-winded and compound statements in terms of his
14  Categories 1, 2, and 3, I'll call them.
15      Q.  And you think that confused respondents?
16      A.  I think that certainly may have confused
17  respondents.  It confused me.
18      Q.  Okay.  Well, do you have any evidence that
19  respondents were, in fact, confused?
20      A.  With respect to what?
21      Q.  When you look at the results, you say,
22  "Oh, my God, this is because, you know, obviously
23  the respondents were confused."
24      I understand you think that's hard to
25  understand.  Okay?  You think -- you personally think

1  the survey is confusing; right?
2      A.  I think the wording of these options is
3  confusing.
4      Q.  Okay.  And you believe that they would be
5  confusing to respondents; correct?
6      A.  I believe that it certainly could be.
7      Q.  Okay.  Do you have any evidence that the
8  respondents were, in fact, confused?
9      A.  Confused with respect to what?  I don't
10  know --
11      Q.  The questions.  Do you think they couldn't
12  answer the questions?
13      A.  Well, as I said, I think the respondents
14  answered his questions.  I don't know that the
15  answers to his questions are relevant in terms of
16  the primary significance of the mark Discount Tire.
17      Q.  Why is that?
18      A.  For the reasons we stated.  One was they
19  are compound; they are confusing; they are long
20  choices.  They -- they are nonexclusive with
21  respect to Options 2 and 3.  He has two choices for
22  more than one company.
23      Leading -- having those two separate
24  options, 2 and 3, that both stand for this notion,
25  generally, of more than one company, I think that can

1  lead respondents toward that type of an answer.  They
2  are allowed to check multiple answer choices.  It's
3  not a primary significance when you can check
4  multiple boxes.  There is a variety of issues that we
5  saw with his survey.
6      Q.  Anything else that you can think of?
7      A.  Well, I think the rebuttal expert report
8  speaks for itself here.  Let me make sure I didn't
9  miss any of our big points here.
10      It's an unused, novel survey approach.  It
11  hasn't been used by courts.  It hasn't been relied on
12  by courts.  He asserts -- well, he asserts that the
13  Teflon design is not appropriate for the noncoined
14  terms.  And I just disagree with it, and certain
15  courts disagree with that as well.
16      MR. HENN:  Are you, related to that,
17  asking him to read the report?
18      MR. ROMAN:  No.
19      THE WITNESS:  Okay.
20      MR. HENN:  Okay.  What is it you are
21  asking him, though?
22      MR. ROMAN:  I'm trying to get all his
23  criticisms out there.
24      MR. HENN:  You mean other than what's
25  already written in here?

1  BY MR. ROMAN:
2      Q.  Well, if you have nothing other than
3  what's in the report, just say that.
4      A.  Yeah.  I think that's an easier way to go.
5  I have nothing other than what's written here in
6  this report.
7      Q.  Okay, that's fine.  I don't want to go to
8  trial and find you say, "Oh, I've got 17 other
9  reasons."  If you've told me everything, I'm fine
10  with that.
11      A.  Yeah.  At this point, there is nothing, in
12  addition to what is written here, that was
13  sufficient enough to raise an issue.
14      Q.  Okay.  So now let's go to his results.
15      A.  Okay.
16      Q.  Page 26 of his report.  We'll do the
17  national.  If you want to refer to the state --
18  the -- the -- any of the others, that's fine, but I
19  just -- why don't we stick with the national one
20  here.
21      A.  Okay.  But we can --
22      Q.  If you think there are differences that
23  you want to talk about, that's fine, but for ease
24  of reference --
25      A.  Okay.

Page 173

1    Q. -- go to page 26.
2    Okay. Now, you would agree, would you not,
3  that the respondents did a pretty good job of
4  identifying -- notwithstanding what you say is a
5  confusing set of questions, they did a pretty good
6  job of identifying, on the left-hand side, the four
7  unambiguous brand names; correct?
8    A. I don't know that I've stated that
9  respondents did a pretty good job. I think I was
10  talking about in our survey, in previous Teflon
11  surveys, asking about the same types of names over
12  history allows you to check results. I don't know
13  that I specifically commented on his results.
14    Q. No, no. But we talked earlier that --
15  about that. We agreed -- you and I agreed that
16  Cap'n Crunch, Pep Boys, Jiffy Lube, and Lucky
17  Charms are all unambiguous brand names.
18    A. To me, they are.
19    Q. Right. And the respondents were able
20  to -- through this confusing survey, were able
21  nevertheless, to identify them as brand names;
22  correct?
23    A. Given Dr. Wind's methodology, his results
24  are what his results are. I don't agree with the
25  conclusions that he arrives at.

Page 174

1    Q. All I'm asking is: Do they
2  successfully -- didn't the respondents successfully
3  identify brand names as brands?
4    A. Given the faulty methodology, I would
5  agree -- if we are just reading what's on the page,
6  I would agree that the number next to Cap'n Crunch
7  is 95.3, et cetera.
8    Q. And those are -- those are numbers
9  analogous to the numbers that you got in your
10  Teflon survey for unambiguous brand names; correct?
11    A. If -- in terms of our Teflon survey, when
12  the primary significance is in one category or the
13  other, then -- if the majority of responses,
14  is what I'm trying to say, are in one category or
15  the other, we would say that the primary
16  significance is that of a brand name or common name
17  as it may be.
18    Q. And your numbers were all in the 90s, just
19  like these numbers; correct?
20    A. Let me double-check. They were not all in
21  the 90 percents. There was STP, for example, with
22  68 percent brand name in Jacksonville.
23    Let's just look at the -- all respondents
24  on page 9. Is that okay for now?
25    Q. Sure.

Page 175

1    A. STP brand name, the percent of respondents
2  who said that STP was a brand name was 72.33
3  percent. The results generally speak for
4  themselves, but there is a variety of --
5    Q. But you had American Airlines at 97
6  percent, 98 percent. Kentucky Fried Chicken, 97,
7  98 percent. And you can tell from this that there
8  were five unambiguous brand names that all scored
9  72 percent, other than STP, which is kind of on the
10  low end, but all of them scored 72 percent or
11  above; correct?
12    A. In terms of our initial ten names?
13    Q. Right.
14    A. All of the -- what I would say are brand
15  names -- the STP, the Coke, the Jell-O, the
16  American Airlines, and Kentucky Fried Chicken --
17  those were all 72 percent or higher brand-name
18  responses.
19    Q. And so they got them right, basically.
20  The response [sic], by and large, got them right?
21    A. Sure. I would say that -- if you assume
22  that these are all brand names, then I would say,
23  yes, they got it right.
24    Q. Do you believe any of those that they said
25  were brand names are not, in fact, brand names?

Page 176

1    A. I guess somebody could -- in certain
2  regions of the country, I understand people might
3  say "Coke" when they are referring to a soda or a
4  pop or a carbonated beverage generally. But I
5  would imagine because of the primary significance
6  or the 85 percent that said "brand name," I think
7  that's pretty clear that Coke is generally
8  perceived as a brand name.
9    Q. And then with respect to the common names,
10  they all scored 81 percent or better, going all the
11  way up to 98 percent, basically; correct? They got
12  those right?
13    A. We are still talking on the same table
14  here?
15    Q. Yes, your table.
16    A. Well, we talked about STP being 72
17  percent. I think you just said 81?
18    Q. Now we are on common names.
19    A. Oh, okay. I'm sorry. We moved over.
20    Q. Table 7B of your report, we look at the
21  common names, and they got them all -- again, they
22  got them right. They got -- the lowest one was
23  aspirin, 81.3 percent, and the highest was
24  refrigerator at 97.67 percent; right?
25    A. I agree with that, that those -- that

Page 177

1    refrigerator, margarine, and aspirin, appliance
2    dealer, and bank were all --
3        Q.   Unambiguous common names.
4        A.   Well, they were all -- the majority of
5    responses saw -- respondents saw those as common
6    names.
7        Q.   Do you have any reason to believe they are
8    not?
9        A.   No, I don't think -- aspirin has, you
10   know, a little more difficult history, but other
11   than that, I think they are all pretty clearly
12   common names.
13       Q.   Okay.  So then you go over to Ford survey.
14           MR. HENN:  You mean Wind?
15           MR. ROMAN:  The Wind survey.  Thank you.
16       Q.   Page 26.  And you look at the unambiguous
17   common names:  oatmeal, auto parts, automotive
18   center.  They are all at the very bottom or
19   actually on the next column.  Why don't you go to
20   the second column.  You have auto parts at 99
21   percent; automotive center, 98.6; granola, 96.8;
22   oatmeal, 96.1.  Do you see that?
23       A.   I see that those are the numbers that
24   Dr. Wind reports.
25       Q.   And those are correct answers; right?

Page 178

1        A.   Again, given his methodology, I don't know
2    that I can agree with the conclusions that he comes
3    to.
4        Q.   Those are all unambiguous common names, as
5    we discussed earlier; correct?
6        A.   If you are asking me, my understanding, I
7    think "auto parts" is an unambiguous common name.
8    "Automotive center," probably the same.  "Granola"
9    and "oatmeal," I would say so.
10       Q.   Okay.  So those should be, as common
11   names, in the 90 percent range; correct?
12       A.   To me, it's a common name.  But, again, he
13   doesn't ask the question about brand name or common
14   name.  He asks these very --
15       Q.   I understand that.
16       A.   -- different questions.
17       Q.   But you have groupings on both charts.
18   The unambiguous brand names are all grouped
19   together, and the unambiguous common names are all
20   grouped together; right?
21       A.   I don't know that I can take that
22   representation.  Again, as I stated, I don't agree
23   with his methodology, but also raisin bran which,
24   to me, by itself, is a common name, is somewhere in
25   the middle of his charts.

Page 179

1        Q.   Well, you would agree that it's not an
2    unambiguous name?
3        A.   Well, I would say they are two words.
4    What do you mean by "unambiguous names"?
5        Q.   Is it your -- well, forget about raisin
6    bran right now.  Let's focus on the -- we talked
7    earlier about eight names, that you agreed four
8    were unambiguous common names and four were
9    unambiguous brand names.
10       A.   In Dr. Wind's survey?
11       Q.   Yes.
12       A.   I think we had that discussion, yes.
13       Q.   Okay.  And all the unambiguous brand names
14   are grouped together on all of his results, and all
15   of the unambiguous common names are all grouped
16   together on his results; correct?
17       A.   With respect to the brand names, I see
18   that the responses to his -- I'm sorry, to
19   Dr. Wind's -- given his methodology, his results
20   are his results.  I see that the brand names are
21   generally grouped together.  I don't know that I
22   can agree about the common names.
23       Q.   Where do you see any of the common names
24   not being grouped together?
25       A.   For example, raisin bran or discount

Page 180

1    windshield, those are --
2        Q.   I asked -- we were talking -- please
3    listen.  We are talking about the eight names.
4        A.   Okay.
5        Q.   I know you have an agenda, but we're going
6    to get through this a lot faster if you listen to
7    the question.
8            We have eight names, and we agreed four
9    unambiguous common names, four unambiguous brand
10   names.
11       A.   I thought that raisin bran was one of the
12   common names, or no?
13       Q.   No.
14       A.   It's not?
15       Q.   No.
16       A.   Okay.
17       Q.   We discussed that.  At least, in my view,
18   it's an ambiguous common name, that there is some
19   who, because of Kellogg's and Post, think it's a
20   brand name.  I was talking about the unambiguous
21   ones, which we discussed were auto parts,
22   automotive center, granola, and oatmeal.
23       A.   If we are talking about just those four
24   names, I would agree that those terms, to me, are
25   common names.  I don't agree with Dr. Wind's

1  methodology, and I don't, therefore, agree with the
2  conclusions that he has come to.
3      Q.  Please listen to the question.
4      A.  Okay.
5      Q.  Do you see that the four unambiguous brand
6  names and the four unambiguous common names are
7  clumped together and separate from one another, the
8  groups are separate from one another, in all of
9  Dr. Wind's results?
10     A.  In Dr. Wind's reported results, I see that
11 they -- the auto parts, automotive center, granola,
12 and oatmeal -- are grouped in proximity to one
13 another.  And I see that Cap'n Crunch, Pep Boys,
14 Jiffy Lube, and Lucky Charms are grouped together
15 with one another, given his methodology.
16     Q.  Right.  And the fact is that they are on
17 the opposite ends of the spectrum.  Common names
18 are being responded to differently than brand names
19 on -- you know, when one is up, the other is down,
20 and when one is down, the other is up; correct?
21     MR. HENN:  Objection to form.
22     A.  The way that Dr. Wind has reported the
23 data, he has two different columns, I guess, for
24 lack of a better term, and I -- he -- if a number
25 appears high on the left, it appears low on the

1  right.  Is that what we are talking about?
2  BY MR. ROMAN:
3      Q.  Yes.
4      A.  I agree that that's the presentation that
5  he chose.
6      Q.  Okay.  And those answers that they gave,
7  that the respondents gave, were correct answers;
8  correct?  They correctly identified the unambiguous
9  brand names, and they correctly identified the
10 unambiguous common names, did they not?
11     A.  That's the part where I can't necessarily
12 agree.  Just because of his categorization of
13 selecting options 2 or 3, I don't agree with the
14 wording.
15     Q.  Regardless of whether you agree or
16 disagree with the categorization, why do you think
17 it is that "discount tire" scores closer to the
18 common names than it does the brand names on every
19 measure?
20     A.  I don't have an opinion as to where -- why
21 the name "discount tire" appears at whatever level
22 it appears, given his methodology.  I guess I have
23 the opinion that I don't agree with his
24 methodology, and I, therefore, don't --
25     Q.  Let me -- do you think that the results

1  for "discount tire" are incorrect?
2      A.  I think the methodology is incorrect, and,
3  therefore, the results are not reliable.
4      Q.  Even though they -- well, which results
5  other than -- do you think the results for, for
6  example, Cap'n Crunch with a 95.3 percent response
7  who preserve -- perceive the term is an exclusive
8  brand name, do you think that's an incorrect
9  result?
10     A.  I think his results speak for themselves
11 based on his methodology.  As I said, I don't agree
12 with his methodology.
13     Q.  If you were answering the survey, where
14 would you -- where would you have put Cap'n Crunch?
15     A.  I don't know where I would have put it.  I
16 didn't --
17     Q.  You don't?
18     A.  I didn't take his survey, and I don't know
19 that I would have finished the survey, given the
20 Options 1, 2, and 3.  It was pretty overwhelming in
21 terms of a lot of words and a lot of
22 back-and-forth.  I don't know that I would have
23 been interested in completing that survey.
24         I can tell you that I understand Cap'n
25 Crunch to be a brand name.  And if it was a brand

1  name, common name dichotomy, I could have answered
2  that.
3      Q.  But you couldn't have done that -- I mean,
4  it seems like a lot of people did finish it with no
5  problem getting the answers right.
6      A.  Your question is -- I'm sorry?
7      Q.  How do you explain that you, a survey
8  expert, well-educated man, don't think you could
9  work your way through a survey that hundreds of
10 people did and seemed to have gotten the answers
11 right?
12     MR. HENN:  Object to the form.
13     A.  It's your supposition that they got the
14 answers, quote/unquote; right.  I suppose you don't
15 have a problem with this methodology.  As I stated,
16 I do have a problem with his methodology, so I
17 don't agree with its conclusions.
18 BY MR. HENN:
19     Q.  Well, you say that the results are a
20 product of bias; correct?
21     A.  I'm sorry?
22     Q.  Your view is that -- I don't want to put
23 words in your mouth, so let me get your exact
24 phraseology.
25         You say that "the survey design is

1    confusing and biased," paragraph 9.  You say other
2    things too, but let's just focus on those two nasty
3    things.  You say it's confusing and biased.  Do you
4    see that?
5         A.  I see that.
6         Q.  Okay.  Where do you see the evidence of
7    bias or confusion in these results?
8         A.  In terms of the respondents who answered
9    Option 2 and 3, I think there can be bias when you
10   have two answer options that provide the
11   alternative of more than one company.  I think that
12   that can very much bias the results.
13        Q.  And bias it in favor of more people saying
14   that -- you think too many people will choose
15   Option 2 or 3.  You think there will be a
16   disproportionate number of people, given that there
17   are two options, who would pick 2 or 3, and that
18   that would have an effect on the results.  Is that
19   your position?
20        A.  I think that given the names in -- that
21   Dr. Wind tested and the wording of his questions, I
22   think that his answer choices could certainly bias
23   things toward the conclusion that he wanted to
24   find.
25        Q.  Which was the option -- more people would

1    take Options 2 or 3?
2         A.  No.  I think the conclusion he was hoping
3    to find was that -- I assume the conclusion he was
4    hoping to find was that "discount tire" was that of
5    a common name because he goes at great lengths to
6    change the tried-and-true Teflon methodology.
7         Q.  Okay.  But how do you explain that, given
8    that people have all these choices and could have
9    taken Options 2 or 3, so few did it for Pep Boys,
10   Cap'n Crunch, Jiffy Lube, and Lucky Charms?  If
11   it's so -- if people are being steered towards
12   Options 2 and 3, why didn't folks, say, put Lucky
13   Charms, Jiffy Lube, Cap'n Crunch, or Pep Boys into
14   one of those categories?
15        A.  I think not all marks are created equal,
16   but I think Pep Boys is probably not descriptive of
17   anything, and I think that could have very much had
18   an outcome on the results of Dr. Wind's survey.
19        Q.  So what you are saying is that a "discount
20   tire" mark is weaker than these other marks?
21        A.  I think that misstates my testimony.
22        MR. HENN:  Form.
23        A.  I think that -- I believe "discount tire"
24   is a descriptive term that has achieved secondary
25   meaning.  And given that status, I think he goes to

1    great lengths to change the Teflon survey
2    methodology to support the conclusion that he wants
3    to find.
4    BY MR. HENN:
5         Q.  By the way, you didn't test for
6    achievement of secondary meaning, did you?
7         A.  We conducted a primary significant
8    survey -- surveys in 2013 and 2019.  And based on
9    those results of the survey, we concluded that the
10   magnitude of responses toward brand name was
11   evidence of secondary meaning.
12        Q.  Okay.  Well, if you are going to do a pure
13   secondary meaning survey, how would you go about
14   doing it?
15        A.  Secondary meaning surveys -- again, if we
16   are starting, kind of, from the very beginning,
17   they would typically ask about past and/or
18   potential purchasers.  They would ask
19   respondents -- some version of our question wording
20   is similar to, do you associate X, whatever X is,
21   you know, the mark, with any particular company or
22   companies.  And if they say "yes," then we would
23   ask them, with what companies -- company or
24   companies.  And if they didn't know the name of a
25   company or companies, then we would ask them

1    Palladino's question of do you associate X, this
2    mark, with one company, with more than one company,
3    or don't you know.
4         Q.  And you didn't do that here?
5         A.  No.  This is not a secondary meaning
6    survey.  This is a Teflon survey designed to test
7    the primary significance of the mark.
8         Q.  Okay.
9         A.  And based upon those results, as I said,
10   we concluded that, based on the magnitude of the
11   results, we were concluding that the mark "discount
12   tire" has achieved a secondary meaning.
13        Q.  In paragraph 10 of your rebuttal report,
14   you say that the term "unique" is confusing and
15   potentially misleading because a brand or trademark
16   need not be unique in the sense of fanciful or
17   coined.  Do you see that?
18        A.  Yes.
19        Q.  Is it your position that to be unique, a
20   term must be fanciful or coined?
21        A.  Well, what we are trying to say here is
22   that Dr. Wind's use of the word "unique" may be
23   misconstrued as implying that a mark has to be
24   fanciful or coined.
25        Q.  Well, doesn't a brand have to be unique or

Page 189

1    else it's not a brand?
2         A.   If a respondent takes the term "unique" to
3    mean something like Kodak, something that I've
4    never seen, never encountered before in a
5    dictionary, or never seen prior to its being used
6    in, you know, advertising or something, that's the
7    notion that I'm trying to watch out for here.
8         It's quite simple in terms of the Teflon
9    methodology.  You are trying to assess whether people
10   think something is a brand name or a common name, and
11   it really doesn't matter, in my view, whether that
12   mark is coined or not coined, whether it's
13   descriptive and achieves secondary meaning or not.
14   It's a pretty simple methodology to follow, and it's
15   been accepted for decades.
16        Q.   Is it your position that the examples used
17   by Dr. Wind for Option 1, American Airlines and
18   Dick's Sporting Goods, are fanciful or coined
19   names?
20        A.   Well, I would say the term -- the word
21   "American" and the word "airlines" by themselves
22   are not fanciful or coined to me.  I think that
23   American Airlines is a descriptive mark that has
24   achieved secondary meaning.
25        So I suppose they are not -- American

Page 190

1    Airlines, to me, doesn't sound like a coined term
2    like Kodak or like Xerox in that sense.
3         Q.   Okay.  And same with Dick's Sporting
4    Goods?
5         A.   Right.  Maybe I've never seen Dick's
6    Sporting Goods, that whole -- you know, maybe that
7    is a new, unique phrase, but I wouldn't say that
8    that's a coined mark in the same sense that Xerox
9    and Kodak are.
10        Q.   So Option 1, therefore, does not suggest
11   that "unique" means that the name has to be
12   fanciful or coined, does it?  I mean, the examples
13   are not fanciful or coined terms.
14        A.   We are talking about Dr. Wind's survey?
15        Q.   Yes.
16        (Miscellaneous comments.)
17        A.   Thank you.  Repeat your question again,
18   please?
19   BY MR. ROMAN:
20        Q.   So Option 1 doesn't suggest that "unique"
21   means that the name has to be fanciful or coined.
22   The two examples they give are not -- he gives are
23   not fanciful or coined names, are they?
24        A.   I think the word "unique name" can still
25   be misleading.  I agree that American Airlines, as

Page 191

1    we discussed, is not a coined term, in my view.
2         Q.   Same with Dick's Sporting Goods.  Not a
3    coined term?
4         A.   Right.  I don't see Dick's Sporting Goods
5    as a coined term in the sense of Xerox or Kodak.
6    I'm sure sporting goods, as a concept, has existed,
7    but Dick's Sporting Goods, I don't know where that
8    falls in terms of -- it's not quite coined, but
9    it's not exactly a three-word phrase you would find
10   in the dictionary either.
11        Q.   How about Outback Steakhouse, which was
12   used in the screener?  That's neither fanciful nor
13   coined, is it?
14        A.   Yeah, I think the same analysis would
15   apply in terms of "outback" and "steakhouse."  As
16   individual words, to me, don't seem coined at all,
17   and Outback Steakhouse combined together is not
18   coined like Xerox or Kodak.
19        Q.   And respondents had to say that Outback
20   Steakhouse was a brand to qualify for the survey --
21   right? -- the Dr. Wind survey?
22        A.   Well, he doesn't use the phrases "brand
23   name" or "common name" in his survey.
24        Q.   No, but you were taking issue with the use
25   of the term "unique," and yet they were able to

Page 192

1    correctly identify Outback Steakhouse as a brand,
2    notwithstanding the fact that it's not coined or
3    fanciful; correct?  Otherwise, you don't get to
4    play.
5         A.   In terms of his screening questions that
6    get you into the survey, I agree that he used the
7    term -- I take your representation that he used
8    that term "Outback Steakhouse."  I do recall
9    reading that.
10        Q.   Okay.  Let's go to paragraph 11.
11        A.   Okay.
12        Q.   We have already talked to you.  You said
13   that Options 2 and 3 are confusing.  But please
14   tell me what evidence you have that anyone was
15   confused by this.
16        MR. HENN:  Asked and answered.
17        A.   When he groups Categories 2 and 3 and
18   calls that one category, I think that it is
19   certainly leading, and you are asking about
20   confusing.  It's confusing because you have two
21   options that say more than one company.  So now you
22   have to parse out the precise nuanced difference
23   between this more-than-one company and that
24   more-than-one company.
25   BY MR. ROMAN:

Page 193

1    Q.  And yet they were able to do that with
2  four of the unambiguous -- the four unambiguous
3  brand names; correct?
4    A.  Dr. Wind reports the aggregate of
5  Categories 2 and 3.  So I don't know -- there may
6  have been a significant split or not between those
7  two.
8    Q.  Well, that's in the backup, but I guess
9  you looked at that.
10     Let's go to paragraph 12.
11    A.  Okay.
12    Q.  Okay.  You say, "The inherently confusing
13  phrasing of the three nonexclusive options
14  available to respondents is then compounded by
15  Dr. Wind offering respondents the option to 'please
16  check any or all that apply.'  This suggestion that
17  respondents should select two or three options" --
18  "three of the options improperly suggests that word
19  or phrase could be used" -- "could at once be used
20  by only one company and by more than one company."
21  Do you see that?
22    A.  I see that.
23    Q.  Where does it say that respondents should
24  select two or three -- three of the options?
25    A.  When it says, "check any or all that

Page 194

1  apply," I think that invites respondents to check
2  multiple options.
3    Q.  You think -- I understand it says "may";
4  it means may.  Where does it say "should"?
5    A.  I don't think Dr. Wind says you should
6  check more.  It says -- his words speak for
7  themselves.  It says, "Check any and all that
8  apply."
9    Q.  Would you agree that a more appropriate
10  word than "should" in your report should be "may"?
11    A.  I suppose we could argue about one word or
12  the other, but you could say "could" or "may" or
13  "should," in my view.
14    Q.  Again, how come respondents only selected
15  one option for the unambiguous brand names?  How do
16  you explain that?
17    A.  Dr. Wind has only one option that would
18  most closely correspond to brand name, but he
19  doesn't ask brand name and common name, so --
20    Q.  Right.  But why do you think, with respect
21  to the question he asked, the overwhelming
22  majority, basically in the 90 to a hundred percent
23  range, identified the four unambiguous brand names
24  as the only option and yet did not do that with
25  "discount tire" How do you explain that?

Page 195

1    A.  As I discussed, there may be some
2  influence based on the names that he chose.  He
3  chose names like Cap'n Crunch, which does not sound
4  descriptive in terms of C-A-P, apostrophe, N.  It
5  seems like a coined term or at least a very
6  unique -- kind of unique.  It seems like a brand
7  name in terms of cereal.
8     So I think when he combines the wording
9  that he uses with a mix of names, some of which may
10  be descriptive, some of which are more fanciful, I
11  think that can be problematic.
12    Q.  And where -- do you think Jiffy Lube is a
13  fanciful or coined term?
14    A.  I think "lube" might -- that "lube" might
15  suggest -- it might be a suggestive mark.  I don't
16  think that's a coined mark -- or a coined term.
17    Q.  No, it's more descriptive; wouldn't you
18  agree?
19    A.  Maybe suggestive or descriptive, more
20  along those lines.
21    Q.  And yet it scored 93.6 percent compared to
22  Discount Tire's 23.4 percent.  How do you explain
23  the gap?
24    A.  Again, Dr. Wind's results are what they
25  are with his methodology, and I don't accept his

Page 196

1  methodology as valid, so I don't accept his
2  results.
3    Q.  But what I'm asking you is:  What results,
4  other than the ones for "discount tire," do you
5  disagree with?
6    A.  I disagree with the methodology of not
7  asking about brand name versus common name.
8    Q.  Let's go to paragraph 13.  Sir, are there
9  other Teflon surveys that have as an answer the
10  word "both," you know, brand name, common name,
11  "both"?
12    A.  I have seen that there have been surveys
13  that offered an explicit "both" option.
14    Q.  Do you have a view as to whether that's
15  appropriate or not?
16    A.  Generally, yes.  I think the courts have
17  either liked survey experts to not offer the "both"
18  option or to offer the "both" option but disregard
19  the responses to -- people who answered "both," I
20  think they would set those aside and look at the
21  other answers, is my general understanding.
22    Q.  I'm sorry.  I just missed that answer.
23    A.  Oh, that's okay.  So I think generally --
24  should we just have the court reporter repeat it
25  back?

1    Q.  That's fine.  I don't want to make you do
2  it twice.
3         MR. ROMAN:  Could you repeat the witness's
4  answer, please?
5         (Reporter read back the requested text.)
6  BY MR. ROMAN:
7    Q.  In your mind, is it an appropriate --
8  strike that.
9         In your expert opinion, is it appropriate
10 to have a "both" option in a Teflon survey?
11   A.  With the telephone, again, a respondent
12 could volunteer the word "both" in order to
13 facilitate an interviewer marking an answer.  You
14 know, Dr. Ford provided, we provided, the "both"
15 option to be recorded.  You are asking about, is it
16 appropriate --
17   Q.  I'm divorcing it from the surveys that
18 were done in this case.  I'm just asking, as a
19 general matter, if you are conducting a Teflon
20 survey on widgets, do you think it would be
21 appropriate to have there to be three choices,
22 brand name -- or four choices:  brand name, common
23 name, both, don't know/not sure?
24   A.  I think you could do it that way, but,
25 again, I think the courts -- it seems to be -- my

1  understanding is that the courts have generally
2  either disregarded the "both" answers as part of
3  the analysis or have just said that it may not be
4  appropriate to ask the "both" question at all.
5         You don't want to give them an explicit
6  "both" option.  So if it's the Internet methodology,
7  I think you would have to give them the explicit
8  "both" option, and I wouldn't agree with that.  If it
9  was another methodology, like telephone, as we
10 discussed, you don't read that option out, but it may
11 be a way -- it may be on the screen for an
12 interviewer to record.
13   Q.  I just want to go back on one thing here.
14 When we were talking about Dr. Ford's survey, we
15 were talking about the conclusions he was drawing,
16 and the -- in your -- in your opening report, I
17 want to direct your attention to page 2, paragraph
18 5, and I want you compare that, please, to page 2,
19 paragraph 5 of the Ford report.
20   A.  Okay.
21   Q.  And I remember your testimony, you were
22 saying -- I was asking you whether Dr. Ford had, in
23 fact, limited his findings to the 37 markets,
24 whether he was trying to make a broader conclusion
25 based on those 37 markets, and you said, "Oh, no,

1  no.  Look at the phrase in the relevant universe.
2  That's what limits it to the 37 market areas."  Do
3  you recall that testimony?
4    A.  I don't know that that exactly
5  characterizes accurately my testimony, but I don't
6  want you to ignore the "relevant universe" language
7  that's in that sentence --
8    Q.  And it's your belief that that's the
9  relevant universe, is where Dr. Ford limited his
10 conclusions to the 37 market areas; correct?
11   A.  So now we are talking about where we
12 targeted versus where the -- where you might draw
13 conclusions.  So I think there is a distinction
14 there.
15   Q.  Well, is it your testimony that Dr. Ford's
16 conclusions on paragraphs 4 and 5 of his report are
17 that the results of the support -- "the results of
18 the survey support a finding that the principal
19 significance of 'Discount Tire' is that of a brand
20 name or trademark and not that of a generic term or
21 designation" applies just in the 37 markets or
22 throughout the entire country?
23   A.  Again, we targeted 37 markets in that
24 study, and I think you can -- a fact finder may or
25 may not want to make broader conclusions than that.

1  I think that the results can be applied to a more
2  broad geographic region than just those 37 markets.
3    Q.  But my question is:  Do you believe that
4  Dr. Ford, in his report that was submitted to the
5  TTAB, was drawing conclusions about the 37 market
6  areas or the country?  Which is it?
7    A.  I'm not sure what he had in his mind.  As
8  I sit here now, again, I understand that the target
9  market was these 37 -- the sample was these 37
10 markets, and I understand that you could
11 extrapolate from those 37 markets, potentially, to
12 a more broad conclusion overall.  And that's really
13 up to the fact finder.
14   Q.  Well, I'm questioning -- you were part of
15 the survey; right?  And you were -- you contributed
16 to this survey, the Ford survey?
17   A.  Yes, I was involved in the design and
18 execution of the survey.
19   Q.  And were you conveying to the TTAB that
20 the survey supported a finding that the principal
21 significance of "discount tire" is that of a brand
22 name or a trademark and not that of a generic term
23 or designation with the 37 markets or the nation as
24 a whole?
25   A.  I don't know if we had that distinction.

1    Clearly, we had the results of our survey, and the
2    results speak for themselves. And I know if --
3    generally, the board maybe doesn't care so much
4    about limited geography in instances in cases of
5    confusion. If there is one mark that is
6    exclusively used in one portion of the country, I
7    think they have still viewed survey evidence that
8    targets a specific geography to bar a national
9    registration. So we are talking about, you know,
10   getting a national registration here.
11        Q. In the phrase in that last paragraph,
12   "among the relevant universe," what do you
13   understand that to refer to?
14        A. I generally understand that to refer to
15   people who are likely to purchase tires in the next
16   two years and potentially -- you know, potentially
17   the 37 markets in which they reside.
18        Q. Okay.
19        A. And potentially beyond that.
20        Q. So let's go to your paragraph 5.
21        A. Okay.
22        Q. There, you say -- you talk about
23   "'Discount Tire' is a strong and famous market" --
24   "mark in Atlanta, Jacksonville, and Orlando, among
25   the relevant universe of people who, within the

1    next two years, are likely purchase tires for a
2    vehicle at a store that sells tires."
3        You are fairly precise there that you are
4    talking about those three markets; correct?
5        A. Again, I'm talking about target markets
6    versus the results of the survey. We targeted
7    three specific markets in this survey.
8        Q. You used the same phrase, "the relevant
9    universe," did you not?
10       A. In?
11       Q. In your report and Dr. Ford's reports, you
12   both talked about the relevant universe?
13       A. We both -- yes, both of those survey --
14   excuse me, declarations use that phraseology.
15       Q. And that phraseology is to refer to those
16   who, within the next two years, are likely to
17   purchase tires for a vehicle in a store that sells
18   tires; correct?
19       A. In the case of our survey, we had a focus
20   on three markets. So I don't know that, by itself,
21   you could go from our survey if -- pretending Dr.
22   Ford's survey -- if you didn't have access to those
23   results, I don't know that you could extrapolate
24   from three markets to the entire United States.
25   But I think, given our results and given Dr. Ford's

1    results, you likely can extrapolate to much of the
2    United States, if not all of the United States.
3        Q. And you think even though the markets that
4    you surveyed, both of you surveyed, were those
5    where you had a concentration of Discount Tire
6    stores, you think it can be extrapolated to the
7    country where there is -- including areas where
8    there is either no or a lesser concentration of
9    Discount Tire stores. You think those -- the
10   results are completely transferable. Is that your
11   testimony?
12       A. I think that it's an empirical question,
13   and if Dr. Wind wanted to test that, he could have.
14   If he wanted to do, you know, that straight
15   comparison and -- I don't know the answer in terms
16   of doing a survey that was entirely national in
17   scope versus the survey that targeted 37 markets.
18       Q. Did anything prevent you from doing a
19   national survey?
20       A. I don't know what you mean by "prevent."
21   I mean --
22       Q. Could you have done the same survey that
23   you performed on a national basis?
24       A. Theoretically, anything is possible. I'm
25   thinking about, given the facts of this case, I

1    don't know that that was particularly relevant
2    because of issues we discussed.
3        Q. Well, you understand that the plaintiffs
4    in this case are seeking a nationwide injunction --
5    are you not? -- permanent injunction?
6        MR. HENN: Object to the form. Misstates.
7    BY MR. ROMAN:
8        Q. Okay. You understand, do you not, that
9    the plaintiffs in this case are seeking an junction
10   that extends beyond these 37 market areas, do you
11   not?
12       A. I generally take your representation.
13       Q. Okay. Was there anything that prevented
14   you from doing the survey -- first of all, let's
15   start with the easy one.
16       Is there anything that prevented you from
17   doing a statewide survey of Florida and Georgia?
18       A. We wanted to do what we did. We targeted
19   these particular markets. So there was no one
20   telling us to do otherwise, and we chose the
21   methodology that we felt was appropriate here.
22       Q. Was there any -- anything preventing you
23   from doing a survey for the entire state of
24   Florida?
25       A. Well, we don't just conduct a survey in

Page 205

1   the abstract. We, you know, have discussions with
2   the client and what is going to be relevant in
3   terms of, you know, the particular facts of a
4   particular case.
5       Q. Did you hear my question?
6       A. I believe I did.
7       Q. Okay. Please answer the question.
8          MR. HENN: Asked and answered.
9       A. I'm trying to answer your question.
10  BY MR. HENN:
11      Q. No. Yes or no. Was there anything that
12  prevented you from doing a statewide survey in
13  Florida?
14         MR. HENN: Object to the form. And asked
15  and answered.
16      A. Yeah, I guess I don't like the way the
17  question is worded. I don't know if I can answer
18  that question, was there anything that prevented.
19  That's the part that I don't like.
20  BY MR. ROMAN:
21      Q. Right. Could you have done a statewide
22  survey of Florida if you had chosen to do so?
23      A. I suppose anything is possible. If you
24  wanted to do a survey in New Zealand, as you were
25  talking about earlier, one could do that. But --

Page 206

1       Q. Was there anything that prevented you from
2   doing a survey in Florida?
3          MR. HENN: Asked and answered.
4       A. We conducted this survey because we feel
5   that the markets that we targeted in Florida
6   directly speak to the Florida market.
7   BY MR. ROMAN:
8       Q. We can be done with this deposition.
9   Please describe any limitations that you had that
10  would have prevented you from doing a survey in
11  either Florida or Georgia.
12      A. We did conduct the survey in parts of
13  Florida and Georgia.
14      Q. No, the entire states.
15      A. Again, one could conduct a survey in the
16  entire state of Florida or the entire state of
17  Georgia. In this case, we conducted a survey in
18  particular markets in those states.
19         Do you mind if I take a quick break just to
20  get water?
21         MR. ROMAN: That's fine. Why don't we
22  take three minutes. I think I'm done, but -- let's
23  go off the record.
24         THE VIDEOGRAPHER: The time is 12:32 p.m.,
25  and we are now off the record.

Page 207

1       (Recess taken from 12:32 p.m. to
2       12:42 p.m.)
3          THE VIDEOGRAPHER: The time is 12:42 p.m.
4   We are back on the record.
5   BY MR. ROMAN:
6       Q. Would you agree that the common names that
7   are used in your survey and Professor Ford's survey
8   include both descriptive and generic names?
9       A. I would say that, for example, "American
10  Airlines" is a descriptive term, but I wouldn't say
11  that that's a generic term for that name
12  specifically. I think that it includes -- but more
13  generally, to the thrust of your question, I think,
14  yes, it does include some generic terms like
15  "refrigerator" or "margarine."
16      Q. And would you agree that your survey does
17  not try to distinguish between descriptive and
18  generic names; it tries to distinguish between
19  brand names and common names?
20      A. I would agree that that's a major feature
21  of the Teflon survey format, is asking respondents
22  their understanding between brand names and common
23  names.
24      Q. Okay. And that's what your survey tried
25  to do?

Page 208

1       A. That's what our survey did ask, was the
2   distinction between brand names and common names.
3       Q. As opposed to between descriptive and
4   generic names?
5       A. I don't --
6       Q. You weren't trying to --
7       A. Right. I --
8       Q. You weren't trying to distinguish in your
9   survey between descriptive and generic names, were
10  you?
11      A. I suppose that's irrelevant, or it's
12  not -- it's not part of the design. The survey
13  choice -- the survey answers here for the primary
14  questions are "brand name," "common name," and
15  "don't know." And it doesn't matter whether a term
16  is descriptive or coined or anything in terms of
17  asking those same three-answer choices.
18      Q. Okay. If you were to design and conduct a
19  new survey today, would you make any changes to the
20  one you designed and conducted in February of 2019?
21      A. No, I don't think so.
22      Q. If you were drafting your opening report
23  today, would you make any changes to the one you
24  submitted on March 1 of 2019?
25      A. I suppose we talked about materials

Page 209

1    considered, and I would amend that to include the
2    two documents that we talked about.
3        Q.  Any other changes?
4        A.  No, not as I sit here today.
5        Q.  And if you were drafting your rebuttal
6    report today, would you make any changes to the one
7    you submitted on April 1 of 2019?
8        A.  Not as I sit here today.
9        MR. ROMAN:  Thank you for your time.
10       THE WITNESS:  Thank you.
11       MR. HENN:  I don't have any questions.
12       THE VIDEOGRAPHER:  Okay.  This concludes
13   the video deposition of Matthew Ezell, consisting
14   of three DVDs.  The time is 12:45 p.m.  We are now
15   off the record.
16       (Proceedings adjourned at 12:45 p.m.)
17
18
19
20
21
22
23
24
25

Page 210

1    STATE OF CALIFORNIA        )
                                 ) Ss
2    COUNTY OF LOS ANGELES      )
3        I hereby certify that the witness in the
4    foregoing deposition was by me duly sworn to
5    testify to the truth, the whole truth and nothing
6    but the truth, in the within-entitled cause; that
7    said deposition was taken at the time and place
8    herein named; and that the deposition is a true
9    record of the witness's testimony as reported by
10   me, a duly certified shorthand reporter and a
11   disinterested person, and was thereafter
12   transcribed into typewriting by computer; that the
13   dismantling, unsealing, or unbinding of the
14   original transcript will render the reporter's
15   certificate null and void.
16       I further certify that I am not
17   interested in the outcome of the said action, nor
18   connected with nor related to any of the parties in
19   said action, nor to their respective counsel.
20       IN WITNESS WHEREOF, I have hereunto set
21   my hand this _____ day of _____.
22   Reading and Signing was:
23   X___ requested  __ waived  ___ not requested
24   _____
25       Grace Chung, CSR. NO. 6246, RMR, CRR

## CORRECTIONS TO DEPOSITION TRANSCRIPT

**NAME OF DEPONENT:** Matthew G. Ezell          DATE OF DEPOSITION: 04/17/2019

CASE NAME:  *The Reinalt-Thomas Corporation d/b/a Discount Tire v. Mavis Tire Supply LLC*

COURT: Northern District of Georgia, Atlanta          CASE NUMBER: **1:18-cv-05877-TCB**
Division

INSTRUCTIONS: Please note changes by listing the page and line number in the places indicated on this sheet and listing the changes in the right-hand column.  Attach additional sheets as necessary.

| PAGE NO. | LINE NO. | READS | SHOULD READ |
|---|---|---|---|
| 161 | 8 | type of market | type of mark |
| 184 | 18 | BY MR. HENN | BY MR. ROMAN |
| 187 | 4 | BY MR. HENN | BY MR. ROMAN |
| 205 | 10 | BY MR. HENN | BY MR. ROMAN |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

___✓___ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.

Signature: ___*M Ezell*___          Dated: ___5/7/2019___

1